IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CYNTHIA F. TONEY, | ) | |
| a/k/a CYNTHIA F. PASSMORE, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NUMBER: 2:06-CV-949 |
| | ) | |
| vs. | ) | |
| | ) | |
| MEDICAL DATA SYSTEMS, INC., | ) | |
| d/b/a MEDICAL REVENUE SERVICES, INC.,) | | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Plaintiff provides this summary of undisputed facts along with her argument and

analysis in support of her motion for summary judgment. The Plaintiff seeks summary judgment

based on the content of the Defendant's PL1 debt collection letter. A copy of the PL1 debt

collection letter is attached hereto as "Exhibit 1." Throughout the content of this brief, the PL1

debt collection letter may be referred to as the "PL1," the "dun," or the "Defendant's debt

collection letter." In addition to the PL1 letter, the Plaintiff also relies on the trial testimony of

Gary Ball, the Defendant's corporate representative. The Plaintiff further relies on the deposition

testimony of Gary Ball and the deposition testimony of various Defendant's employee debt

collectors. The trial testimony transcript occurred in the civil action styled James Cambron v.

Medical Data Systems, Inc., d/b/a Medical Revenue Services, Adversary Proceeding number 06-

01057, and Wendy Cambron v. Medical Data Systems, Inc., d/b/a Medical Revenue Services,

Adversary Proceeding number 06-01058. The Chapter 7 Trustee, William C. Carn, III, was

substituted as Plaintiff in both Adversary Proceedings. The style of the case is now Carn v.

Medical Data Systems, Inc., d/b/a Medical Revenue Services, Civil Action numbers 1:07-cv-369

and 1:07-cv-370.

    In Cambron, Judge William R. Sawyer submitted a proposed report and recommendation.

The Defendant objected to the proposed report and recommendation of liability. The Report and

Recommendation was subsequently reviewed de novo by the Honorable W. Harold Albritton in

Carn. The trial testimony refers to the testimony given by Gary Ball in the United States

Bankruptcy Court for the Middle District of Alabama. A copy of the relevant trial testimony is

attached hereto as "Exhibit 2," and is referred to as "trial transcript." The relevant portions of

Gary Ball's deposition are attached hereto as "Exhibit 3," and are referred to as "Ball

deposition." The individual Defendant's debt collector employees were are all deposed on April

6, 2007. Those debt collectors are hereinafter referred to as "Barbara Thomas, Richard (Larry)

Heath, Michelle Peacock, Shawn Smith, Denise Bobelak, and Tammy Schaffer." The relevant

portions of Barbara Thomas' deposition are attached hereto as "Exhibit 4;" the relevant portions

of Larry Heath's deposition are attached hereto as "Exhibit 5;" the relevant portions of Michelle

Peacock's deposition are attached hereto as "Exhibit 6;" the relevant portions of Shawn Smith's

deposition are attached hereto as "Exhibit 7;" the relevant portions of Denise Bobelak's

deposition are attached hereto as "Exhibit 8;" and, the relevant portions of Tammy Schaffer's

deposition are attached hereto as "Exhibit 9". The Plaintiff's "face sheet" is attached hereto as

"Exhibit 10."

## UNDISPUTED FACTS

1.    The Plaintiff filed the instant complaint on October 20, 2006.

2.    The Plaintiff's complaint alleges that the Defendant's PL1 debt collection letter violates various portions of the FDCPA.

3.    The Defendant is a debt collector as that term is defined under the FDCPA, 15 U.S.C. § 1692a(6). See Defendant's responses to Plaintiff's Requests for Admissions numbers 3, 4, and 5, wherein the Defendant admitted that it was a debt collector.  A copy of the Defendant's responses are attached hereto as "Exhibit 11."

4.    The Defendant was attempting to collect a medical debt allegedly owed by the Plaintiff to Medical Center Enterprise.

5.    The debt to Medical Center Enterprise is a consumer debt as that term is defined under the FDCPA, 15 U.S.C. § 1692a(3) & (5).  See Exhibit 11, Defendant's responses to Plaintiff's Request for Admission number 6, wherein the Defendant admits the debt is a consumer debt.

6.    The Defendant admits that it transmitted the PL1 debt collection letter, to the Plaintiff on April 19, 2006.  See Exhibit 11, Defendant's responses to Plaintiff's Request for Admission number 8, wherein the Defendant admits that it transmitted the PL1 debt collection letter on April 19, 2006.

7.    The Plaintiff's complaint alleges that the following portion of the Defendant's PL1 debt collection letter violates the FDCPA:

> "Medical Revenue Service is a collection agency, retained to
> represent the below named creditor. Since you have failed to pay

this obligation in full, we now must determine your ability to repay this debt. The information we may be seeking, if available, to determine what further collection effort to take is:

1.) Real estate ownership/equity      4.) Your source of income
2.) Personal property assets          5.) Automobile ownership
3.) Savings, checking balances        6.) Verification of employment"

Exhibit 1.

## ARGUMENT AND ANALYSIS

The FDCPA is a federal law passed "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). To accomplish its purposes, the FDCPA expressly prohibits debt collectors from engaging in numerous specific practices. 15 U.S.C. §§1692c, -d, -e, -f & -g.

The FDCPA is remedial in nature and designed to encourage consumers and attorneys to enforce compliance with the FDCPA by acting as private attorneys general. Martinez v. Law Offices of David J. Stern, P.A. (In re Martinez), 266 B.R. 523, 541 (Bankr. D. Fla. 2001) ("This provision is intended to encourage consumers and their attorneys to act as 'private attorneys general' in order to enforce the FDCPA. (citing Baker v. G.C. Services Corp., 677 F.2d 775, 780 (9th Cir. 1982)); Whatley v. Universal Collection Bureau, Inc., 525 F. Supp. 1204, 1206 (N.D. Ga. 1981)"); see also Yelvington v. Buckner, 1984 U.S. Dist. LEXIS 24890, 1-2 (D. Ga. 1984) ("The purpose of this section is to deter debt collection practices violative of this Act through the use of private enforcement ... (citations omitted)").

The FDCPA is a strict liability statute. Proof of one violation is sufficient to support summary judgment for a plaintiff. Clark v. Capital Credit & Collection Services, Inc., 2006 U.S. App. LEXIS 21594, *29-*30 (9th Cir. 8/24/2006); see also Russell v. Equifax A.R.S., 74 F.3d 30, 33 (2d Cir. 1996) ("Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages."); Hartman v. Meridian Financial Services, Inc., 191 F. Supp. 2d 1031, 1046-1047 (W.D. Wis. 2002) ("One false or misleading statement in a collection letter renders the entire communication false or misleading and constitutes one violation."); see also, Cacace v. Lucas, 775 F. Supp. 502, 505 (D. Conn. 1990); Traverso v. Sharinn, 1989 U.S. Dist. LEXIS 19100, *4 (D. Conn. Sept. 15, 1989); Picht v. Jon R. Hawks, Ltd., 236 F.3d 446, 451 (8th Cir. 2001); Bentley v. Great Lakes Collection Bureau, 6 F.3d 60, 62 (2nd Cir. 1993).

In light of the strict liability standard, Ms. Toney need not prove what the Defendant intended to convey in the PL1 letter. The only inquiry concerns the actual content of the PL1 letter as viewed through the eyes of the "least sophisticated consumer."[1] Furthermore, the Defendant's intent is irrelevant to this summary judgment inquiry if such intent is not readily apparent from the face of the PL1 collection letter. As evidenced by the trial testimony and deposition testimony, the Defendant's intent is rather vague and hazy. Under the FDCPA, there are no unimportant violations. Bentley at 63 (no non-actionable violations of FDCPA); Taylor v. Perrin, Landry, deLaunay & Durand, 103 F.3d 1232, 1234 (5th Cir. 1997) (failure "to comply with any provision of the FDCPA" leads to liability). Further, no proof of deception or actual

---

[1]Jeter v. Credit Bureau, 760 F.2d 1168, 1172-1173 (11th Cir. 1985)

damages is required to obtain statutory remedies. <u>Baker v. G.C. Services Corp.</u>, 677 F.2d 775, 780 (9th Cir. 1982).

## LEGAL STANDARDS

A.    <u>Summary judgment should be granted where there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law</u>

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). A material fact is one "that might affect the outcome of the suit under the governing law. . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Id.</u> The court must resolve all ambiguities and draw all reasonable inferences in favor the non-moving party. <u>Provenz v. Miller</u>, 102 F.3d 1478, 1483 (9th Cir. 1996).

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." <u>Celotex</u>, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of a element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id.</u> at 322. The moving party need not disprove matters on which the opponent has the burden of proof at trial. <u>Id.</u> at 317. The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a

genuine issue for trial." Fed. R. Civ. P. 56(e); <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475

U.S. 574, 585-88, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

B.    <u>FDCPA general liability standards</u>

A violation of the Fair Debt Collection Practices Act,[2] occurs when:  (1) the plaintiff has

been the object of collection activity arising from a consumer debt; (2) the defendant collecting

the "debt" is a "debt collector" as defined in the Act; and (3) the defendant has engaged in any

act or omission in violation of the prohibitions or requirements of the Act.  <u>Kolker v. Duke City</u>

<u>Collection Agency</u>, 750 F. Supp. 468, 469 (D.N.M. 1990); <u>Riveria v. MAB Collections, Inc.</u>, 682

F. Supp. 174, 175-76 (W.D.N.Y. 1988); <u>Withers v. Eveland</u>, 988 F. Supp. 942, 945 (E.D. Va.

1997); <u>Whatley v. Universal Collection Bureau, Inc.</u>, 525 F. Supp. 1204, 1206 (N.D. Ga. 1981).

1)    Medical debts are defined as consumer debts.

The Defendant, in its capacity as a debt collector, attempted to collect a medical debt.

Medical debts are widely acknowledged as consumer debts. *E.g.,* <u>Pipiles v. Credit Bureau, Inc.</u>,

886 F.2d 22 (2d Cir. 1989); <u>Healy v. Jzanus Ltd.</u>, 2002 WL 31654571 (E.D.N.Y. Nov. 20, 2002);

<u>Campion v. Credit Bureau Services, Inc.</u>, 2000 U.S. Dist. LEXIS 20233 (E.D. Wash., Sept. 19,

2000).  In its Request for Admissions, the Defendant, in response to admission request number

six, admitted that the alleged debt to Medical Center Enterprise was a consumer debt.

Defendant's Response to Plaintiff's Request for Admissions, Exhibit 11, Response 6.

2)    The Defendant is a debt collector.

---

[2]In her complaint, plaintiff is seeking relief pursuant to the Fair Debt Collection Practice Act, 15 U.S.C. §1692, *et seq.*, [FDCPA]

By its own admission, the Defendant is "a debt collector within the meaning of the term under the Fair Debt Collection Practices Act." Id. at Responses 3, 4, and 5.

    3)    Defendant mailed the PL1 debt collection letter to the Plaintiff on April 19, 2006.

At issue in this case is the language in the Defendant's form debt collection letter identified as the PL1 letter. A copy of that letter is attached hereto as Plaintiff's Exhibit 1. In response to the Plaintiff's Request for Admissions, the Defendant admits to mailing the letter on April 19, 2007. Plaintiff's Exhibit 11, Response 8.

    4)    In assessing liability under 15 U.S.C. §§ 1692e & e(10), the court views the offending language through the eyes of the "least sophisticated consumer."[3]

The PL1 offending language states as follows:

> Medical Revenue Service is a collection agency, retained to represent the below named creditor. Since you have failed to pay this obligation in full, we now must determine your ability to repay this debt. The information we may be seeking, if available, to determine what further collection effort to take is:
>
> 1.)    Real estate ownership/equity
> 2.)    Personal property assets
> 3.)    Savings, checking balances
> 4.)    Your source of income
> 5.)    Automobile ownership
> 6.)    Verification of employment

    5)    Courts use an objective standard in reviewing offending language.

In determining whether the Defendant's collection letter violates the FDCPA, the Court uses an objective standard based on the "least sophisticated consumer." Jeter v. Credit Bureau, 760 F.2d 1168, 1172-1173 (11th Cir. 1985); see also Bentley v. Great Lakes Collection Bureau, 6 F.3d 60, 62 (2d Cir. 1993) ("We apply an objective test based on the understanding of the "least

---

[3]Jeter v. Credit Bureau, 760 F.2d 1168, 1172-1173 (11th Cir. 1985).

sophisticated consumer" in determining whether a collection letter violates section 1692e.")

"The basic purpose of the least-sophisticated consumer standard is to ensure that the FDCPA

protects all consumers, the gullible as well as the shrewd." Clomon v. Jackson, 988 F.2d 1314,

1318 (2d Cir. 1993).

C.     The PL1 letter violates 15 U.S.C. § 1692e & e(10) with false deceptive representations.

    1)     PL1 letter is capable of multiple interpretations.

The PL1 letter is both explicit and implicit in its message. As to the six categories of

assets, every conceivable item of property is mentioned. Nothing is left to the imagination. The

listed assets are: 1.) Real estate ownership/equity; 2.) Personal property assets; 3.) Savings,

checking balances; 4.) Your source of income; 5.) Automobile ownership; and, 6.) Verification

of employment. The letter creates much confusion in stating its intent to gather information and

"determine what further collection effort to take." Specifically, the Defendant seeks information

pertaining to the listed assets.

The preface to the specific assets, however, creates much confusion. A reasonable person

might wonder how the Defendant intends to gain this information and who will be contacted.

The reasonable person, however, is not the standard. Instead, the "least sophisticated consumer"

is told that the six categories of assets may be reviewed. In determining "what further collection

effort to take," the who, what, when, where, why and how are left to imagination. The initial

thought may be, will the Defendant take the property without the consumer's knowledge? Or,

will the employer find out? Will the consumer's wages be subject to garnishment? Will the

Defendant empty out the bank account? Will the Defendant take the consumer's automobile?

What about the poor consumer on Social Security? Is it subject to attachment? The PL1 letter,

unfortunately, creates more questions than it does answers. As such, the consumer is never

informed that the Defendant only intended to call and inquire about a payment plan. That

explanation, however, is never mentioned.

To define deception, courts crafted a multiple interpretation definition as tending to

deceive. Wilson v. Quadramed Corp., 225 F.3d 350, 354 (3d Cir. 2000) (" a collection letter 'is

deceptive when it can be reasonably read to have two or more different meanings, one of which

is inaccurate.'" (citation omitted)); Russell v. Equifax A.R.S., 74 F.3d 30, 35 (2d Cir. 1996) ("In

addition, a collection notice is deceptive when it can be reasonably read to have two or more

different meanings, one of which is inaccurate.") The court in Russell goes on to hold that "the

initial collection notice . . . was reasonably susceptible to an inaccurate reading [and] was also

deceptive within the meaning of the Act." Id. See also Clomon v. Jackson, 988 F.2d 1314, 1319

(2d Cir. 1993) ("Courts have held that collection notices can be deceptive if they are open to

more than one reasonable interpretation, at least one of which is inaccurate.").

Summary judgement is appropriate here as the Defendant's PL1 debt collection letter

contains very real possibilities of multiple interpretations. Dutton v. Wolhar, 809 F. Supp. 1130,

1141 (D. Del. 1992) ("When analyzed in light of the least sophisticated debtor standard, the fact

that this language is susceptible to two plausible interpretations leads this Court to find in favor

of plaintiff. The least sophisticated debtor is not charged with gleaning the more subtle of the

two interpretations."). In Dutton, the Plaintiffs moved for summary judgment based on language

in a debt collector's dun. The court analyzed the phrase "once judgment is obtained" and

determined the language was false on its face. The court reasoned that "[s]uch a debtor would

believe this language represents that judgment would inevitably be obtained against him when in fact such an outcome would not be inevitable." Id.

In comparison to the case at bar, the Defendant warns of information it may be seeking "to determine what further collection to take . . . ." Deposition testimony, however, reveals that there is one and only one further collection effort and that is to telephone the Plaintiff. [Cambron/Carn, Trial Tr. 18:23-24] ("[a]ll of our business is done on the phone, not by letters, for all intents and purposes."); [Trial Tr. 19:2-3] ("[t]he vast, vast majority of the money that we collect is money that we collect by talking to the guarantor."). When questioned about "further collection efforts," the Defendant's representative testified that "we would continue making phone calls, . . . we will continue to make phone calls. . . we are just going to keep on trying to call them." [Trial Tr. 28:21-23, 29:5-6.] To clarify, Plaintiff's counsel asked the Defendant's representative: "Your further collection efforts, from what you're testifying to, simply means more calls, more letters?" The Defendant's representative responded: "[y]es unless something extenuating was to happen, yeah." [Trial Tr. 29:7-9.] The Defendant's corporate representative was unwavering in his responses. Contacting a potential debtor on the telephone was the primary mechanism for discovering these assets. Ball Dep. 71:14-23, 72: 1-5. Only in rare occasions did the Defendant pull a credit report because it cost too much. Trial Tr. 47:15-20. The expense Ball refers to is an .18¢ credit report inquiry. Ball Dep. 21:20-23.

By definition, the phrase, "to determine what further collection effort to take" along with the list of assets contains multiple possibilities. The reasonable consumer, let alone the "lease sophisticated consumer," may assume that assets are at risk. It is even reasonable to believe that the Defendant will make contact with third parties to talk about the recipient. How else can the

Defendant obtain source of income information or savings and checking balances without benefit of a third party contact? It is beyond reasonableness that the phrase can only be interpreted to mean that the Defendant will call and discuss the assets as a means for working out payment arrangements. The court in <u>Dutton</u> held that "[w]hen measured by the least sophisticated standard, Defendants' use of the phrase "once judgment is obtained" falsely represents Defendants' ability to secure judgment . . . ." <u>Id.</u> The court correctly granted summary judgment in the Plaintiff's favor as to the 1692e(10) claim. <u>Id.</u>

While courts recognize that the "FDCPA does not extend to every bizarre or idiosyncratic interpretation," the Plaintiff's allegations are far from bizarre or idiosyncratic. <u>Rosa v. Gaynor</u>, 784 F. Supp. 1 (D. Conn. 1989). If the PL1 describes a host of assets where the Defendant "may be seeking [information] . . . to determine what further collection effort to take . . . ," the "least sophisticated consumer," believes that the assets may be in real jeopardy; not to mention the embarrassment associated with making contact with third parties to obtain this information. The Defendant would have this Honorable Court believe that the list of assets will be examined only when the Defendant telephones the Plaintiff. The offending language, however, never mentions the Defendant's intent to telephone the Plaintiff to question her about the assets. During Ball's deposition, he was asked why the consumer was not informed of this simple meaning. That is, why doesn't the letter plainly state that the Defendant will call? Ball simply stated that the letter was authored by his partner over twenty years ago and he (Ball) never asked. Ball Dep. 81:19-23, 82:1-22.

Without benefit of the corporate representative's testimony, the statement regarding further collection efforts and the mention of assets leads one to believe that the Defendant will

conduct some form of asset search. Even the simplest of imaginations could fathom multiple possibilities, none of which involve the Defendant telephoning the Plaintiff and simply asking about the assets. To the contrary, the PL1 letter, by its very terms, elicits the most basic responses of fear, panic or embarrassment over the coming doom. In reality, the letter probably is meant to invoke a phone call from the recipient to telephone the Defendant to avoid the loss of property or avoid third party contact.

2)    There are no factual disputes concerning Defendant's collection tactics.

To be sure, there is no doubt as to the Defendant's collection procedure. That is, the Defendant attempts to get the debtor on the telephone and discuss payment arrangements. The Defendant, in very rare instances, performs a very limited asset search only when the individual collector believes a debtor is being untruthful. Ball Dep. 91:11-16, 92:5-18. Even then, the collector may go no further. Ball Dep. 89:21-23. The Defendant's representative testified that if a debtor tells them they have nothing, then collection stops. Ball Dep. 87:11-23, 88:1-11.

In summary, the Defendant telephones the debtor and attempts to obtain payment in full or set up a payment plan. If the debtor does not answer, or they cannot speak with the debtor, nothing further occurs.

3)    The content of the PL1 letter stands in sharp contrast to actual collection tactics.

The letter informs the Plaintiff of the Defendant's intent to gather information pertaining to six categories of assets. The reasonable assumption is that the letter applies to the Plaintiff's assets. In fact, item number four states "your source of income." On this issue, the letter is very personal. Nowhere is there a mention of using the assets as a means to assist in formulating a payment plan. In response to discovery, the Defendant provided the Plaintiff's "face sheet." A

debtor "face sheet" is "a print-out from [the Defendant's] computer collection system that gives the information [the Defendant has] stored on the account. It's what shows [debtor information] for a collector when he's working the account." Ball Dep. 9:16-20. The Plaintiff's "face sheet" is attached hereto as Exhibit 10. The contact between Defendant's collectors and Plaintiff reveals that there was no discussion of assets during the conversations. The contacts only mention a payment plan. At best, the sole reason for discussing assets during a telephone conversation was to formulate a payment plan. The collectors, if they actually talk to the debtor, attempt to establish payment plans. Smith Dep. 40:11-25; Bobelak Dep. 43:10-12; Peacock Dep. 17:15-18, 30:20-24. The true intent of the letter is important only in the sense that it shows that the Defendant has no intent to take any actions regarding the assets. The letter itself conjures up implied threats of asset seizure. The Defendant's representative and the collectors all echoed the same response. That is, if there was a discussion about assets, the information would be contained in the "face sheet."[4]

> 4)    The Defendant representative's testimony reveals that the PL1 letter contains a false representation.

---

[4] If information was gathered pertaining to real estate equity, the information would be contained either on the debtor face sheet or in the collector's head. Ball Dep. 61:22, 23, 62:1-6. Collectors are asked to put notations of the relevant points of the conversation in the software which is contained on the debtor face sheet. Ball Dep. 62:11-12. The Defendant's policy is that relevant information gained during a telephone conversation with a debtor is supposed to be [put input into] the collection software system which will then show up on the face sheet. Ball Dep. 63:1-3. Information regarding personal property assets discussed with a debtor during a collection call must be documented on the debtor's face sheet. Schaffer Dep. 28:15-18, 22-25; 29:1-7. Information pertaining to assets would be noted in the debtor's face sheet / Defendant's computer system. Heath Dep. 17:3-25; 18:1-21. Ownership of property would be noted in the computer system. Shawn Smith Dep. 26:20-25. All pertinent information obtained during a collection call is noted in the computer and is not stored anywhere other than the computer. Bobelak Dep. 31:7-25. Pertinent information is typed by the debt collector and stored in the collection software / face sheet. Bobelak Dep. 32:8-11.

The PL1 letter states that the Defendant will "determine what further collection effort to take. . . ." The letter, however, never mentions the Defendant will telephone the Plaintiff. The phrase "what further collection effort to take" coupled with the list of assets implies multiple possibilities. But, as the Defendant's representative testified, the Defendant only utilizes one collection effort and that is to telephone the Plaintiff. Trial Tr. 18:23-19:3. If the Plaintiff has no phone, does not answer, or avoids the Defendant, no other collection effort is initiated. That is to say, the Defendant only attempts telephone calls and nothing more. On this simple issue, the PL1 letter is false. The telephone call is a condition precedent to "further collection effort." The PL1 letter continues in its falsity because further collection effort is only defined as an initial telephone call. Moreover, as a secondary debt collector, the Defendant does not even return the account to the hospital for collection efforts that may be initiated by the hospital. Trial Tr. 12:7-24.

     5)     The individual debt collectors never search assets. At best, the collectors only seek a monthly payment plan.

Under 15 U.S.C. § 1692e, "Debt collectors may not make false claims, period." Randolph v. IMBS, Inc., 368 F.3d 726, 730 (7th Cir. 2004) (citing Russell v. Equifax A.R.S., 74 F.3d 30, 33 (2d Cir. 1996)); Clomon v. Jackson, 988 F.2d 1314, 1320 (2d Cir. 1993). The Defendant's PL1 letter utilizes false representations in attempting to collect the debt. It states "we now must determine your ability to repay this debt. The information we may be seeking, if available, to determine what further collection effort to take is: [six categories of assets listed]." The collectors, however, testified that they did not search for assets, did not inquire about the listed assets, or utilized only a small portion of the assets to assist in a payment plan when they

reached the debtor by telephone. Peacock Dep. 31:12-32:6, 43:2-5; Bobelak Dep. 46:1-16; Smith
Dep. 22:1-2. (e.g., using checking account to ask about check by phone).

The FTC commentary provides that a "debt collector may not state or imply that he or any
third party may take any action unless such action is legal and there is a reasonable likelihood, at
the time the statement is made, that such action will be taken (emphasis added). 53 Fed. Reg. at
50106. Under this charge, the Defendant must have a "reasonable likelihood" of taking such
action as to every debtor that it sends the PL1 letter. In any given year, the Defendant mailed out
1.8 million PL1 letters. Trial Tr. 15:16-23. To the contrary, the only possibility of such asset
review or inquiry only occurred when the individual debt collector reached the debtor on the
telephone. Ball Dep. 81:19-82:3. Under the standard set forth by the FTC, the Defendant, in
each instance of sending out the PL1 letter (1.8 million), must have a reasonable likelihood of
seeking the asset information listed in the PL1 letter. If the potential debtor is reached on the
telephone, each of the Defendant's debt collectors deposed in connection with this case, indicated
that they either did not ask about the listed assets or only asked limited questions for the sole
purpose of determining a payment plan. Peacock Dep. 31:12-32:6, 43:2-5; Bobelak Dep. 46:1-
16; Smith Dep. 22:1-2.

The FTC commentary further states that if the debt collector has reason to know there are
facts that make the action unlikely in the particular case, a statement that the action was possible
would be misleading. 53 Fed. Reg. at 50106. By its very terms, the PL1 letter is misleading.
According to the Defendant's own policies, first and foremost, the Defendant must reach the
Plaintiff on the telephone. Trial Tr. 18:23-19:3. Next, the Defendant, at best, only asks limited
questions in an attempt to obtain a payment plan. In the instant case, the Plaintiff's "face sheet"

contains no discussion whatsoever about assets. <u>See</u> "face sheet", Exhibit 10. Instead, the

discussion centers only around a $50 per month payment. Oddly enough, the collector never

asked about the "source of income." Exhibit 10. As the individual debt collectors testified, they

know little if anything about discovering assets and even then, the collectors are only concerned

with a payment plan. Peacock Dep. 31:12-32:6, 43:2-5; Bobelak Dep. 46:1-16; Smith Dep.

22:1-2. This argument, of course, goes to the intent of the PL1 letter as stated by the corporate

representative. This Honorable Court should not lose sight of the actual content of the letter.

Nowhere does the letter even mention a phone call from the Defendant. Instead, the only

mention of a telephone call is contained in the next to last paragraph of the PL1 letter where the

Plaintiff is invited to initiate the phone call.[5]

By its own admission, the Defendant rarely even questions a potential consumer about the

six categories of assets. During trial in the <u>Carn v. Medical Data</u>, on cross examination by the

Defendant's counsel, the following exchange occurred:

Q.    But in every case you are not going to have to go through all of [these six
      items]; are you?

A.    No, absolutely not.

Trial Tr. 37:7-9.

Apparently, unaware of the FTC commentary, Defendant is perfectly content to perform

some type of asset inquiry only in very limited circumstances. Nonetheless, the Supreme Court

finds the FTC Commentary particularly persuasive. <u>Chevron, U.S.A. v. Natural Resources</u>

---

[5]"If you have any questions, you may contact an account representative at the above listed phone number."

Defense Council, Inc., 467 U.S. 837, 844 (1984); see also Hawthorne v. Mac Adjustment, 140

F.3d 1367, 1372, n.2 (11th Cir. 1998). The Federal Trade Commission (FTC) is the primary

enforcement agency of the FDCPA under the Act. 15 U.S.C. §§ 1692l(a), 1692m. Congress

specifically charged the FTC with enforcement and administration of the FDCPA. See 15 U.S.C.

§ 1692l. The FTC has developed a Staff Commentary (hereinafter referred to as "the

Commentary") on the FDCPA. 53 Fed. Reg. 50097-50110 (Dec. 13, 1988). Although the FTC's

construction of the FDCPA is not binding on the courts, because the FTC is entrusted with

administering the FDCPA, its interpretation should be accorded considerable weight. See

Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).

     6)     The Defendant's use of the phrase "may" does not relieve it of liability.

The Defendant would have this Honorable Court believe that its use of the phrase "may"

offers it a safe passage through the FDCPA liability waters. The Defendant overlooks, however,

the clear mandate of "least sophisticated consumer." In attempting to define "may," even great

legal minds wrestle with the definition focusing more on the context than the actual definition

itself. United States v. Lexington Mill & Elevator Co., 34 S. Ct. 337, 340 (U.S. 1914) (In citing

Webster's Dictionary, the Court defined "may" as "'an auxiliary verb, qualifying the meaning of

another verb, by expressing ability, . . ., contingency or liability, or possibility or probability.'");

United States v. Cook, 432 F.2d 1093, 1098 (7th Cir. 1970) ("While it is true in construction of

statutes, and presumably also in the construction of Federal rules, that the word 'may' as opposed

to 'shall' is indicative of discretion or a choice between two or more alternatives, the context in

which the word appears must be the controlling factor.")

If reasonable legal minds grapple with the phrase "may," how is the non-lawyer supposed to interpret the PL1 meaning? What is meant when the Defendant says "[t]he information we may be seeking, if available, to determine what further collection effort to take . . ."? There is nothing facially clear by this phrase especially when six categories of assets follow. Another court wrestled with the seemingly benign phrase "legal review process" and found the dun letter violated the FDCPA. Drennan v. Van Ru Credit Corp., 950 F. Supp. 858, 860 (D. Ill. 1996) ("Unsophisticated consumers to whom [the debt collector] addresses such communications do not open their mail with Strunk and White's *The Elements of Style* at their elbows (for that matter, who does?)"). The court, in Drennan, posed the question, "[j]ust what is meant by "the legal review process," a term that is puzzling even to anyone schooled in the law. . . ." Id. The same should be asked here? Just what is meant by "the information we may be seeking, if available, to determine what further collection effort to take . . . ."? Coupled with the host of assets, the dun is rendered beyond comprehension. All sorts of possibilities arise. Maybe the Defendant wanted to leave it to the recipient's imagination.

Defendant contends that the use of the word "may" makes the implication non-deceptive. The Second Circuit in Bentley disagreed. Bentley v. Great Lakes Collection Bureau, 6 F.3d 60, 62 (2d Cir. 1993). There, the collection agency used the subjunctive "were our client" and such tenuous phrases as "could result", "might . . . include", "where applicable", "were not satisfied", "might be collected by attachment", "garnishment may also be an available remedy." The use of the word "may" does not make the letter non-deceptive to the "least sophisticated consumer;" to the contrary, as illustrated by Bentley, that usage reinforces the deception. Id. Pursuant to the FTC Staff Commentary, the assertion that something might happen cannot be made unless it

usually does happen. <u>Brown v. Card Serv. Ctr.</u>, 464 F.3d 450, 455 (3d Cir. 2006); <u>cf.</u> <u>United</u>

<u>States v. National Financial Services, Inc.</u>, 98 F.3d 131 (4th Cir. 1996) (where "literally millions

of notices were sent" and only 15 suits were ever filed, the Court found that creditors did not

intend to pursue the course of action threatened.)

D.    <u>The Defendant violated 15 U.S.C. § 1692e(5) threatening action it could not legally take</u>
      <u>and threatening an action it did not intend to take.</u>

In accordance with 15 U.S.C. § 1692e(5), a collection agency may not threaten to take

any act which it does not intend to take, is not able to take, or which is illegal. 15 U.S.C. §

1692e(5); <u>Bentley v. Great Lakes Collection Bureau, Inc.</u>, 6 F.3d 60 (2d Cir. 1993); Even the

threat that a third party might litigate is also inappropriate for a collection agency. <u>Pipiles v.</u>

<u>Credit Bureau of Lockport, Inc.</u>, 886 F.2d 22, 25-26 (2d Cir. 1989) (only action then

contemplated was attempt at telephone contact); <u>Bentley v. Great Lakes Collection Bureau</u>, 6

F.3d 60, 26 (2d Cir. 1993) (implied legal action was imminent when not in fact the case); <u>United</u>

<u>States v. National Financial Services, Inc.</u>, 98 F.3d 131, 138 (4th Cir. 1996) (false implication of

legal action).

The Defendant's PL1 form debt collection letter constitutes an implied "threat" within

the meaning of 15 U.S.C 1692e(5). While the FDCPA does not provide a definition of "threat,"

courts have applied the plain meaning of that term. In <u>Ferguson v. Credit Mgmt. Control, Inc.</u>,

140 F. Supp. 2d 1293 (M.D. Fla. 2001), that court defined "threat" as "a communicated intent to

inflict . . . loss on . . . another's property . . . [or] an indication of an approaching menace. <u>Id.</u> at

1299, (<u>quoting</u> Black's Law Dictionary 1489-90 (7th ed. 1999)). The court in <u>Ferguson</u> cited

numerous examples of threatening communications including "threats to sue, threats to garnish

wages and/or seize assets, threats to contact the debtor's neighbors and/or employer, threats to

subject the debtor to additional costs for collecting the debt, threats to investigate the debtor's

employment, and threats to transfer the account to an attorney for assessment." Id. at 1299-1300.

In the PL1 letter, the threat is implied based on the reference to the six categories of

assets, coupled with the failure to define "further collection efforts." The PL1 letter easily meets

the definition of "threat" as well as the examples of threatening communications set forth in

Ferguson. Id. Besides an implied threat, the question arises as to whether the threatened action

could "legally be taken" or was "intended to be taken." 15 U.S.C. § 1692e(5). The plain

language of the PL1 letter states that the "information" regarding the listed assets would be used

to determine "further collection effort." The statement "further collection effort" leads to the

implication that MDS intends to act upon one of the listed assets in order to collect on the debt it

alleges the Plaintiff owes.

Looking first at whether the threatened action could be "legally taken," seizures and

garnishments are only available to the Defendant as post-judgment remedies against a Plaintiff.

The Defendant, however, at no point obtained a judgment against any of the Plaintiffs. While it

is clear the Defendant could not legally take action against the Plaintiffs, it is equally as obvious

that the Defendant never intended to take such action. In his capacity as the Defendant's

corporate representative, Gary Ball previously testified that the Defendant does not file legal

actions in Alabama. Trial Tr. of Pro. 18:4-6. Therefore, there will never be a time when the

Defendant is entitled to seize or garnish the assets listed in the form debt collection letter.

Because the Defendant has not obtained a judgment against the Plaintiff, the Defendant has no

legal right to the listed assets. The listing of the specified assets is false, misleading and

deceptive in that the language leads the "least sophisticated consumer" to believe that the listed

assets are at risk. Jeter at 1172-1173. The Defendant violated 15 U.S.C § 1692e(5) by threatening to take an action that it could not legally take.

Based upon the testimony of Medical Data employees, it is also clear that the Defendant did not intent to take the threatened action. Quite simply, the Defendant did not intend to act upon any of these assets. The only action the Defendant ever intended to take, and in fact the only action the Defendant EVER takes is to continue calling the debtor. Ball Dep. 37:20-38:8, 71:14-72:5. Defendant did not even seek information regarding these assets when it called the Plaintiff. Despite speaking with the Plaintiff on several occasions, the Plaintiff's "face sheet" reveals that the Plaintiff was never questioned about any of the six assets. In fact, the Plaintiff wanted to set up a payment plan, yet the Defendant's collector never asked for the Plaintiff's source of income.

A "Debtor Face Sheet" is a printout from the Defendant's computer collection system that contains information regarding that account. Ball Dep. 9:16-19. Larry Heath is a collection supervisor for the Defendant. Heath Dep. 9:16-18, April 6, 2007. Mr. Heath stated that entering information on the computer is something collectors are trained to do (21:3-6), and that he would enter information he learned regarding a debtors assets in the computer. 21:16-21. More specifically, he would have noted information on the "face sheet" if he spoke with a debtor regarding automobile ownership (17:22-25), real estate ownership (18:1-3), checking accounts (18: 5-13), personal property assets (18:14-17), or additional sources of income (18:18-21).

The Plaintiff's "face sheet" is clear in that none of the Defendant's collectors questioned the Plaintiff regarding the assets listed on the PL1 letter. This is surprising because it is not

common practice for the collector to ask debtors about these assets. Peacock Dep. 31:12-32:6,

43:2-5; Bobelak Dep. 46:1-16; Smith Dep. 22:1-2.

Defendant's corporate representative testified under oath in Carn/Cambron that gathering

information about the listed assets are "things that we would normally do when we get a hold of

someone on the telephone, and those are the standard questions that the collector is asked to ask

when they talk to them...." Trial Tr. 24:17-20.

However, Denise Bobelak, the debt collector for MDS who worked on Plaintiff's account,

stated she does not ask debtors about real estate. Bobelak Dep. 42:23-25, April 6, 2007. She

further stated that she only asks about automobiles when setting up a payment plan. Id. at 44:

13-17. The only discussion of checking accounts occurs when she accepts a check over the

phone. Id. at 43:13-15. She does not ask about either savings accounts or other personal

property assets. Id. at 43:16-22. Of course, the PL1 letter is contradictory because it first

threatens to gather information regarding checking balances, but later informs the consumer we

also accept "check by telephone." She also stated she only asks about other listed assets in order

to set up payment plans. Id. at 46:1-16.

Other debt collectors working for MDS echoed Bobelak's position. Shawn Smith stated

that he does not ask about assets. Shawn Smith Dep. 22:1-2, April 6, 2007. Specifically, he

testified he would not have asked about automobiles, real estate, or personal property. Id. at

24:18-25:2. Smith would only ask about a checking account in order to take a payment check

over the telephone. Id. at 25:19-21. Further, he would not ask about a savings account. Id. at

25:22-25. Smith goes so far as to say he was never trained to search for assets aside from asking

if the debtor had a checking account. Id. at 27:1-3, 34:4-15, 35:1-3. Unlike Ms. Bobelak, Mr. Smith never even asked about assets when working out payment plans. Id. at 40:22-25, 41:1-3.

Barbara Thomas, another debt collector employed by the Defendant, stated she never asked debtors if they owned real estate (Id. at 26:23-25), an automobile (Id. at 27:1-3), a savings account (Id. at 27:4-6) or other personal assets (Id. at 27:7-9). Even while working a payment plan, she might ask about an auto payment (Id. at 28:5-6). She also stated she would not ask if additional real estate was owned (Id. at 31:10-21).

Ms. Thomas went on to explain that she felt that it is unimportant if real estate or personal property assets are owned by the debtor. 32:4-15. Also, she never asks about checking or savings account balances. Id. at 32:19-25. When asked about her training as a debt collector, she stated that she never received training regarding the discovery of assets or auto ownership. Id. at 34:16-19. This includes training to locate any assets or even pull a debtor's credit report. Id. at 34:22-35:22. She went on to state that she would never ask about checking account, savings account, or auto ownership because such matters are private. Id. at 41:25-42:25.

Although the Defendant's corporate representative believes the collectors are trained to ask about these assets on every call, it seems as though the collectors were never clued into the requirement. Indeed, it seems impossible for a collector to ask about all six categories of assets when each collector must make 120 telephone calls a day. Ball Dep. 62:13-17; Heath Dep. 16:8-13. Of the collectors deposed, Michelle Peacock stated that she had been trained to search for assets. Peacock Dep. 25:5-7, April 6, 2007. This training included contacting clerks of county courts to determine property ownership. Id. at 25:9-12. She goes on to state that she will only contact a county clerk in the event that the debtor owed more than $500. Id. at 28:4-20, 29:2-7.

Furthermore, she only contacts a county clerk when two other factors are present. Id. at 29:25-30:1. Those factors are "gainful full-time employment" (Id. at 30:2), and the debtor's refusal to set up a "reasonable payment arrangement" (Id. at 30:2-3). Ms. Peacock stated unequivocally that "[t]hose three must be present to prompt me to even think about it." Id. at 30:7-8. Any other training related to assets was merely "part of reviewing income versus expenses" for payment plan purposes. Id. at 31:12-32:6, 43:2-5.

Given the inconsistency of the Defendant's asset discovery training, or lack of such training, it is readily apparent that the Defendant never intended to discuss the assets listed in its PL1 letter with debtors. In the instant case, despite three contacts, the collectors did not evidence an intent to discuss the Plaintiff's assets. According to the Plaintiff's "face sheet," the Defendant's representatives spoke with the Plaintiff three times, never mentioning or gathering any information regarding assets. Obviously, this information would have been available through the Plaintiff, but the Defendant did not attempt to elicit such data. As such, the Defendant violated 15 U.S.C § 1692e(5) by threatening to take an act it simply never intended to undertake.

E.    Collateral Estoppel

1)    Prior litigation against Defendant based on PL1 letter

On April 18, 2006, James Cambron initiated an adversary proceeding against the Defendant, in the United States Bankruptcy Court based on the identical language of the PL1 letter. The lawsuit sought redress under 15 U.S.C. §§ 1692e; e(5) and e(10). Concurrent with the James Cambron Adversary Proceeding, Wendy Cambron also filed a Complaint in the Bankruptcy Court asserting the identical issues as James Cambron. Ultimately, the Trustee,

William C. Carn, III, intervened as Plaintiff in both Adversary Proceedings.  Both Complaints

were consolidated and tried to conclusion on March 15, 2007, before the Honorable William R.

Sawyer.  See Adversary Case Numbers 06-1057 & 06-105.  On April 5, 2007, Judge Sawyer

entered a Report and Recommendation finding liability against the Defendant for violating the

FDCPA.  The Report and Recommendations are attached hereto as "Exhibit 12."  The Defendant

timely objected to the finding of liability and the matter was reviewed de novo by the United

States District Court, Middle District of Alabama, pursuant to Rule 9033.  Fed R. Bankr. Pro.

On December 4, 2007, the Honorable Harold Albritton entered a "Memorandum Opinion

and Order," attached hereto as "Exhibit 13," in the consolidated action of Carn v. Medical Data.

In prefacing the issue before the court, Judge Albritton stated that "[t]he sole issue decided today

is whether this language violates the Fair Debt Collection Practices Act ("FDCPA"), which

prohibits, inter alia, the use of "any false, deceptive, or misleading representation or means in

connection with the collection of any debt."" See Exhibit 13 at 3, quoting 15 U.S.C. 1692(e).

In addressing preliminary issues, the District Court found that the "least sophisticated

consumer" standard is applied when "determining 'deception' under the FDCPA".  Order at 4.

The "least sophisticated consumer" standard is not applied when determining threats of

unintended action under e(5).  Id.  The District Court also found that violations of e(5) and e(10)

"warrant independent analysis under different standards."  Order at 7.

Looking first to the e(5) violation, the Judge Albritton concluded that "the language in

MDS's debt collection letter implied that, due to Plaintiff's failure to "pay this obligation in full,"

MDS would now begin seeking available information to determine which specific assets to go

after."  The Court went on to state that the PL1 letter "violates § 1692e(5) precisely because

MDS suggested that investigation into available sources in order to locate assets would be undertaken, and that collection efforts against assets would be taken . . . when MDS had no intention of doing so." The District court further stated that "the defendant's letter impliedly threatened to investigate the debtor's employment, contact others to find assets, garnish wages or seize assets, or take further collection efforts other than contacting the debtors, if they did not pay the debts, none of which it had any intention of doing."

The District Court then addressed the e(10) violation, finding that the Defendants PL1 letter was deceptive and therefore violated e(10). The Court summarized that "the language of the letter would still lead 'the least sophisticated consumer' to believe that their assets were endangered due to some type of impending collection action. This deception alone constitutes a violation of e(10) under the strict liability of the FDCPA." Order at 14.

Given the Court's findings upon its de novo review of the case, the Court found that the Defendant violated sections 1692e(5) and e(10) of the FDCPA. Based upon those findings, the District Court adopted the Report and Recommendation of the Bankruptcy Court and entered a final judgment against the Defendant.

2)    The Defendant is collaterally estopped from re-trying the issues pertaining to the PL1 debt collection letter.

The doctrine of collateral estoppel bars the Defendant from re-litigating the issue of whether its form debt collection letter is false, deceptive or misleading to the "least sophisticated consumer." See Sims v. Morris, 185 B.R. 939 (Bankr. N.D. Ga. 1994) ("Under the doctrine of collateral estoppel or issue preclusion, a party may be barred from re litigating an issue actually and necessarily litigated and decided in a prior action.")

To successfully invoke collateral estoppel, a party must demonstrate that: (1) the issue at stake in a pending action is identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the action; and, (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. See In re McWhorter, 887 F.2d 1564 (11th Cir. 1989) (citation omitted).

In the instant case, the issue at stake is identical to the one involved in the Carn/Cambron litigation: Does the Defendant's PL1 form debt collection letter violate the FDCPA? The language employed by the Defendant in each and every one of its PL1 letters is nearly identical. Trial Tr. 16:1-22. The language in question was also the basis of the rulings made by the Bankruptcy Court and the District Court in Carn/Cambron. Id. The only difference between the instant case and the issues in Carn/Cambron involves an additional claim under 15 U.S.C. § 1692e(4) which was not litigated in the Carn matter.

The section 1692e(5) & e(10) claims, however, were previously litigated in Bankruptcy Court and reviewed de novo by the District Court. After the District Court review, Judge Albritton entered a final judgment holding that the Defendant's PL1 form debt collection letter violated the FDCPA. The determination of whether the Defendant's PL1 letter violated sections 1692e(5) & e(10) was not only "a critical and necessary part of the judgment" it was the lone issues in those cases. The Defendant had a "full and fair opportunity to litigate the issues" and to fully brief the issues on review before the District Court. The Defendant was fully represented at

trial in the Bankruptcy Court and fully represented during the de novo review process in District Court.

Given that the issues at stake in the instant case are identical to the ones involved in Carn, the issues were fully and finally litigated. [Judge Albritton's decision in determining that the Defendant's PL1 debt collection letter violated the FDCPA is also a determination in the instant case that the Defendant's PL1 letter violates the FDCPA.] Because the Defendant had a full and fair opportunity to litigate the issue in Carn, the Defendant should be collaterally estopped from re-litigating this issue before this Honorable Court. As such, the issue is ripe for summary judgment.

      3)      Defendant's appeal of Carn does not interfere with court's ability to issue summary judgment or collaterally estop Defendant from re-litigating issues presented in Carn

The Defendant may argue that it chose to appeal the Carn decision to the Eleventh Circuit Court of Appeals. Such argument should have no impact on this Court's decision on summary judgment. Even with a strong argument and a weak decision from the District Court, neither of which the Defendant can claim, the Defendant faces long odds at the Eleventh Circuit Court of Appeals. According to the information provided by the Administrative Office of the United States Courts Statistics Division, the percentage of cases reversed by the Eleventh Circuit Court of Appeals is 9.1%.[6] The percentage of cases of a similar nature to the instant case and Carn reversed by the Eleventh Circuit Court of Appeals is 11.1%.[7]

---

[6] Administrative Office of The United States Courts, Statistics Division, *Federal Judicial Caseload Statistics*, (March 31, 2007), http://www.uscourts.gov/caseload2007/tables/B05Mar07.pdf.

[7] Id.

Further, in order for the Carn decision to be reversed, the Eleventh Circuit Court of Appeals would have to find that Judge Albritton's Memorandum Opinion and Order are "clearly erroneous." Fed. R. Civ. P. 52(a). Given the narrow scope of review of the Eleventh Circuit, and the Appeals Court's low reversal rate, the Defendant's confidence of victory on appeal seems ill-founded. The case history in Carn, including the well-reasoned Memorandum Opinion and Order entered by Judge Albritton, only serve to strengthen the Plaintiff's likelihood of success on appeal. In light of these facts, the likelihood of a reversal by the Eleventh Circuit Court of Appeals is negligible at best.

F.  Medical Revenue violated 15 U.S.C. § 1692e(4) by implying that nonpayment of the debt will result in the seizure, garnishment, attachment, or sale of Plaintiff's property or wages. Such implication was both unlawful and unintended.

15 U.S.C. §1692(e)(4) prohibits the following:

> "The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action."

The Defendant's PL1 debt collection letter implies that the Plaintiff's assets "may" be seized as the Defendant states its intent to determine "further collection efforts." The Defendant's letter lists four specific asset groups as well as information regarding the Plaintiff's employment and income. Further, it is clear that the Defendant's letter states, "[s]ince you have failed to pay this obligation we must determine your ability to repay this debt." The implication is that the assets will be used to satisfy the indebtedness. Given the circumstances, the "least sophisticated consumer" could reasonably believe that the defendant intended to seize, garnish, attach, or sell the Plaintiff's property or garnish the Plaintiff's wages. Even a reasonable person

would have cause for concern with all of the enumerated assets and threat of third party contact. [Section 1692e(4) requires the implication that non-payment will result in seizure, garnishment, attachment, or sale of Plaintiff's property or wages.] The implication is clearly present. The Defendant warned the Plaintiff that "you have failed to pay this obligation in full, we must [do the following]." In following exact wording of 1692e(4), the Defendant goes on to list property and wages with the implication that those items constitute "further collection effort[s]." In this instance, the reasonable juror is left with but one conclusion and that is the PL1 letter violates section 1692e(4). Clark v. Capital Credit & Collection Servs., 460 F.3d 1162, 1168 (9th Cir. 2006) ("Well-established canons of statutory construction provide that any inquiry into the scope and meaning of a statute must begin with the text of the statute itself.")

In Weiss v. Collection Ctr., 2003 ND 128 (N.D. 2003), the Supreme Court of North Dakota, while reviewing an appeal based upon summary judgment, was faced with a similar determination based upon a debt collector's threat to inquire about assets. In that case, the Defendant, CCI, sent the Plaintiff a debt collection letter stating, in relevant part, as follows:

> "PLEASE LET THIS LETTER SERVE AS ACKNOWLEDGMENT THAT OUR
> AGENCY HAS REQUESTED INFORMATION AND MADE AN INQUIRY TO
> THE MOTOR VEHICLE DEPARTMENT, REGARDING YOUR MOTOR
> VEHICLE(S)."

Weiss v. Collection Ctr., 2003 ND 128, P4 (N.D. 2003).

The Weiss Court opined that "[t]o demonstrate a § 1692e(4) violation, the Weisses must show (1) CCI represented or implied nonpayment of their debt would result in one of the above actions and (2) CCI could not lawfully take such action or did not intend to do so." Id. at 14.

In the instant case, the Defendant implies that the assets listed in the PL1 letter may be in jeopardy. The only way in which these assets could be threatened is via seizure, garnishment,

attachment, or sale.  As such, the Defendant's PL1 letter implies that one of these actions will be taken against the Plaintiff's property.  The Defendant, however, does not file lawsuits.  Trial Tr. 18:2-6.  The Defendant never takes any action other than repeated calls to debtors which stretch into perpetuity.  Trial Tr. 22:16-24, 18:23-19:3.  Based on this fact, it is apparent that the Defendant never intended to take any action which would lead to the "seizure, garnishment, attachment, or sale" of the Plaintiff's property or wages.  The Defendant, therefore, is in violation of 15 U.S.C. § 1962e(4).

G.    FTC Commentary

The Federal Trade Commission (FTC) is the primary enforcement agency of the FDCPA under the Act.  15 U.S.C. §§ 1692l(a), 1692m.  Congress specifically charged the FTC with enforcement and administration of the FDCPA.  See 15 U.S.C. § 1692l.  The FTC has developed a Staff Commentary (hereinafter referred to as "the Commentary") on the FDCPA.  53 Fed. Reg. 50097-50110 (Dec. 13, 1988).  Although the FTC's construction of the FDCPA is not binding on the courts, because the FTC is entrusted with administering the FDCPA, its interpretation should be accorded considerable weight.  See Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).  The 11th Circuit has also adopted this policy.  Pickens v. Collection Servs. of Athens, Inc., 165 F. Supp. 2d 1376, 1381 (M.D. Ga. 2001).

The Commentary views § 1692e(5) in a manner indicative of the plain text of that subsection, focusing almost entirely upon threats, the legality of the actions threatened, and the intent of the debt collector to take those actions.  53 Fed. Reg. 50106(1988).  The Commentary puts forth a well-reasoned explanation of what actions generally can and cannot be taken, some of which were discussed at length above.

In reference to § 1692e(10), the Commentary states that "[t]he prohibition is so comprehensive that violation of any part of [§ 1692e] will usually also violate subsection 10." Id. It also states that "[§ 1692e(10)], which prohibits the 'use of any false representation or deceptive means' by a debt collector, is particularly broad and encompasses virtually every violation, including those not covered by the other subsections." Id. at 50105. Therefore, every one of the enumerated violations under § 1692e falls within the scope of § 1692e(10).

Nowhere in the Commentary, however, does it state that claims arising from violations of multiple subsections are in any way dependant upon one another. On the contrary, it is clear that the Commentary views each and every violation as individual. Therefore, if a collection letter, or the language therein, may be violative of any of these subsections, the test for each subsection should be applied. The letter, or language therein, may fall short of one violation while fitting squarely inside another. The latter violation should not be discounted merely because the letter does not violate all sections that were tested.

## CONCLUSION

The Fair Debt Collection Practices Act balances the right of creditors to collect valid debts, against the right of consumers to be free from the harassment and avarice of debt collectors. The FDCPA also seeks to place debt collectors on a level playing field. All consumers are protected, whether financially burdened by events beyond their control, or merely impecunious or unwise in incurring debts. Medical Revenue is guilty of violating 15 U.S.C. §§ 1692e; e(4); e(5) and (10) by using false, misleading, and deceptive means in its attempt to collect the debt.

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that she be granted summary judgment on liability.

Respectfully submitted this **18**[th] day of January, 2008.

BROCK & STOUT

David G. Poston, Esq.
Walter A. Blakeney, Esq.
Michael D. Brock, Esq.
Gary W. Stout, Esq.
Post Office Drawer 311167
Enterprise, Alabama 36330
Tel: (334) 671-5555
Fax: (334) 671-2689
Email: christal@circlecitylaw.com

## CERTIFICATE OF SERVICE

I, the undersigned hereby certify that I have this date served a copy of the foregoing upon James C. Huckaby, Jr., Esq., J. Kirkman Garrett, Esq., John G. Parker, Esq., and Stefanie Jackman, Esq., via electronic mail at jch@hsdpc.com, jkgarrett@csattorneys.com, johnparker@paulhastings.com, and stefaniejackman@paulhastings.com, this **18**[th] day of January, 2008.

David G. Poston

**EXHIBIT "1"**

Medical Revenue Service is a collection agency retained to represent the below named creditor. Since you have failed to pay this obligation in full, we now must determine your ability to repay this debt. The information we may be seeking, if available, to determine what further collection effort to take is:

1.) Real estate ownership/equity
2.) Personal property assets
3.) Savings, checking balances

4.) Your source of income
5.) Automobile ownership
6.) Verification of employment

Unless you notify this office within thirty (30) days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within thirty (30) days from receiving this notice, this office will: obtain verification of the debt or obtain a copy of a judgement and mail you a copy of such judgement or verification. If you request this office in writing within thirty (30) days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

Please make your check or money order payable to Medical Revenue Service. In order to assure proper credit to your account, include the reference number with your payment. We also accept "check by telephone" for your convenience. If you have any questions, you may contact an account representative at the above listed phone number.

Pursuant to Section 807(11) FDCPA, this communication is from a debt collector and is an attempt to collect a debt. Any further information obtained will be used for that purpose.

A. U. Clancy
Collection Department

AUC/tb

| Account # | Client Name | Service Date | Balance | Patient Name |
|-----------|-------------|--------------|---------|--------------|
| E0323100026 | Medical Center Enterprise | 08/19/2003 | 55.00 | Passmore, Cynthia F |
| E0333200036 | Medical Center Enterprise | 11/28/2003 | 75.00 | Passmore, Cynthia F |
| E0322400161 | Medical Center Enterprise | 08/12/2003 | 447.65 | Passmore, Cynthia F |

TOTAL BALANCE: $577.65

*Cynthia Toney*
*6-24-64*
*SS# 418-06-83 9*

EXHIBIT "2"

1    financial controls.

2    Q.      Is Medical Revenue Services a debt collector?

3    A.      That is one of the processes that we do, yes.

4    Q.      And that is what we are here about today, is their

5    function as a debt collector; is that correct?

6    A.      That is affirmative.

7    Q.      What is a secondary debt collector?

8    A.      It is a term that we coined but has become more or

9    less standard phraseology in the industry where, when a debt is

10    not repaid, it used to go to a collection agency and that was

11    the end.  And the business that we developed was the account

12    goes to a collection agency.  If the collection agency is

13    unsuccessful in collecting the debt within a certain period of

14    time, it is then passed on to a secondary collection agency,

15    us, and we handle the account forever.

16    Q.      Okay.  You handle the account forever?

17    A.      That is correct.

18    Q.      What do you mean by that?

19    A.      The account stays on our records forever as long as

20    the client is with us.

21    Q.      So you continue to attempt to collect a debt

22    indefinitely?

23    A.      And credit report it until the statute says it can no

24    longer be credit reported.

25    Q.      Okay.  And Medical Revenue Services is a secondary

1    Q.      Approximately twenty-five years, okay.

2            MR. BROCK: Judge, I would move now to just go ahead

3    and admit both Plaintiff's Exhibit "A" and "B" and I think we

4    can stipulate to that.

5            MR. McGILL: Yes.

6            THE COURT:    Okay. Let me see if I have got this.

7    Plaintiff's "A" is a letter from Medical Revenue Services to

8    James Cambron, dated 4-19-05, and Exhibit - is this "A" and

9    "B?"

10           MR. BROCK: "B" is separate and it is dated 5-24-2005,

11   to Wendy Cambron.

12           THE COURT:    To Wendy Cambron, okay.  And those are

13   admitted.

14           MR. BROCK: Thank you.

15   BY MR. BROCK:

16   Q.      In the opening statement, your lawyer stated that this

17   letter is sent out to every single debt.  I mean, how many of

18   these letters does Medical Revenue Services send out a year?

19   A.      Give me just a second to answer that.  This would be

20   a very rough answer.

21   Q.      That's fine.

22   A.      Probably something in the vicinity of about 1.8

23   million.

24   Q.      So about 1.8 million letters annually, and Medical

25   Revenue Services operates in how many different states?

1    that we institute the lawsuit.

2    Q.       Well, my question to you is simple.   Does Medical

3    Revenue Service file lawsuits in the state of Alabama?

4    A.       I do not believe that we have a client in Alabama that

5    has us do lawsuits.   So, therefore, I believe the answer to

6    that is no.

7    Q.       And this letter that you send out is the initial

8    letter, Plaintiff's Exhibit "A" and "B" is the initial letter

9    that you send out on all accounts that are due the hospital; is

10   that correct?

11   A.       Yes.  Every account that we get, we have an obligation

12   to send out a letter on every account that we get.  And on the

13   vast majority of the accounts, the only letter that they will

14   get is this letter and, if we didn't have to send out letters,

15   we wouldn't send the vast majority of them out.

16   Q.       I am sorry.  What did you say?

17   A.       I said if it wasn't for the fact that we are required

18   by the Fair Debt Collection Practices Act to notify them by a

19   letter, the vast majority of these letters that are sent out,

20   we would not send out.

21           THE COURT:  Excuse me.  Then do you follow up with a

22   telephone call?

23           THE WITNESS:  Yeah.  All of our business is done on

24   the phone, not by letters, for all intents and purposes.

25   Q.       All of your business is done by the phone; is that

1    correct?

2    A.        The vast, vast majority of the money that we collect

3    is money that we collect by talking to the guarantor.

4    Q.        All right.  Now the letter states the information you

5    may seek, if available, to determine what further collection

6    efforts to take and then you list real estate ownership and

7    equity; is that correct?

8    A.        That is affirmative.

9    Q.        Okay.  Now my question to you is would foreclosing on

10   the Cambrons' home be a further collection effort?

11              MR. McGILL:  I would object, Your Honor.

12   A.        Yes.

13              MR. McGILL:  I don't understand the relevance of that

14   question.

15              MR. BROCK:  Well, I think it is -

16              THE COURT:  Excuse me.  I will overrule the objection.

17   Answer it again.  Why don't you re-ask the question?

18   BY MR. BROCK:

19   Q.        My question is, and I base this upon your letter, you

20   list real estate ownership and equity.  My question to you and,

21   again, Judge, the basis of this is a least sophisticated

22   consumer.  My question to you is would foreclosing or taking

23   the Cambrons' real estate be a further collection effort?

24              MR. McGILL:  I am going to again object and state to

25   Your Honor that there is nowhere in this letter that even

Ball - Direct                                          22

1   correct.

2   Q.      Okay.  And my question to you is -

3   A.      Sometimes unfortunately it will take a while before

4   action is taken on the account, before it even starts to be

5   worked.  That is why I can't - I can say it was in our agency

6   from that point in time.

7   Q.      But you were working on this case for almost four

8   years prior to the debtor filing bankruptcy; is that correct?

9   A.      Yes.

10  Q.      Okay.  And you have no idea whether or not Mr. Cambron

11  owned any real estate; is that correct?

12  A.      That is correct, yes.

13  Q.      Now is finding out whether or not a debtor has real

14  estate, is that available; is that information available?

15  A.      Yes.

16  Q.      Well, after four years, you don't have any idea

17  whether or not he owned any real estate?

18  A.      No one made a decision that it was worth spending the

19  money to research the account further from the way that the

20  account was being handled.

21  Q.      Well, why is it that you listed real estate ownership

22  and equity on your letter?

23  A.      Because it said "may."  We have one letter -

24  Q.      No, it says, "may, if available."  It is available.

25  I am a bankruptcy attorney.  I look up real estate all of the

Ball - Direct                                            24

1    Q.      What about automobile ownership?  Your letter states

2    that this is some information, number five, automobile

3    ownership.   Information we may be seeking if available to

4    determine what further collection efforts to take is automobile

5    ownership.   Did either Mr. Cambron or Mrs. Cambron own any

6    automobiles?

7    A.      I don't know the answer to that.  Your Honor, we are

8    going to go through six different questions here and I guess I

9    can answer all of them to say that, you know, we send out a

10   letter and it says we may do these things, and the answer is

11   no.  So we can take a lot of time asking it six times or we can

12   answer it no.

13   Q.      Okay.  So you are testifying in this case that you did

14   not do any of these six items listed on Plaintiff's Exhibit "A"

15   and "B" on either Mr. Cambron or Mrs. Cambron?

16   A.      Because I don't believe, and then I will have to maybe

17   stop here, those are things that we would normally do when we

18   get a hold of the person on the telephone, and those are the

19   standard questions that the collector is asked to ask when they

20   talk to them because that is how we collect our money, and it

21   would appear that we didn't get the opportunity to do that.

22   Q.      Over a four-year period, you didn't get the

23   opportunity to do that?

24   A.      That is correct.

25   Q.      So are you telling me that the only way you get the

1    to seize any of the assets of the Cambrons; is that correct?

2            MR. MCGILL: I will object to the question, Your Honor.

3    There is no statement that there is going to be any seizure.

4            THE COURT:  Overruled.

5    A.       Ask the question again.  I am sorry.  Please.

6    Q.       My question to you is Medical Revenue Service, at the

7    time of sending these letters, had no legal right to seize any

8    of the assets listed -

9    A.       At the time that the account was placed with us, it

10   was not placed simultaneously with a judgment already on it,

11   no.

12   Q.       And there was no judgment at the time of these

13   letters; is that correct?

14   A.       No, sir, not that I am aware of.

15   Q.       In your letter when you refer to further collection

16   efforts, what are you referring to if it is not to seize any of

17   the assets?

18   A.       Further collection efforts.  It means that we are

19   going to continue to try to collect on the account, and I could

20   go into a very, very long answer on that, which I don't think

21   we want to go too much, but it would be that we would continue

22   making phone calls, we will continue to keep the - we will

23   continue to make phone calls.  We will get further information

24   on the account frequently.  As you can see, this person here

25   has a regular flow of accounts coming to us and each time the

Ball - Direct                                29

1    account comes to us, there can be more information than there

2    was the last time when the account was placed with us.  The

3    person's financial position could have changed.  We might

4    actually get a good phone number on the second or third

5    placement, etc., so we are just going to keep on trying to call

6    them.

7    Q.    So your further collection efforts, from what you're

8    testifying to, simply means more calls, more letters?

9    A.    Yes, unless something extenuating was to happen, yeah.

10   Like if the account was - there is no sense going on.

11         THE COURT:  This may be off the point.  I am just

12   curious.  I see that the earliest entry on this Mr. Cambron

13   letter is 3-26-1997, was the date of the medical service.  How

14   long are hospital bills collectible in Alabama?

15         THE WITNESS: Well, this is -

16         MR. BROCK: It was way past the statute of limitations.

17         THE WITNESS: This is where you come to what is a

18   rather confusing answer and, typically speaking, there is a

19   difference between - if the question is how long can you sue a

20   person for, then it is your statute of limitations, which would

21   be like six or seven years, but most people feel that that does

22   not mean that there is not a moral obligation to continue to

23   pay.  The statute doesn't say that all debts are forgiven; it

24   just says that they are no longer legally enforceable.  But if

25   your conscience was to change, you still have a moral

1    A.       I am sorry?

2    Q.       When you send this letter out, you have got these six

3    things listed.

4    A.       Right.

5    Q.       That you may seek, if available?

6    A.       They are all things that we may do.

7    Q.       But in every case you are not going to have to go

8    through all of this stuff; are you?

9    A.       No, absolutely not.

10   Q.       Sometimes you can call people up and just get a

11   payment; can't you?

12   A.       Yeah, particularly, as I just answered, particularly

13   with co-pays if you can establish phone communication with them

14   and convince them that the amount is payable, in a large amount

15   of the circumstances they will pay the bill.

16   Q.       Okay.  Now Mr. Brock had asked you in the past about

17   filing lawsuits in Alabama.  I want to clarify that for the

18   judge and make sure he understands that situation.  When you

19   file a lawsuit, do you file it in the name of Medical Data or

20   do you file it in the name of the actual creditor?  Tell me how

21   the process works.

22   A.       Well, because we are representing the hospital, then

23   we will ultimately in some situations we will tell the hospital

24   that we think they should initiate suit against the individual

25   or sometimes the hospital will tell us that they think there

1    A.        I just answered that question, I think.

2    Q.        I missed it.  I apologize.

3    A.        Okay.  I said the Fair Debt Collection Practices Act,

4    my recollection of it - I don't have the act sitting in front

5    of me here - says that we have to notify the debtor that the

6    debt has been assigned to us and, as part of that notification

7    process, we also have to make sure that the letter includes the

8    specific wording that says unless you notify, dot, dot, dot.

9    Q.        And it doesn't require one through six, yes or no?

10   It does require it or it does not?

11   A.        It does not require it.

12   Q.        Thank you.  Did you pull a credit report?  You stated

13   that you report to the credit bureau.

14   A.        That's correct.

15   Q.        Did you ever pull a credit report for Mr. Cambron to

16   determine his ability -

17   A.        According to these, we did not, no.

18   Q.        You never did?  Why not?

19   A.        The debt collector decided that it wasn't worth the

20   expense to do it.

21   Q.        Okay.  So what is the expense?  I mean, do you have

22   to have an amount of debt before you will pull a credit report?

23   I mean, you would be able to tell about a person's assets from

24   his credit report; wouldn't you?  You would be able to tell if

25   he had a vehicle or owned any real estate?

**EXHIBIT "3"**

1    that Notice of Deposition?

2        A.    I provided you with what we were able to

3    provide you with.  Let's go through them and see if

4    you're missing anything.

5        Q.    Okay.  Well, as far as I can

6    understand -- and I'll go ahead and mark these as

7    well.

8

9            (Whereupon, Plaintiff's Exhibit 3 was

10            marked for identification and same is

11            attached hereto.)

12

13        Q.    I'm going to hand you what's been

14    previously marked as Plaintiff's Exhibit No. 3.

15    Can you tell me what that is?

16        A.    It's called a Debtor Face Sheet, and

17    it's just a printout from our computer collection

18    system that gives the information that we have

19    stored on the account.  It's what shows for a

20    collector when he's working the account.

21        Q.    Okay.  And we're here today on two

22    different matters:  One, James R. Cambron; and

23    another, Wendy L. Cambron.

1  data in the hospital's format.  And then they'll

2  put it through a system to rearrange the data and

3  sort it in such a manner -- put it into another

4  file so that the data is ready to load into our

5  collection system.  And now that account will also

6  be sent to the credit bureau and pull credit bureau

7  information on it, which will come back and be

8  loaded into the system and --

9       Q.    Let me stop you right there.  So on all

10 accounts that y'all receive --

11      A.    We have some parameters that we won't

12 do.  Like if the account balance is -- if the total

13 of all the accounts is less than $50 -- if we've

14 made a pull on the account in the previous six

15 months -- on the guarantor in the previous six

16 months.

17      Q.    So when you say you report it to the

18 credit --

19      A.    We don't report it.

20      Q.    Can you go over that again?  You do a

21 credit check?

22      A.    We make an inquiry.  We pay 18 cents an

23 account; and they load back to us alternate

1    Q.    Okay.  So four and a half months after

2    the first letter was sent out, a subsequent letter

3    was sent out?

4    A.    Yeah.

5    Q.    After reviewing Plaintiff's Exhibit

6    No. 3, can you tell whether or not a collector for

7    Medical Data Systems ever made telephonic

8    conversation with James Cambron?

9    A.    It looks like no answer, no answer.

10    They tried several times but were unable to -- I

11    don't see anything here where they have.

12    Q.    All right.  After --

13    A.    Let me just make sure I'm reading all

14    the notes.

15    Q.    Sure.  Again, I'm just looking for after

16    the letter that was sent out on April 19th, 2005,

17    Plaintiff's Exhibit No. 6.

18    A.    No.  There were several attempts, but

19    they were never able to talk to anybody.

20    Q.    So back to the general policy or

21    practices of collecting a debt by Medical Data.

22    After you send out the letters and make telephone

23    calls and attempt to collect the debt, what else

happens, if anything?

A.    They will continue to collect the data -- they will continue to attempt to collect the data.

Q.    By doing what?

A.    By repeated phone calls on the person, any updated information that comes from the hospital.  As you can see from this file, frequently, the person is coming back again and again.  And so there might be updated information that comes, like a new telephone number or whatever, which will allow them to get started on another path.

They might determine that, you know, from the looks of things here, we want -- but, basically, they just -- they sit out there.  The collector has got -- if the hospital hasn't placed new accounts with him for a couple of months, they're scrounging through all their old accounts, trying to rejuvenate them again.

Q.    So besides sending out letters and besides making telephone calls, what else, if anything, does your collectors do in attempt to

spoke to him.

Q.    You would ask the debtor whether or not he owns any real estate?

A.    Yes.

Q.    Does Mr. Cambron have any equity in his home?

A.    It's just part of that manual that you're going through, and I just brought it out as something to look at.

Q.    My question is --

          MR. McGILL:  Answer his question.

Q.    My question is, Does Mr. Cambron have any equity in any real estate?

          MR. McGILL:  To the best of your
          knowledge.

A.    To the best of my knowledge, at this point in time, I don't have an answer to that.

Q.    Well, if that information -- if Medical Data Systems had that information, where would it

62

1    be, if not in the face sheet?  What other

2    records -- are there other records that you did not

3    provide us that that information would be in?

4         A.    No.  It would be in here or in the

5    collector's head, if he had spoken to them and not

6    entered the notes into the system.

7         Q.    Does your policy require your collectors

8    to annotate any information they obtain from the

9    debtors, or are they allowed to keep it in their

10   head and not put it down on paper?

11        A.    They are asked to put notations of the

12   relevant points of the conversation.

13        Q.    And are they -- how many calls are your

14   collectors asked to make each day, according to

15   your manual?

16        A.    They're supposed to make -- a minimum

17   performance level is to attempt 120 attempts a day.

18        Q.    120 attempts a day?  And so your policy

19   is not, after making 120, that they maintain the

20   information in their head, it's that they put them

21   on the face sheet; is that correct -- if they

22   receive any information?

23        A.    Their policy is that they are to attempt

1  120 calls a day, and our policy is that they are

2  to -- when they're finished talking to a debtor, to

3  put the notes in the system.

4      Q.    So what you're telling me is the only

5  attempt that Medical Data Systems makes in order to

6  determine real estate ownership is to ask the

7  debtor?

8      A.    At that point in time, it could be

9  accomplished -- no.  That's not what I said.

10     Q.    Okay.  Well, then, correct me.  What

11  other -- I asked you if he owns any -- had any real

12  estate ownership, and you said you didn't know.

13  That's one of the questions you would ask the

14  debtor.  What other --

15     A.    I'm trying to answer your questions, and

16  you keep changing the question midstream between a

17  generic combination of all the debtors in the

18  world --

19     Q.    I'm specifically -- I apologize.  I'm

20  specifically only asking you questions -- and

21  that's why I preface it with Mr. Cambron -- only

22  Mr. Cambron.  Let's go back.  If I need to repeat

23  it, if you're confused -- does Mr. Cambron own any

do for a debtor?

A.    Now you're changing it.

Q.    Well, I have the right to do that, sir.
It's my deposition.  You're job is to answer the
questions.  My job is to ask the questions.

A.    I'm being very, very diligent at trying
to answer your questions.

Q.    Well, I don't understand what the
confusion is.  Let's start all over, then.  We'll
start all over, and we'll make this go out as long
as it takes so you'll understand my questions.  I
apologize for my inability to ask you a question
that you understand.

I want to know what Medical Data Systems does
to determine whether or not a debtor -- any debtor,
not just James Cambron -- has any assets.  One, I
know that they call the debtor and ask them, Hey,
do you have any assets?  Two, I know at times --
not with Mr. Cambron, but at times -- you pull a
credit report.  Three, I know you call neighbors
and ask, Does he live next door to you?  I don't
know if that's looking for an asset, but that was
the response I got to that question.

1    I would like to know what else does Medical

2    Data Systems do to determine whether or not any

3    debtor -- not just Mr. Cambron -- whether or not he

4    has any assets.

5    A.    You have covered the available basis.

6    Q.    Thank you.

7    A.    I think -- yeah.

8    Q.    Okay.  Let's switch over to Wendy

9    Cambron.  And you have previously testified that

10   you have never pulled the credit report.  Now, I am

11   going to repeat some of these questions simply

12   because I'm taking depositions for two cases at

13   this time.  Can you tell me whether or not

14   Ms. Cambron had the ability to pay this $175 debt?

15   A.    I can give you the exact same answers to

16   all those questions that you just asked about this

17   individual to this individual.

18   Q.    So you would have no idea whether or not

19   she had the ability to repay the debt?

20   A.    I can give you exactly the same answers

21   that I gave --

22   Q.    I'm taking the deposition for two

23   different people.

81

1    Q.    How long have you been in the collection

2    business?

3    A.    Ten years.

4    Q.    Ten years?  And you have no idea, as

5    you've stated -- and I'm reiterating -- that you

6    could discover whether or not an individual owned

7    an automobile through a public record or owned any

8    real estate through a public record?

9    A.    I would -- thank you for allowing me to

10   clarify that answer.  I don't know how to do it.

11   Q.    But do you know that it can be done?

12   A.    It would seem to be logical that it

13   could be done in some way.  I don't know how to do

14   it.

15   Q.    But the only steps that Medical Data

16   takes is to ask the client or through a credit

17   report; is that correct?

18   A.    That is correct.

19   Q.    Why is it in your letter, Plaintiff's

20   Exhibit No. 6 and 7, that you state that you are

21   going to determine what further collection effort

22   to take by asset ownership?  Why do you put that in

23   your letter?

82

1    A.    Those are all questions that we intend
2    to ask them.
3    Q.    Okay.  Well, if you intend to just ask
4    them on the telephone, why do you put it in your
5    letter?
6    A.    We're required by law to send them a
7    letter.
8    Q.    Why do you not put it in your letter
9    that you are going to ask them whether or not they
10   have any real estate ownership or equity or
11   whether -- you're going to ask them -- why do you
12   tell them in your letter that the information we
13   may be seeking, if available, to determine what
14   further collection effort to take is -- why don't
15   you -- if that's what you do, why don't you put it
16   in writing, that we're going to ask you whether or
17   not you own any land?
18   A.    This letter was written by my partner
19   about 20 years ago.  I never have asked him that
20   question, honestly.
21   Q.    You've never asked him that question?
22   A.    No.
23   Q.    Do you think it's possible that the

1    Q.    Okay.  From a debt collector's

2  perspective, is what I would like to know.  From a

3  debt collector's perspective -- do you know the

4  definition of unsophisticated consumer from a debt

5  collector's perspective?

6    A.    I have never seen an accepted

7  definition.

8    Q.    Okay.  That's fine.

9    A.    I would love to.

10    Q.    Well, I'll be happy to show you one.

11  Okay.  So if -- and this is a general debtor

12  question, not to Mr. Cambron or Ms. Cambron.  If

13  you call up a debtor and your collector says, Do

14  you own any real estate ownership?  He says, No.

15  Do you have any personal property assets?  He says,

16  No.  Do you have any savings and checking

17  balances?  He says, No.  Do you have any income?

18  He says, No.  Do you have any automobile

19  insurance?  He says, No -- to all these questions

20  that you have listed in your letter, what does

21  Medical Data Systems do?

22    A.    At that point in time, if the collector

23  has asked those questions, felt that he's got a

1    good answer, he would Z the account.

2        Q.    What does "Z the account" mean?

3        A.    Give up.

4        Q.    Okay.  Is that in your policy manual

5    that that's what he does?

6        A.    I think if you read through it -- I

7    haven't read that one.

8        Q.    And that's Plaintiff's Exhibit No. 5.

9        A.    Z is the end of the road.  In our

10   procedure, eventually, you have to stop your

11   efforts, other than credit reporting.

12       Q.    Well, my question is, If he answers no

13   to all those questions, does your policy manual --

14       A.    I don't know the answer to that.

15       Q.    You don't know?

16       A.    But I could tell you that most

17   collectors, at that point in time, would put the

18   account in Z.

19       Q.    Would they do that after the first

20   telephone call if they get a no to every one of

21   those answers?

22       A.    If I was on the phone with a -- if a

23   collector was on the phone with a debtor and the

1  debtor said that -- when they ask them -- because
2  they're going to ask them just from a -- you know,
3  look, we've got a debt here.  We've got a problem.
4  We've got to get this paid off somehow.  Do you
5  have -- that would be wonderful.  Do you have
6  equity here?  Is there something we could do with
7  that?  Do you have any assets?  We're going to be
8  looking for -- is there something they could get a
9  loan on to pay it?
10       If they said, We don't have any -- a
11  hypothetical question here -- we don't own the
12  property.  We're renters.  We don't have any
13  assets.  We rent our furniture.  We don't have any
14  checking -- I don't have a checking account.
15  Nobody will let me have a checking account.  My
16  employer pays me in cash.  I only make 50 bucks a
17  week.  I don't own a car.  My friends drive me
18  around -- and we've got nothing else at that point
19  in time, almost all of my collectors would say, I
20  give.
21       Q.    Okay.  So they just take the debtor's
22  word on it?
23       A.    That's correct.

1    to work through -- that a hundred percent of the

2    accounts that are placed with us -- we will pull an

3    automatic credit bureau on them because we've got

4    down to the point where it's 18 cents.

5        Q.    Anything else besides the credit report?

6        A.    No.

7        Q.    Do you call up Alabama Department of

8    Public Safety to determine any ownership interest

9    of an automobile on an account that's placed in

10    Alabama?

11        A.    I know that there are certain things

12    that certain collectors will do.  There are certain

13    things that certain managers will do that are --

14    embellishments, extensions -- that have different

15    degrees of resourcefulness to go after different

16    items.  There's a --

17        Q.    Is it the policy of Medical Data Systems

18    to call the Alabama Department of Public Safety on

19    an account that's in Alabama to determine

20    automobile ownership?

21        A.    On every account that's placed with --

22        Q.    On any account.  The policy of Medical

23    Data Systems.

1     A.    At this point in time, I think I would

2    probably have to answer no.  But to further expand

3    upon that answer, I've got five different offices

4    that could be handling accounts in Alabama.

5     Q.    And the policy now and in 2005 is that

6    you do not contact the county that the debtor

7    resides in to determine -- through the probate

8    court here in Alabama -- whether or not he has any

9    real estate ownership?

10     A.    I can answer to you that in the Sebring

11    office -- because that's the office that we're

12    referring to here.  It wouldn't be fair -- you

13    know, it wouldn't be appropriate for me to tell you

14    what the Alabama office does.

15     Q.    In the Sebring office --

16     A.    In the Sebring office, I did not see

17    anything in their operations manual that indicated

18    they were under the policy of doing that.

19     Q.    Okay.  But you would agree, as earlier,

20    that those avenues are available; correct:  Public

21    records of automobile ownership and real estate

22    ownership?

23     A.    Uh-huh.

**EXHIBIT "4"**

11

1    Q.   Has anyone told you what would be a correct

2  answer?

3    A.   No.

4    Q.   Have you been threatened with your job if you

5  gave an incorrect answer?

6    A.   No.

7    Q.   Have you reviewed any documents in preparation

8  for this deposition?

9    A.   No.

10    Q.   And speaking of documents, is that your

11  collection manual?

12    A.   Yes, sir.  Now, it's three and a half years old

13  so it's not like the other ones.

14    Q.   Okay.  And I'm not going to keep it.  I'm just

15  going to --

16    A.   That's fine.

17    Q.   In your job at Medical Data how are you

18  employed presently?

19        MR. McGILL:  What is your job?

20    Q.   What is your job title?

21    A.   I'm a medical bill collector.

22    Q.   Okay.  You work on the collection side?

23    A.   Yes, sir.

24    Q.   How long have you been there?

25    A.   Three and a half years.

1    Q.   Let's suppose that you've set up a payment plan

2  and the debtor makes ten timely payments but then

3  defaults and your next teammate calls that debtor and he

4  begins making ten more payments.  Who receives the bonus

5  for the second ten payments?

6    A.   The person who is assigned that facility.

7    Q.   And there are multiple people assigned

8  facilities?

9    A.   No.

10    Q.   Are you the only person that collects for --

11    A.   Lower Florida Keys?  Yes, sir.

12    Q.   So, for example, when you collected for Flowers

13  Hospital were you the only person assigned to Flowers

14  Hospital?

15    A.   Yes.

16    Q.   Will you be assigned a different hospital from

17  day to day?

18    A.   No.

19    Q.   Will it change from month to month?

20    A.   It could, yes.

21    Q.   It could change.  Okay.  I want to go back a

22  bit to your training and your day-to-day collections

23  with Medical Data.  When you get a debtor on the phone

24  do you ever ask them if they own real estate?

25    A.   No, sir.

1     Q.    When you get a debtor on the phone do you ever

2  ask them if they own an automobile?

3     A.    No, sir.

4     Q.    When you get a debtor on the phone do you ever

5  ask them if they own a savings account?

6     A.    No, sir.

7     Q.    When you get a debtor on the phone do you ever

8  ask them if they own any other personal assets?

9     A.    No, sir.

10         MR. POSTON:  Can we go off the record for just

11     a second, please?

12             (Discussion off the record.)

13     Q.    Now, Ms. Thomas, I'm a bankruptcy attorney,

14  have been a bankruptcy attorney, so I certainly

15  appreciate payment plans, so I'm sure that my clients

16  and the people you call are generally the same people.

17  So it wouldn't surprise me at all to know that when you

18  talk to debtors that they want payment plans.  Is that

19  an accurate statement?

20     A.    I'm sorry.  Would you say that one more time?

21     Q.    Is it safe to say that when you talk to debtors

22  that they will ask for payment plans?

23     A.    Yes.

24     Q.    When you are setting up a payment plan will you

25  generally ask them if they have a house payment?

28

1     A.   No.

2     Q.   You won't ask them if they have a house

3  payment?

4     A.   No.

5     Q.   Will you ask them if they have a car payment?

6     A.   It depends on the balance of the account.

7     Q.   Is there ever a threshold amount that you just

8  will not even work a payment plan?

9     A.   I would say under three hundred dollars.

10    Q.   You will not try to institute a payment plan?

11      MR. McGILL:  I think we're sort of leaving off

12    the rest of that.  Is the question you won't

13    institute a payment plan if it's under three hundred

14    dollars?  Is that what you mean?

15      MR. POSTON:  If I didn't say that correctly,

16    that's what I meant.

17      MR. McGILL:  Okay.  I just wanted to make sure.

18    A.   There's a couple of different ways you could do

19 that.  You could ask them if they would be able to defer

20 an auto payment for one month.

21    Q.   Okay.

22    A.   You would ask them if they would be able to do

23 seventy-five dollars for four months.  You would ask

24 them if they could do one fifty for two months.  There's

25 different ways that you work out a payment plan.

31

1    month.  You work with them.

2        Q.   During the payment plan process, during the

3    payment plan process, do you inquire about how much rent

4    they pay?

5        A.   Yes, we do try to base this on a monthly

6    income.

7        Q.   During the payment plan process do you inquire

8    about what their mortgage payment may be?

9        A.   Yes.

10        Q.   During the payment plan process do you ever ask

11    them if they own any other real estate?

12            MR. McGILL:  Aside from the house?

13            THE WITNESS:  Right.

14            MR. McGILL:  Is that the question?

15            MR. POSTON:  That is the question.

16        A.   No.  No.

17        Q.   Okay.  So if you called me and I said, "Look,

18    my mortgage payment is $2,005 a month," would you ask

19    me, for example, "Well, do you own any other real

20    estate?"

21        A.   No.

22        Q.   During the payment plan process do you ever

23    inquire about the amount of their car payment?

24        A.   Again, only to establish their monthly income

25    and deferring a payment.

Accurate Reporting Service, Inc.
863 382-4441

32

1  Q. So the car payment is pertinent in your mind if

2 there is the ability to defer a car payment?

3  A. Right.

4  Q. Is it important to you whether that debtor may

5 own vehicles that are paid for?

6  A. No.

7  Q. Is that important at all?

8  A. Not at all.

9  Q. Okay.  Is it important to you at all whether

10 that debtor may own real estate aside from a house

11 payment?

12  A. No.

13  Q. Is it important to you whether that debtor may

14 own other personal property assets?

15  A. No.

16  Q. Is it important to you how much money the

17 debtor has in his checking balance?

18  A. When you present that check to the bank it is.

19  Q. That's the only time that it's important?  Do

20 you ever ask the debtor, "How much money is in your

21 checking account?"

22  A. No.

23  Q. Do you ever ask them, "How much money is in

24 your savings account?"

25  A. Absolutely not.

34

1    "Do you have any disability income?"

2        A.   No.

3            MR. McGILL:  I'll object to that.  If they are

4        disabled they probably don't have any other income.

5        Q.   Assuming that the debtor works and assuming

6    that the spouse works, would you ever inquire about

7    child support income?

8        A.   No.

9        Q.   Would you ever inquire about annuity income?

10       A.   No.

11       Q.   Would you ever inquire about stock income?

12       A.   No.

13       Q.   So, in your mind, employment income is really

14   all that's relevant in trying to set up payment plans?

15       A.   Right.

16       Q.   Okay.  Fair enough.  During your training,

17   during your training, did you ever receive training on

18   how to discover an asset?

19       A.   No.

20       Q.   Do you know what an asset is?

21       A.   Something that is owned.

22       Q.   Yes.  Did you ever receive any training on how

23   to discover automobile ownership?

24       A.   No, sir.

25       Q.   Have you ever received any training on how to

35

1    search for real estate ownership?

2         A.    No, sir.

3         Q.    Have you ever received any training on how to

4    discover checking account balances?

5         A.    No, sir.

6         Q.    How about training on how to discover the

7    existence of a checking account?

8         A.    No, sir.

9         Q.    How about discovering the existence of a

10   savings account?

11        A.    No, sir.

12        Q.    Or a savings account balance?

13        A.    No.

14        Q.    Have you ever received any training on how to

15   discover a source of income apart from employment?

16        A.    No, sir.

17        Q.    In your employment do you ever pull a debtor's

18   credit report?

19        A.    No, sir.

20        Q.    Do you ever have the occasion to pull a credit

21   report?

22        A.    No, sir.

23        Q.    Would you even know how to pull a credit

24   report?

25        A.    No, sir.  For a debtor?  For myself?

41

1    A.    Yes, sir.

2    Q.    So nothing in that conversation led you to

3    believe that she was going to file for bankruptcy then?

4    A.    No, sir.

5    Q.    Suppose she had said that she was going

6    bankrupt, "I'm going to file bankruptcy," what would you

7    have typed in?

8    A.    B-k-r.

9    Q.    B-k-r.  Fair enough.  That looks like the last

10   contact that you had with Mrs. Vaughn.  Is that a

11   correct statement?

12   A.    Yes, sir.

13   Q.    If you had asked Mrs. Vaughn whether she owned

14   any real estate, would you have written it in there?

15   A.    Yes, sir.

16   Q.    If Mrs. Vaughn had told you that she owned a

17   car, would you have written it in there?

18   A.    Yeah.  Yes.

19   Q.    If Mrs. Vaughn had told you that she had money

20   in her checking account, would you have written that in

21   there?

22   A.    I probably would have asked the team leader on

23   that because that would probably -- that's personal

24   information and I'm not sure on that.

25   Q.    So, in your mind, asking about checking

42

1    balances and savings account balances is of a private

2    nature and that you should not be inquiring about them?

3        A.    Right.

4            MR. McGILL:  I'll object.

5        Q.    Is that a correct --

6            MR. McGILL:  I don't know exactly what you

7        said, but I'll let you clarify.

8        Q.    Is that a correct statement?

9        A.    I'm sorry?

10        Q.    Okay.  Would you never ask a checking account

11    balance because you believe that to be private?

12        A.    Right.

13        Q.    Would you never ask a savings account balance

14    because you believe that to be private?

15        A.    I wouldn't ask it either whether it was

16    private.  I just wouldn't ask it.

17        Q.    Thank you.

18        A.    That's none of my business.

19        Q.    Okay.  Could the same be said about

20    automobiles?  And that is, would you never ask whether

21    they owned a car free and clear?

22        A.    Right.

23        Q.    You believe that also to be none of your

24    business?

25        A.    That is correct.

EXHIBIT "5"

9

1      Q.    What were the nature of the depositions?

2      A.    Primarily in the area of -- most of them were

3   concerning vehicle accidents that employees that

4   reported to me were involved in.

5      Q.    Have you given any depositions in connection

6   with being employed as a collector?

7      A.    No.

8      Q.    Have you ever been employed as a collector

9   other than at Medical Data?

10     A.    No.

11     Q.    Fair enough.  How long have you been at Medical

12  Data?

13     A.    Since December of 2003.

14     Q.    How long did you work as a collector?

15     A.    About six to eight months.

16     Q.    And since that time you have been working in a

17  supervisory capacity?

18     A.    Primarily, yes.

19     Q.    Tell me again when you started.

20     A.    December 2003.

21     Q.    So through June of '04 you were a collector and

22  after that you were a supervisor?

23     A.    Approximately, yes.

24     Q.    Mr. Heath, in your capacity as a collector have

25  you ever had the occasion to talk to debtors who owed

16

1    A.    No, I do not know that.

2    Q.    Have you ever seen any of your co-workers fired

3    because they were not making enough phone calls?

4    A.    No.

5    Q.    So that really is more of a suggestion then,

6    the number of calls?

7    A.    It was a goal.

8    Q.    It was a goal.  Tell me again what the goal

9    was, the number of calls per day.

10    A.    I don't honestly remember during that period of

11    time.

12    Q.    Do you know what it is today?

13    A.    Our goal today is in the area of 120 calls.

14    Q.    Do you recall if that's changed since you were

15    a collector?

16         MR. McGILL:  If you know.

17    Q.    Yes.  Sure.  If you know.

18    A.    I really don't recall what the goal was then,

19    so I don't know.

20    Q.    When you would contact a debtor and you would

21    obtain the information from the debtor, would you key it

22    directly into the computer or would you write it down?

23         MR. McGILL:  Do you understand where he's

24    going?

25         THE WITNESS:  No.

1          MR. McGILL:  Okay.  Well, let's ask him to

2     rephrase it.  You seem to be questioning him.

3          Q.  As a collector you would talk to a debtor.  You

4     have got the telephone or either a headset.  The debtor

5     gives you information.  Would you write it down or would

6     you type it directly into the computer at the time?

7          A.  Situational.  It depends on the situation.

8          Q.  Okay.  Again, not meant to be a trick question.

9     It's just simply your habit.

10          A.  I understand.  Situational again.  If it was a

11     credit card payment it was written down in hard copy.

12     If it was conversation, then it was reported on the

13     computer.

14          Q.  So you're one of those guys that would type it

15     out as you went?

16          A.  Yes.

17          Q.  Okay.  Some of your co-workers apparently write

18     it down.

19          A.  Okay.

20          Q.  And then they type it in.

21          A.  No, no.  I would type it in as I went.

22          Q.  Okay.  Typically you would type it in.  If you

23     talked to someone about automobile ownership would you

24     have written it down on the computer?

25          A.  Yes.

18

1     Q.   If you talked to someone about real estate

2  ownership would you have written it down on the

3  computer?

4     A.   Yes.

5     Q.   If you talked to someone about the amount of

6  money they had in their checking account would you have

7  written it down on the computer?

8     A.   Not the dollar amount, only that they

9  acknowledged they had an account.

10     Q.   If they acknowledged they actually had money in

11  the checking account would you have noted that fact on

12  the computer?

13     A.   A valid checking account, yes.

14     Q.   If they told you that they had other personal

15  property assets would you have noted that on the

16  computer?

17     A.   Yes.

18     Q.   If they told you that they had a source of

19  income besides employment would you have noted it on

20  their face sheet?

21     A.   Yes.

22     Q.   Fair enough.

23         (Plaintiff's Exhibit No. 11 was marked for

24  identification.)

25         MR. POSTON:   Plaintiff's Exhibit Number 11.

21

1    days, whatever.  That's what it means, it reassigned the

2    days.

3        Q.    Would you say that entering information in the

4    computer is something that you as collectors are trained

5    to do?

6        A.    Yes.

7        Q.    Would you agree that all -- I'm not going to

8    use the word "pertinent".  Would you agree that data

9    pertaining to a wide variety of topics is entered on the

10   computer during the collection of the accounts?

11       A.    I'm not sure of wide variety.

12       Q.    He doesn't like my word "pertinent" today.

13   He's objected to it.

14           MR. McGILL:  It's just subjective, that's all,

15       but whatever.

16       Q.    In relation to collection of accounts,

17   information that the debtor tells you regarding assets

18   would be entered on the computer?

19       A.    I would have, yes.

20       Q.    You would have?

21       A.    (Witness nods head.)

22       Q.    I think everyone has testified to that today.

23           MR. POSTON:  That's it.  That's all I've got.

24           MR. McGILL:  All right.  I guess we are done

25       with you.

EXHIBIT "6"

17

1    you, but I'm talking about where you either go into a

2    classroom setting, whether you view a videotape, whether

3    you listen to a lecture, any type of training of that

4    magnitude, have you had any other training in the

5    collection process since that time?

6        A.    Yes.

7        Q.    You have?  Would you tell me about that?

8        A.    We periodically have group forums.

9        Q.    Tell me about a group forum.

10       A.    They are small group forums --

11       Q.    Yes, ma'am.

12       A.    -- specifically of our team members, so there's

13   anywhere from seven to ten individuals.

14       Q.    Okay.

15       A.    We strategize about different talk-offs, better

16   verbiage to use, techniques to resolve debts, collection

17   of debts, how to work with a debtor on establishing

18   payment plans and payment arrangements.  We've had

19   meetings regarding changes in policies and practices,

20   things that we would currently be doing that would be

21   modified or changed to a new process.  We would meet and

22   go over the new technique.

23            Anything from the wording of the mini-Miranda,

24   the presentation of it, the sequence of when you contact

25   someone, to general information about changes in the

1      expanding --

2      Q.   Okay.  Your first week of training did not

3   consist of locating assets?

4      A.   No.

5      Q.   Okay.  Since that time have you had any

6   training about locating assets?

7      A.   Yes.

8      Q.   Tell me about it.

9      A.   In assessing eligibility for referral to legal

10   status, I was trained how to contact the clerk of county

11   court to determine if there was physical property

12   ownership.

13      Q.   And when did that training occur?

14      A.   Twelve to eighteen months ago.

15      Q.   Twelve to eighteen months ago.  Okay.  Have you

16   ever contacted the clerk of court pertaining to the

17   location of personal property assets?

18      A.   Could you be more clear?

19      Q.   You said you had some training pertaining to

20   the location of assets, some subsequent training to your

21   initial training.

22      A.   Uh-huh.

23      Q.   And you had some training regarding contacting

24   the clerk of court regarding the location of assets.  Is

25   that a true statement?

1  an account, a debtor is going to owe a certain amount of

2  money.  Fair enough?

3      A.  Absolutely.

4      Q.  Is there a certain amount of money that a

5  debtor should owe before you will contact a clerk of

6  court regarding land ownership?

7      A.  Yes.

8      Q.  What is that amount?

9      A.  In my particular circumstance it's a minimum of

10 $500.

11     Q.  So your testimony is that anything over $500

12 you might contact the clerk of court to determine land

13 ownership?

14     A.  I might, yes.

15     Q.  And anything under five hundred you would not

16 contact the clerk of the court?

17     A.  No.

18     Q.  Would you say that you never contact the clerk

19 of court for anything under $500?

20     A.  Yes.

21     Q.  Or, stated another way, you do not contact the

22 clerk of court for any debt less than $500?

23         MR. McGILL:  Ever --

24         MR. POSTON:  Ever.

25         MR. McGILL:  -- during the history or life of

29

1    the account?

2    Q.   If you receive an account for less than $500

3  will you contact a clerk of the court to determine land

4  ownership?

5    A.   I would not contact the clerk of court

6  regarding ownership with a debtor balance less than $500

7  ever.

8    Q.   Okay.  Thank you for clarifying that for me,

9  because I told you that I had trouble getting these

10  questions just right.  Thank you.

11        Okay.  Now, let's then just talk about accounts

12  over $500.  Now, is it safe to say you do not contact

13  the clerk of court for every debtor that you're

14  collecting on?

15    A.   I do not contact them for every debtor.

16    Q.   Obviously, if you called me and you said that I

17  owed you $1,500 and I said, "Here you go," there would

18  be no need to contact them?

19    A.   Absolutely.

20    Q.   Why waste your time, right?

21    A.   Take your money, yes, sir.

22    Q.   Okay.  So, what circumstance -- you're an

23  experienced collector, I know that.  What circumstance

24  would prompt you to contact the clerk of court?

25    A.   The criteria of account balance owed by the

1    debtor, whether it's one or collectively five hundred,

2    gainful full-time employment, and a refusal to make any

3    type of reasonable payment arrangement.

4        Q.    Okay.  In your mind that's going to be the top

5    three right there?  There may be others, but that's the

6    top three?

7        A.    Those three must be present to prompt me even

8    to think about it.

9        Q.    So if a debtor is not employed, you would not

10   contact -- let's go through those three.  I'm just going

11   to set up a hypothetical.  A debtor owes $10,000, the

12   debtor tells you he's not employed and he would be more

13   than happy to pay you ten dollars a month.  Would you

14   contact the clerk of court under that scenario?

15       A.    First, I wouldn't be required to qualify him.

16       Q.    Because?

17       A.    Because a ten-dollar monthly payment on a

18   $10,000 balance isn't reasonable.  It would take over a

19   hundred years to pay that.  That's not reasonable.

20       Q.    Okay.  Fair enough.  But if he told you, "All I

21   can pay is ten dollars a month because I'm not

22   employed" --

23       A.    I would still have to attempt to qualify him

24   for a reasonable payment arrangement.

25       Q.    But if he said, "Look, ten dollars is all that

31

1    I've got, all I can pay," would you contact the clerk of

2    court to determine real estate ownership?

3        A.    At that point, age, prior history on the

4    account, would come into play.  The high balance on the

5    account would come into play.

6        Q.    Sure.

7        A.    And more often than not I believe I would.

8        Q.    Fair enough.  Now, let's back up a second. Now

9    we're talking about training.  Okay?  You said that you

10   have been trained on contacting the clerk of court

11   regarding land ownership.  Have you received any other

12   training regarding assets?  Since your initial training

13   have you received any other training?

14       A.    Regarding assets in general?

15       Q.    Regarding assets in general, yes, ma'am.

16       A.    Yes.

17       Q.    You have?  Would you tell me about that,

18   please?

19       A.    In our qualification process to determine

20   reasonable payment plan arrangements --

21       Q.    Yes, ma'am.

22       A.    -- we review income versus expenses.

23       Q.    Yes, ma'am.

24       A.    Part of reviewing income versus expenses

25   includes actual wage income, obviously.  When you're

1   qualifying the expenses would be mortgage, rent, car

2   payment, insurance payment, health benefits, child

3   support and other things that an individual would

4   qualify as required monthly expenses and then you have a

5   ratio of what's available to make a reasonable payment

6   out of what's left.

7       Q.   Okay.

8       A.   So obviously, because of that process, you are

9   obtaining information they own their home or they are

10  owning it, trying to own it --

11      Q.   Sure.

12      A.   -- or they are paying on a vehicle, just to

13  qualify them on that income expense ratio.

14      Q.   Okay.  So if I get a picture, if I get a

15  picture here of the collection process, when you're

16  dealing with a debtor you are dealing with someone who

17  is -- obviously, you are first trying to get the payment

18  in full.  That doesn't occur, then you are falling back

19  on a secondary position to try to determine a payment

20  plan.

21      A.   A reasonable payment arrangement, yes, sir.

22      Q.   What you call a reasonable payment arrangement.

23  You yourself are not going to just take any old payment

24  plan?

25      A.   No, sir.

43

```
 1        A.    No.

 2        Q.    So really the determination of personal

 3   property assets and real property, land assets, comes

 4   about during the monthly payment assessment process?

 5        A.    The initial payment process.

 6        Q.    The initial payment process.  Do you have an

 7   instinct for when someone is lying?

 8        A.    Absolutely.

 9        Q.    I believe you.  I really do believe you.  So if

10   you thought someone was lying -- "I'm not working.  I

11   live with my mama, and all I've got is social security."

12   If you had the idea that they were lying, what would you

13   do at that point?  Besides refer them to legal, what

14   would you personally do at that point?

15        A.    At this point I put it in SA status because I

16   get a credit report.

17        Q.    SA status then generates a credit report?

18        A.    Uh-huh.

19        Q.    Okay.  How long have you had the ability to put

20   an account in SA status?

21        A.    Twelve to eighteen months.

22        Q.    Twelve to eighteen months?  Prior to that --

23        A.    Nope.

24        Q.    -- you never got a credit report?

25        A.    No.  I'm sorry.
```

**EXHIBIT "7"**

1    ask -- when you called on the telephone did you ask

2    debtors about their assets?

3         A.    No.

4         Q.    Okay.  Thank you.

5              (Plaintiff's Exhibit No. 3 was marked for

6    identification.)

7         Q.    I want to hand you what's been marked as

8    Plaintiff's Exhibit 3 and ask you if you know what that

9    is?

10        A.    Face sheet.

11        Q.    Okay.  For simplistic purposes can we say that

12   the face sheet refers to activity on a debtor's account?

13        A.    Yes.

14        Q.    In your capacity as a collector did you enter

15   information into a computer system?

16        A.    Yes.

17        Q.    And that information entered into the computer,

18   would that be reflected on that face sheet?

19        A.    Yes.

20        Q.    Do you know of any other location where

21   information that you as a collector would enter into the

22   computer would be located other than on a face sheet?

23        A.    No.

24        Q.    What is the name of that debtor?

25        A.    Matthew Ellsworth.

1      course of the conversation?

2      Q.   Other than what's generally contained on the

3   talk-off.

4      A.   It would have been basically what was on it.

5      Q.   What generally was on the talk-off?

6      A.   (Witness nods head.)

7      Q.   Okay.  If you had reached Mr. Smith, what's

8   generally your first question to Mr. Smith?

9      A.   Find out if it is who I'm calling.

10      Q.   How would you do that?

11      A.   Ask him if it's Mr. Smith.

12      Q.   What else would you have asked him?

13      A.   If he said yes, verify that it was him.

14      Q.   Would you have asked him his date of birth?

15      A.   Or his social.

16      Q.   Or his social security number?

17      A.   Yes.

18      Q.   If you had reached Mr. Smith would you have

19   asked him whether he owned any automobiles?

20      A.   No.

21      Q.   If you had reached Mr. Smith would you have

22   asked him if he owned any real estate?

23      A.   No.

24      Q.   If you had reached Mr. Smith would you have

25   asked him if he owned any other personal property

25

1    assets?

2        A.    No.

3        Q.    If you had reached Mr. Smith would you have

4    asked if he worked?

5        A.    Yes.

6        Q.    If he said that he did work would you call him

7    at work?

8        A.    Yes.

9        Q.    If you called him at work would you have spoken

10   with anyone other than Mr. Smith?

11       A.    Only to leave a message for him.

12       Q.    Only to leave a message?  Would you have talked

13   about Mr. Smith's business with any of his co-workers?

14       A.    No.

15       Q.    If you had reached Mr. Smith would you have

16   asked him if he had a checking account or savings

17   account?

18       A.    Yes.

19       Q.    You would have?  What would have been the

20   purpose of asking him about that?

21       A.    To pay the bill with a check over the phone.

22       Q.    What if Mr. Smith had told you that he did not

23   have a checking account, would you have asked him if he

24   had a savings account?

25       A.    No.

26

1    Q.   Would you have asked Mr. Smith if he owned any

2    cars free and clear?

3    A.   No.

4    Q.   Would you have asked him if he owned any real

5    estate free and clear?

6    A.   No.

7    Q.   If that information had been available to any

8    collector would that have been entered into the

9    computer?

10       MR. McGILL:  I'll object to the question as to

11       any collector.  I mean, you're asking him to testify

12       as to what --

13       MR. POSTON:  I understand.

14       MR. McGILL:  -- other collectors may or may not

15       do.

16       MR. POSTON:  I understand.

17       MR. McGILL:  That's something that may be

18       discretionary.  Answer if you can.

19   BY MR. POSTON:

20   Q.   Would you expect to see ownership of property

21   on these notes if you were looking through there?

22   A.   If they got the information from them, yes.

23   Q.   Would you view the ownership of property as

24   important information to enter in the computer?

25   A.   Yes.

27

1     Q.   Mr. Smith, have you ever had a class at Medical

2  Data about searching for assets?

3     A.   No.

4     Q.   Let me go back to some general questions.  Have

5  you ever testified before?

6     A.   No.

7     Q.   Have you ever given a deposition?

8     A.   No.

9     Q.   Have you ever even been in a courtroom?

10    A.   No.

11    Q.   Do you ever want to be in a courtroom?

12    A.   No.

13    Q.   Did you ever work for any other collection

14  companies beside Medical Data?

15    A.   No.

16    Q.   In your present job as research are you paid a

17  salary or are you paid by the hour?

18    A.   By the hour.

19    Q.   How many hours a week do you work?

20    A.   Forty.

21    Q.   In your job as a collector were you paid by the

22  hour or were -- were you paid by the hour as a

23  collector?

24    A.   Yes.

25    Q.   Were you also paid a commission based upon how

34

1    say your primary goal was to get the person to pay

2    money?

3        A.    Yes.

4        Q.    During your collection process were you ever

5    trained to ask about automobiles?

6        A.    No.

7        Q.    During your collection process were you ever

8    trained to ask about real estate?

9        A.    No.

10       Q.    And during your collection process were you

11   ever trained to ask about personal property?

12       A.    No.

13       Q.    During your collection process were you ever

14   trained to ask about checking?

15       A.    Yes.

16       Q.    And when you would ask them about checking what

17   would you ask them?

18       A.    If they have a checking account.

19       Q.    If a debtor told you they had a checking

20   account, what would you then say?

21       A.    Would you like to pay it with a check.

22       Q.    And suppose the debtor said no, what would you

23   ask then?

24       A.    If they could mail in a money order or --

25       Q.    If the debtor said that, "Hey, I don't have a

1    checking account," were you ever trained to ask them for

2    a savings account number?

3        A.    No.

4            (Plaintiff's Exhibits No. 4 and No. 5 were

5    marked for identification.)

6            MR. POSTON:  I'm doing a better job of getting

7        these introduced into evidence.

8        Q.    I want to hand you what has been marked as

9    Plaintiff's Exhibit Number 4, which is Leticia Andrews.

10           THE WITNESS:  Give these to her?

11           MR. POSTON:  Yes, please.  Thank you, sir.

12       Q.    That one is pretty short and sweet, huh?

13       A.    Yes.

14       Q.    Did you make contact with Mrs. Andrews by

15   telephone?

16       A.    No.

17       Q.    Does it appear from the face sheet there was

18   ever any contact made with Mrs. Andrews?

19       A.    No.

20       Q.    Would you pass her that exhibit?  I'm going to

21   hand you now what has been marked as Plaintiff's Exhibit

22   5, which is Jeffrey Dixon.

23           MR. POSTON:  That particular face sheet will be

24       used through some other depositions and so I'm going

25       to ask that it not be put as part of this record

40

1  we're lawyers we call them cases.  You may call them

2  accounts.  When you get a new account do you have any

3  duties as a researcher?

4      A.   Just to go in the hospital site and see what

5  information there is if there is any.

6      Q.   Do you periodically do that as well?

7      A.   For every account.

8      Q.   For every account you periodically go in and

9  look for new information, is that correct?

10     A.   Yes.

11     Q.   When you were a collector did you ever work out

12 payment plans?

13     A.   Yes.

14     Q.   Do you recall in general how that went?  I know

15 it's been six months since you've done that.  What do

16 you recall about doing payment plans?

17     A.   If they couldn't pay the full amount, try to

18 get what they can do over a certain period of time.

19     Q.   And how would you get that from them?

20     A.   They would either do a check with us or send it

21 in.

22     Q.   In order for them to qualify for doing a

23 payment plan do you have to do anything to find out

24 about their assets, what they have?

25     A.   At the time I didn't.

1    Q.    Well, did you ever have to ask them about what

2    maybe their payments were for a home, that you recall?

3    A.    Not that I recall.

4        MR. McGILL:    Okay.    That's all I have.    I guess

5    you're done.

6                        STIPULATIONS

7        IT WAS STIPULATED BETWEEN counsel for the

8    respective parties, with the consent of the witness,

9    that reading and signing of the foregoing deposition by

10   the witness be waived.

11       THEREUPON, the deposition of SHAWN SMITH, taken

12   at the instance of the Plaintiffs, was concluded at

13   11:05 a.m.

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT "8"

31

1    Q.    Would you say never?

2    A.    Never.

3    Q.    Okay.  Is that also a no-no?

4    A.    Excuse me?

5    Q.    I said is that also prohibited?

6    A.    Right.  We can't leave anything on the desk.

7    Q.    Any pertinent information that you obtain from

8    a debtor, is it noted in the computer?

9    A.    Yes.

10   Q.    Is there ever information stored anywhere other

11   than in the computer?

12   A.    No.

13   Q.    Like is there a second computer system or a

14   second face sheet?

15   A.    That, I don't have knowledge of.

16   Q.    Okay.

17   A.    But everything gets shredded or noted in the

18   computer.

19   Q.    So if you receive pertinent information from a

20   debtor, is it safe to say that you would enter it into

21   the face sheet -- or enter it into the computer?  Excuse

22   me.

23   A.    Yes.

24   Q.    So, for example, anything the debtor said you

25   would write down in notes?

32

1    A.    Anything?

2    Q.    Yes.

3         MR. McGILL:  Are you asking if she verbatim

4    types out a conversation?

5         MR. POSTON:  I'm not asking --

6         MR. McGILL:  I think the answer to that

7    question would be no.

8    Q.    I'm not asking you did you verbatim.  I'm

9    saying pertinent information regarding the debtor, is it

10   written down in the notes?

11   A.    It should be.

12   Q.    So any relevant information pertaining to the

13   debtor would be in the notes?

14        MR. McGILL:  I'm going to object to the word

15   "pertinent" because that's something that an

16   individual would determine on an individual basis.

17   What is pertinent to you is not pertinent to her.

18   But, other than that objection, you can answer if

19   you can.

20   A.    Yes.

21   Q.    What information might you not put into the

22   computer?

23   A.    If they discuss their medical --

24   Q.    Problems?

25   A.    -- problem, concern, I can't put that in there.

42

1   Medical Data require that you do to verify employment?

2       A.    You can call the employer and ask for the

3   debtor.

4       Q.    Okay.  Is there any other method by which you

5   would verify employment?

6       A.    No.

7       Q.    Is that all you would do is call the employer?

8       A.    (Witness nods head.)

9       Q.    Would that satisfy your verification by simply

10  calling and asking to speak to the debtor?

11      A.    For me, yeah.

12      Q.    What if the employer said, "I've never heard of

13  that person," what would you say next?

14      A.    Okay.  Thank you.

15      Q.    What would you enter into the notes if the

16  employer said, "I've never heard of that person?"

17      A.    No one by that name.

18      Q.    In looking at those notes on that face sheet

19  there, if it was discovered that Mrs. Passmore owned

20  real estate, would that information have been written on

21  that face sheet?

22      A.    No.

23      Q.    Do you personally ask the debtor whether she

24  owns real estate?

25      A.    No.

43

1      Q.  Do you personally ask the debtor whether she

2  owns an automobile?

3         MR. McGILL:  And these are just general

4    questions in every circumstance --

5      Q.  In your collection --

6         MR. McGILL:  -- or at any point in time in her

7    efforts to collect?

8      Q.  In your collection process with any debtor do

9  you ask them do they own an automobile?

10     A.  When we're qualifying for a payment plan there

11  are questions that we ask to get to a reasonable

12  payment, monthly payment from them.  We're helping them.

13     Q.  During your collection process do you ask

14  whether they own a checking account?

15     A.  When we take a check over the phone, yes.

16     Q.  During your collection process do you ask if

17  they own a savings account?

18     A.  No.

19     Q.  During your collection process do you ever ask

20  the debtor, "What other types of personal property do

21  you own?"

22     A.  No.

23        MR. McGILL:  Again, asking for at any point at

24    all during any possible --

25        MR. POSTON:  During her collection process --

44

1        MR. McGILL:  -- any possible --

2        MR. POSTON:  I'm leaving that open-ended.  I'm

3    not talking about just Mrs. Passmore.  I'm asking

4    her what she does during her collection process.

5        Q.    If you were to call a debtor trying to collect

6    and the debtor says, "I'm not working," do you ask them

7    if they have any other sources of income?

8        A.    Again, it's all so individual.

9        Q.    Okay.  Suppose a debtor tells you, "I'm not

10   working right now and I'm living alone," would you ask

11   her if she had any other source of income?

12       A.    Probably not.

13       Q.    During the payment plan process you said you'll

14   ask them about automobile ownership?

15       A.    No.  I ask, "Do you have a car payment?"  See,

16   we're trying to work out a payment plan for them that

17   they can work out with them.

18       Q.    Do you have a worksheet that you fill out for a

19   payment plan?

20       A.    Yes.

21       Q.    You do?

22       A.    Yes.

23       Q.    Is that worksheet furnished by Medical Data?

24       A.    Yes.

25       Q.    Is it in your collection manual?

45

1    A.    No.    They are on my desk.

2    Q.    So in the payment plan that's on your desk is

3    there a budget for you to work through in determining a

4    payment plan?  Is that -- to simplify the process that's

5    there, do you start with income and then deduct

6    expenses, is that --

7    A.    Yes.

8    Q.    -- a simplified explanation?

9    A.    Monthly income, monthly expenses.  Sometimes we

10   break down the monthly expenses to work out a reasonable

11   payment plan for them.

12   Q.    When you're asking them about an automobile, do

13   you ask them what type of automobile?

14   A.    No.

15   Q.    No?  Do you ever ask them if they own an

16   automobile outright?

17   A.    No.

18   Q.    Do you ever ask them if they own any land or

19   other property outright?

20   A.    No.

21   Q.    You're simply concerned with the amount of

22   payments that they have?

23   A.    Utilities, groceries, insurance, mortgage.

24   Q.    Being a bankruptcy attorney I have asked that,

25   I don't know, several thousand times in my life.  I

46

1    appreciate that.  But apart from the payment plan do you

2    ever ask or inquire about real estate ownership?

3         A.    No.

4         Q.    Apart from the payment plan process do you ever

5    ask about automobile ownership?

6         A.    Well, I say, "Do you have a car payment?"  I

7    don't put it your way, no.

8         Q.    Like, "Do you own any cars outright?"

9         A.    No.

10        Q.    Do you ever ask them that?

11        A.    No.

12        Q.    You have never asked them that?

13        A.    No.

14        Q.    Apart from the payment plan process do you ever

15   ask them if they own any other personal property?

16        A.    No.

17             MR. POSTON:  That's about all I have.

18                        STIPULATIONS

19        IT WAS STIPULATED BETWEEN counsel for the

20   respective parties, with the consent of the witness,

21   that reading and signing of the foregoing deposition by

22   the witness be waived.

23        THEREUPON, the deposition of DENISE BOBELAK,

24   taken at the instance of the Plaintiffs, was concluded

25   at 10:06 a.m.

**EXHIBIT "9"**

1        A.    No.

2        Q.    You wouldn't have to ask if they've got any

3   sort of real property?

4        A.    No.

5        Q.    Or any sort of personal property?

6        A.    No.

7              MR. McGILL:  Okay.  That's all I needed to

8        clear up.

9                    REDIRECT EXAMINATION

10  BY MR. POSTON:

11       Q.    Would it be a requirement of Medical Data, as

12  far as training goes, that any contact regarding

13  personal property assets be listed on this face sheet?

14             MR. McGILL:  Say that again.

15       Q.    Would Medical Data require any of its

16  collectors to list information regarding personal

17  property assets on this face sheet if it was discussed

18  during a collection call?

19             MR. McGILL:  That assumes a need to request it

20       on Boswell, but I'll let you answer the question if

21       you can.

22       A.    I would say yes.  Every conversation, whatever

23  is said, has to be documented.

24       Q.    So any discussion regarding automobiles must be

25  documented?

1     A.    Correct.

2     Q.    Any discussion regarding real estate must be

3  documented?

4     A.    Correct.

5     Q.    Any discussion regarding employment

6  verification must be documented?

7     A.    Yes.

8     Q.    Did you ever have the occasion to deal with

9  bankruptcy accounts?

10    A.    Meaning documenting them or personally calling?

11    Q.    Yes, documenting.

12    A.    Yes.

13    Q.    As a research analyst do you get information

14  pertaining to bankruptcies?

15    A.    It's usually either on the account already --

16    Q.    Okay.

17    A.    -- or it's in the hospital files.

18    Q.    And I guess that's really my question.  If the

19  hospital reports bankruptcy are you the person, as a

20  researcher now, are you the person that keys the

21  information in?

22    A.    Yes, in the notes and also on what we call the

23  edit screen, additional information which is on the

24  top -- well, it's on the top of his where it says

25  "Additional Information".

**EXHIBIT "10"**

03/06/2007        **Medical Data Systems, Inc. / dba Medical Revenue Services**        2:06PM
**Debtor Information Face Sheet**

**PASSMORE, CYNTHIA F**

| Debtor Name | Client Code | Client Number | |
|---|---|---|---|
| PASSMORE, CYNTHIA F | 03590 | Medical Center Enterprise | |
| Street Address | P.O. Box, Suite Number, Mailbox Number | | Telephone Number |
| 43 SOUTHLAND TRAILOR | | | (334) 670-0573 |
| City, State Zip Code | Current Employer | | Employer Telephone |
| TROY, AL 36079-0000 | | | |

| Date Of Birth | Social Security | Placement Date | Lit Days | Extension | Status | Letter Assigned | Last Activity |
|---|---|---|---|---|---|---|---|
| 06/24/1964 | 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 | 01/30/2006 | 1 Days | 09/06/2006 | Z | | 03/06/2007 |

Additional Comments
FLD CHAP 13 DT FDL 11-11-02 CS# 02-12547 ATNY MICHAEL D BROCK PH# 334-393-4357

| Account N° | Service Date | Placement Date | Account Status | Amount Placed | Total Payments | Total Adjustments | Current Balance | Patient Name |
|---|---|---|---|---|---|---|---|---|
| E0323100026 | 08/19/2003 | 01/27/2006 | | $55.00 | $0.00 | $55.00 | ½ $0.00 | PASSMORE, CYNTHIA F |
| E0333200036 | 11/26/2003 | 01/27/2006 | | $75.00 | $0.00 | $75.00 | $0.00 | PASSMORE, CYNTHIA F |
| E0322400161 | 08/12/2003 | 01/27/2006 | | $447.65 | $150.00 | $297.65 | $0.00 | PASSMORE, CYNTHIA F |
| **Total Accounts:** | | | | **$577.65** | **$150.00** | **$427.65** | **$0.00** | |

Debtor Notes

| Date | Note | Name |
|---|---|---|
| 02/16/2006 | Charge Status Set to RBAL | Betty Morris |
| 02/16/2006 | Debtor Status Changed From UL To P1 | Betty Morris |
| 02/16/2006 | Insurance Paid Balance Due By Guarantor | Betty Morris |
| 02/16/2006 | Insurance Paid Balance Due By Guarantor | Betty Morris |
| 02/16/2006 | Checked Facility For Additional Info | Betty Morris |
| 02/16/2006 | Checked Facility For Additional Info | Betty Morris |
| 02/16/2006 | Checked Facility For Additional Info | Betty Morris |
| 03/23/2006 | Charge Status Changed From RBAL To INSX | Monica Marquez |
| 03/23/2006 | Talked To Guarantors Insurance Carrier | Monica Marquez |
| 03/23/2006 | per bcbs recorder clm pressed on 9/25/03 and 472.65 went towards | Monica Marquez |
| 03/23/2006 | pt ded amt, pt liable | Monica Marquez |
| 04/19/2006 | Letter PL1 Assigned To Debtor | Denise Bobelak |
| 04/19/2006 | Debtor Status Changed From P1 To P2 | Denise Bobelak |
| 04/19/2006 | Debtor Extension Re-Assigned To 05/19/2006 | Denise Bobelak |
| 04/19/2006 | No Answer At Residence | Denise Bobelak |
| 04/20/2006 | Letter PL1 Sent To The Debtor | Letter Manager |
| 04/27/2006 | Debtor Status Changed From P2 To E | Trisda Marshall |
| 04/27/2006 | Debtor Extension Re-Assigned To 05/17/2006 | Trisda Marshall |
| 04/27/2006 | Return Call From Guarantor | Trisda Marshall |
| 04/27/2006 | mrn gvn dbtr vrfyd dob dbtr wntd to be pt on PPLAN sid that she | Trisda Marshall |
| 04/27/2006 | cld mail out first pymnt of 50.00 on 5/12/06 informd dbtr she | Trisda Marshall |
| 04/27/2006 | wid be set up on a PPLAN aftr we receieve frst pymnt | Trisda Marshall |
| 05/08/2006 | Debtor Extension Re-Assigned To 05/09/2006 | Victoria Rana Williams |
| 05/09/2006 | Debtor Extension Re-Assigned To 05/31/2006 | Denise Bobelak |
| 05/09/2006 | Charge Status Changed From INSX To PPLAN | Denise Bobelak |
| 05/09/2006 | Charge Status Set to PPLAN | Denise Bobelak |
| 05/09/2006 | Charge Status Set to PPLAN | Denise Bobelak |
| 05/09/2006 | Payment Arrangement Setup For $50.00 Every 30 Days | Denise Bobelak |
| 05/09/2006 | Letter PPLAN Assigned To Debtor | Denise Bobelak |
| 05/09/2006 | Debtor Status Changed From E To PPLAN | Denise Bobelak |
| 05/09/2006 | Debtor Extension Re-Assigned To 05/09/2006 | Denise Bobelak |
| 05/16/2006 | Debtor Extension Re-Assigned To 06/05/2006 | Denise Bobelak |
| 06/06/2006 | Letter PPLAN Sent To The Debtor | Letter Manager |
| 06/08/2006 | Debtor Extension Re-Assigned To 06/28/2006 | Denise Bobelak |
| 06/15/2006 | Debtor Extension Re-Assigned To 07/15/2006 | Victoria Rana Williams |
| 07/05/2006 | No Answer At Residence | Belinda Anderson |
| 07/10/2006 | Letter PPLAN Sent To The Debtor | Letter Manager |
| 07/17/2006 | Debtor Extension Re-Assigned To 07/31/2006 | Belinda Anderson |
| 07/17/2006 | Talked To Guarantor At Residence | Belinda Anderson |
| 07/17/2006 | Cltd askd fr debtor sh answd ph sh identlf hrslf as debtor t | Belinda Anderson |

03/06/2007      **Medical Data Systems, Inc. / dba Medical Revenue Services**      2:06PM
**Debtor Information Face Sheet**

*PASSMORE, CYNTHIA F*

| Date | Description | Agent |
|---|---|---|
| 07/17/2006 | sd whr I ws cling frm ph discond convrs ended | Belinda Anderson |
| 08/01/2006 | Talked To Guarantor At Residence | Belinda Anderson |
| 08/01/2006 | spk with debtor sh identfd hrslf I mmd hr sd the cll was a followup | Belinda Anderson |
| 08/01/2006 | cll per pmt pln agred sd sh forgot bt wil snd pmyt in nx wk | Belinda Anderson |
| 08/01/2006 | 8-4-06 I sd I'll do another follow up cll per tht pymt of $50.00 | Belinda Anderson |
| 08/01/2006 | convrs ended | Belinda Anderson |
| 08/07/2006 | Debtor Status Changed From PPLAN To DFLT | Medical Data Administrator |
| 08/07/2006 | Charge Status PPLAN Removed From Account | Medical Data Administrator |
| 08/08/2006 | Letter PPLAN Not Sent: Debtor Defaulted On Payment Plan | Letter Manager |
| 08/11/2006 | No Answer At Residence | Belinda Anderson |
| 08/18/2006 | Letter DEFAULT Assigned To Debtor | Belinda Anderson |
| 08/18/2006 | Debtor Status Changed From DFLT To P2 | Belinda Anderson |
| 08/18/2006 | Debtor Extension Re-Assigned To 09/08/2006 | Belinda Anderson |
| 08/18/2006 | No Answer At Residence | Belinda Anderson |
| 08/24/2006 | Letter DEFAULT Sent To The Debtor | Letter Manager |
| 09/05/2006 | Debtor Status Changed From P2 To E | Theresa Turner |
| 09/05/2006 | Debtor Extension Re-Assigned To 09/06/2006 | Theresa Turner |
| 09/07/2006 | Guarantor Bankrupt | Theresa Turner |
| 09/07/2006 | FLD CHAP 13 DT FDL 11-11-02 CS# 02-12547 ATNY MICHAEL D BROCK | Theresa Turner |
| 09/07/2006 | PH# 334-393-4357 | Theresa Turner |
| 09/07/2006 | Debtor Status Changed From E To Z | Theresa Turner |
| 09/07/2006 | Charge Status Set to BNK | Theresa Turner |
| 09/07/2006 | Charge Status Set to BNK | Theresa Turner |
| 09/07/2006 | Charge Status Set to BNK | Theresa Turner |
| 09/07/2006 | Cancellation Request Made On This Account | Medical Data Administrator |
| 09/07/2006 | Cancellation Request Made On This Account | Medical Data Administrator |
| 09/07/2006 | Cancellation Request Made On This Account | Medical Data Administrator |
| 03/06/2007 | Debtor Information Face Sheet Requested | Nancy Matos |

EXHIBIT "11"

9.     MDS objects to Plaintiff's Requests, including the definition and instructions, to the extent they purport to impose obligations upon MDS greater or different than those imposed by the Federal Rules of Civil Procedure or this Court and/or attempt to give meaning to terms beyond those terms' common and ordinary meaning.

10.    MDS objects to Plaintiff's Requests to the extent that they seek a description of information or documents prepared by or for experts in a manner contrary to the Federal Rules of Civil Procedure.

**SPECIFIC OBJECTIONS AND RESPONSES TO PLAINTIFF'S REQUESTS**

1.     That Defendant, Medical Data Systems, Inc. d/b/a Medical Revenue Services, Inc. (hereinafter, "Medical Revenue"), is a Florida corporation.

**RESPONSE NO. 1**:

MDS admits to the information stated in Request to Admit No. 1.

2.     That Defendant's principal place of business is located at 2001 9th Avenue, Suite 312, Vero Beach, Florida 32960.

**RESPONSE NO. 2**:

MDS admits to the information stated in Request to Admit No. 2.

3.     That Defendant's principal purpose is to collect debts using the mail and telephone.

**RESPONSE NO. 3**:

MDS admits it is a debt collector within the meaning of the term under the Fair Debt Collection Practices Act. MDS denies all other inferences or allegations included in Plaintiff's Request No. 3.

4.    That Defendant regularly attempts to collect debts alleged to be due another.

**RESPONSE NO. 4**:

MDS admits it is a debt collector within the meaning of the term under the Fair Debt

Collection Practices Act. MDS denies all other inferences or allegations included in

Plaintiff's Request No. 4.

5.    The Defendant, Medical Revenue, is a debt collector as defined by the FDCPA,

15 U.S.C. §1692a(6).

**RESPONSE NO. 5**:

MDS admits Plaintiff's Request No. 5.

6.    That the debt allegedly owed by Plaintiff to Medical Center Enterprise is a consumer debt

as defined by the FDCPA, 15 U.S.C. §1692a(3&5).

**RESPONSE NO. 6**:

MDS admits Plaintiff's Request No. 6.

7.    That Plaintiffs alleged debt to Medical Center Enterprise was for personal, family, or

household purposes.

**RESPONSE NO. 7**:

MDS admits Plaintiff's Request No. 7.

8.    That, in approximately April, 2006, the Defendant transmitted a collection letter, attached

hereto as Exhibit "A," to Plaintiff.

**EXHIBIT "12"**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re

JAMES R. CAMBRON and
WENDY L. CAMBRON,

      Debtors.

WILLIAM C. CARN, III,
BANKRUPTCY TRUSTEE,

      Plaintiff,

    v.

MEDICAL DATA SYSTEMS, INC.,

      Defendant.

WILLIAM C. CARN, III,
BANKRUPTCY TRUSTEE,

      Plaintiff,

    v.

MEDICAL DATA SYSTEMS, INC.,

      Defendant .

Case No. 05-11879
Chapter 7

Adv. Pro. 06-1057

Adv. Pro. 06-1058

### REPORT AND RECOMMENDATION OF THE UNITED STATES
### BANKRUPTCY JUDGE WILLIAM R. SAWYER

These consolidated Adversary Proceedings came before the Court for trial on March 15,

2007. Plaintiff William C. Carn, III, the Trustee in bankruptcy, was present by counsel David G.

Poston and Michael Brock. Defendant Medical Data Systems, Inc., was present by its Chief

Operating Officer Gary Ball and by counsel Russell McGill. The parties have filed briefs which

the undersigned has found helpful. (Adv. Pro. No. 06-1057, Docs. 30, 32). The Court heard

evidence and the arguments of counsel and took the matter under advisement.

## I.  PROPOSED FINDINGS OF FACT

On April 19, 2005, Medical Revenue Services, a unit of Defendant Medical Data

Systems, Inc., wrote James R. Cambron a letter demanding payment of medical bills totaling

$1,875.59. (Pl.'s Ex. A).[1]  Two of the five individual debts allegedly owed were for services

rendered at Flowers Hospital in March of 1997, more than eight years prior to the date of the

letter. This is significant in that the statute of limitations to collect an unsecured debt in

Alabama is only six years. Thus, of the $1,875.59 allegedly owed, $1,694.23 was uncollectible

because the statute of limitations had expired.

On May 24, 2005, Medical Revenue Services wrote Wendy L. Cambron an almost

identical collection letter as that sent to James Cambron. The letter addressed to Wendy

Cambron demanded payment of a $175.00 medical bill. (Pl.'s Ex. B). The debt was for services

allegedly rendered at Flowers Hospital on August 27, 2003.

Both letters contained the same opening paragraph. The first paragraph states as follows:

> Medical Revenue Service is a collection agency, retained to represent
> the below named creditor.  Since you have failed to pay this
> obligation in full, we now must determine your ability to repay this
> debt. The information we may be seeking, if available, to determine
> what further collection effort to take is:
>
> 1.) Real estate ownership/equity      4.)  Your source of income
> 2.) Personal property assets          5.) Automobile ownership
> 3.) Savings, checking balances        6.) Verification of employment

---

[1]  The full text of the letters are provided in an Appendix to this Memorandum.

-2-

(Pl.'s Exs. A, B).

The Plaintiff contends that this communication is misleading in that it implies that nonpayment of the bill will result in the seizure of property or garnishment of wages. As the creditor had not obtained judgment on the debts in question, and as the debts were unsecured obligations, the creditor had no immediate right to take any action with respect to the Cambrons' wages or property. Indeed, about 90% of the amount allegedly owed was more than six years old and therefore, uncollectible as a matter of law. With respect to the 10% of the debt which was not stale, the evidence showed that Medical Data had no intention to take that action. Indeed, the evidence is clear that it was the intention of Medical Data to attempt to make telephonic contact with the Cambrons and press them to pay these debts. If those efforts were unsuccessful, the debt was referred back to the original creditor, which in this case was Flowers Hospital.

Medical Data has its principal office in Sebring, Florida, and describes itself as a "secondary" debt collector. That is, it does not receive referrals of debts until collection has first been attempted by another agency. Its efforts to collect debts appear to consist of two things. First, it sends a letter and then it follows up with telephone calls. Gary Ball, Medical Data's Chief Operating Officer, testified that they would not send the letters unless it was required by the Fair Debt Collection Practices Act, as he feels that the most effective means of collecting debts is by way of the telephone.

In response to questions about collecting a debt after expiration of the statute of limitations, Ball testified that he felt that the debtors have a moral obligation to repay a debt which survives the statute of limitations. Ball does not believe that he has any obligation to

disclose the fact that the debts he is attempting to collect are beyond the statute of limitations. Nor apparently, does he believe that he must tell debtors that he may not seize their property until after he takes judgment, an action he has no intention to take.

The question of whether the first paragraph of the letters in question is deceptive is a close one. There is nothing in the letters that is demonstrably false. Ball's claim that information on the debtors' wages and property is needed to evaluate further collection efforts is not, in and of itself, wholly implausible. However, there are several troublesome facts here. Medical Data did not order credit reports or consult property records, state motor vehicle records, or other sources which would have provided the same information. In the experience of the undersigned, financially stressed individuals frequently do not voluntarily provide such information unless legally obligated to do so. Moreover, when such information is provided by an uncounseled debtor, the information is frequently incomplete or inaccurate. Ball testified that Medical Data mails approximately 1.8 million such letters each year. However, Medical Data provided no evidence as to how often debtors respond to such letters with accurate information. Given the evidence adduced at trial, it strains credibility to believe that the true purpose of the language in question is to obtain accurate information on a debtors' assets and wages. Rather, it appears that the purpose, and surely the effect of these letters, is to coerce payment by giving a false impression that the debtors' wages and assets are in jeopardy.

## II.  PROPOSED CONCLUSIONS OF LAW

### A.  Procedural Setting

This is an action under the Fair Debt Collection Practices Act. 15 U.S.C. § 1692k.  The

Plaintiff seeks damages in the amount of $1,000.00 in each Adversary Proceeding, plus

attorney's fees and costs. 15 U.S.C. § 1692k(a).

James R. Cambron and Wendy L. Cambron filed a joint petition in bankruptcy pursuant

to Chapter 7 of the Bankruptcy Code on September 8, 2005. (Case No. 05-11879, Doc. 1).  The

claims of James and Wendy Cambron are property of their bankruptcy estates.  11 U.S.C. § 541.

As these claims are property of the estate, this Court has jurisdiction to hear these Adversary

Proceedings pursuant to 28 U.S.C. § 1334.  These claims are "related to" the Cambrons'

bankruptcy filing.  William C. Carn, III, the Chapter 7 Trustee, has been substituted as named

Plaintiff for James and Wendy Cambron.[2]

In general terms, an action is a core proceeding if it is one that could not be brought but

for the existence of a bankruptcy case. 28 U.S.C. § 157(b); see also, The Whiting-Turner

Contracting Co. V. Electric Machinery Enterprises, Inc. (In re Electric Machinery Enterprises,

Inc.), __ F.3d __ , 2007 WL 548781 (11th Cir. Feb. 23, 2007) (holding that a proceeding is core

"if the proceeding is one that would arise only in bankruptcy").  As these Fair Debt Collection

Practices Act claims do not depend on a bankruptcy filing for their existence, these are not core

proceedings.  As these are non-core proceedings, the undersigned Bankruptcy Judge makes

---

[2] The Court conditionally dismissed Adversary Proceeding No.06-1057 on the grounds
that it had not been brought by the proper party in interest. (06-1057, Docs. 9, 10). In response,
the Chapter 7 Trustee William C. Carn, III, entered the case as Plaintiff. (06-1057, Doc. 11). As
the same reasoning applies to Adversary Proceeding No. 06-1058, Trustee Carn is likewise
substituted as named Plaintiff in Adversary Proceeding No. 06-1058.

proposed findings of fact and conclusions of law in accordance with the provisions of 28 U.S.C.

§ 157(c)(1) and directs the Clerk of the Bankruptcy Court to file the same with the District

Court. By way of a separate order, a schedule for the filing of objections pursuant to Rule 9033,

FED. R. BANKR. P. is established.

### B. FDCPA Claims

The Plaintiff makes claims under both 15 U.S.C. § 1692e(5) and (10). While the same

set of facts support each claim, the undersigned with analyze the claims separately. Although

the Court concludes that the Plaintiff has established both claims, it will discuss the e(10) claim

first because, in its view, it is the stronger claim.

#### 1. The § 1692e(10) Claim[3]

Congress has determined that "there is abundant evidence of the use of abusive,

deception, and unfair debt collection practices by many debt collectors. Abusive debt collection

practices contribute to the number of personal bankruptcies, to marital instability, of the loss of

jobs, and to invasions of individual privacy." 15 U.S.C. § 1692(a). Congress further stated that

"it is the purpose of this subchapter to eliminate abusive debt collection practices by debt

collectors." 15 U.S.C. § 1692(e). In furtherance of this purpose, Congress enacted the "Fair

Debt Collection Practices Act," which provides, in part, as follows:

---

[3] For purposes of clarity, the claims made pursuant to 11 U.S.C. § 1692e(10) will be referred to as the e(10) claims, and the claims made pursuant to 11 U.S.C. § 1692e(5) will be referred to as the e(5) claims. The e(5) claims are considered in Part II(B)(2) below.

> A debt collector may not use any false, deception, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> * * *
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

15 U.S.C. § 1692e.

The issue here is whether the letters in question are deceptive. The United States Court of Appeals for the Eleventh Circuit has held that courts making this determination should use the "least sophisticated consumer" standard. Jeter v. Credit Bureau, Inc., 760 F.2d 1168 (11th Cir. 1985).

> That law was not "made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous," and the "fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.

Id. at 1172-73 (internal citations omitted); see also, Kimber v. Fed. Financial Corp., 668 F.Supp. 1480, 1487-89 (M.D. Ala. 1987) (Thompson, J.) (holding that bringing suit to collect a debt barred by the statute of limitations was deceptive within the meaning of the Fair Debt Collection Practices Act); Thompson v. D.A.N. Joint Venture III, L.P., 2007 WL 496754 (M.D. Ala. Feb. 13, 2007) (Moorer, Mag. J.) (to same effect).

The Plaintiff argues that the language in question is deceptive because it falsely implies that the debtors' assets and wages may be in jeopardy. They argue that the purpose of this language is to unlawfully coerce payment. Gary Ball testified that the purpose of this language

-7-

was to attempt to obtain information on the debtors, reasoning that debtors who are employed and have assets are more likely to pay their debts. The undersigned finds that the language in question is deceptive and that the explanation advanced by Medical Data is unconvincing. An unsophisticated consumer would be deceived by the language in the letters.

A debtor with competent counsel would know that a debt is uncollectible if the statute of limitations has run. A counseled debtor would also know that the holder of an unsecured claim may not seize property until judgment has been taken in a court of law. Thus, the ambiguity in the first paragraph of the collection letters would cause no harm to a properly counseled debtor. However, the law is clear that the Court, in determining whether a given communication is misleading, for purposes of an e(10) claim, must apply the "least sophisticated consumer" standard. Applying that standard here, the Court finds that the communication from Medical Data is misleading. An unsophisticated consumer would conclude that his wages and property are in jeopardy and for that reason, would be coerced into paying the debt in violation of the Fair Debt Collection Practices Act.

Medical Data advanced an argument that the language in question is not deceptive. Ball testified that the information as to wages and property is useful to Medical Data in its determination as to what further action to take. If a debtor has a job and property, he is more likely to pay the debt and for that reason should be further pressed to pay. This reasoning is circular. A debtor without income and without property would not feel coerced to pay as he has nothing to lose. Indeed, it is only those debtors with jobs and property who Medical Data would seek to mislead.

-8-

The Plaintiff argues that Medical Data's claim–that they need the information for their collection purposes–is without merit. Ball admitted that they had not consulted credit reports or property records, nor had they consulted any other records which might have provided the information requested in the first paragraph of the letter in question. That Medical Data had not taken any such action suggests that their claim is a pretext and that their true purpose was to unlawfully coerce payment.

### 2. The § 1692e(5) Claim

Plaintiff also alleges a violation of 15 U.S.C. § 1692e(5), which prohibits a debt collector from threatening to take action which cannot legally be taken. As the letters in question do not, strictly speaking, threaten anything, there is no express violation of this provision. However, the overarching problem here is one of deception and not of express threats to take action. For this reason, the undersigned is of the view that the claims are better considered under e(10) than under e(5). It should also be noted that the Eleventh Circuit does not apply the "least sophisticated consumer" standard to e(10) claims and for this reason, the Plaintiff's burden is somewhat heavier for an e(5) claim than is the case for an e(10) claim.

While the undersigned is of the view that the Plaintiff's claims here are best cast in terms of e(10), the question remains whether the Plaintiff has also made out a claim under e(5). There is case law for the proposition that deceptive language in a collection letter which suggests that such action will be taken may constitute such a violation. Mailloux v. Arrow Financial Services, LLC, 204 F.R.D. 38, 41-42 (E.D.N.Y. 2001) (certifying class status where a collection letter deceptively implied that collection action which could not lawfully be taken would be taken and finding a violation of § 1692e(5)). The facts in Mailloux are similar to the facts here in that the

-9-

letter inquired into the debtor's income, checking account balances, employment, real estate ownership, and automobile ownership. The court in <u>Mailloux</u> found that letter, which was very similar to the letters here, to be in violation of e(5). Therefore, the undersigned concludes, in the alternative, that the evidence establishes a violation of § 1692e(5), as well as a violation of e(10).

### C. Damages

Having found violations of the Fair Debt Collection Practices Act, the Court should next consider an award of damages. As the Plaintiff does not request actual damages, none are awarded. <u>See</u> 15 U.S.C. § 1692k(a)(1) (allowing an award of actual damages). In addition, the Court may award "such additional damages as the court may allow, but not exceeding $1,000." 15 U.S.C. § 1692k(a)(2)(A). Having heard the evidence and having considered the arguments of counsel, the Court is of the view that an award of damages in the amount of $1,000.00 for each claim is appropriate, for a total of $2,000.00. In other words, the claim originally held by James Cambron and the claim originally held by Wendy Cambron are allowed separately. It further appears that an award of attorney's fees is appropriate. <u>See</u> 15 U.S.C. § 1692k(a)(3).

### III. CONCLUSION

Having considered the evidence, the undersigned finds that the language in question in the letters, applying the least sophisticated consumer standard, is deceptive within the meaning of § 1692e(10). The effect of the subject language is to create apprehension that the debtors' assets and wages are in jeopardy and thereby unlawfully coerce payment of a debt. It is recommended that judgment be entered in favor of the Plaintiff in the amount of $1,000.00 each for each of two claims, for a total of $2,000.00  In addition, it is further recommended that

-10-

Plaintiff be awarded attorney's fees. The undersigned will order Plaintiff's counsel to file an

Affidavit in support of their claim for attorney's fees within 15 days. Defendant will be given 15

days to respond.

Done this the 5th day of April, 2007.

/s/ William R. Sawyer
United States Bankruptcy Judge

-11-

**Medical Revenue Services**
P.O. Box 1149
Sebring FL 33871

| Reference | Total Amount Due |
|---|---|
| F9708100109 | $1874.59 |

Toll Free Number
(800) 315-6050

| CHECK CARD USING FOR PAYMENT | | |
|---|---|---|
| MasterCard ☐ | VISA ☐ | DISCOVER ☐ |
| CARD NUMBER | | |
| AMOUNT | | EXP. DATE |
| SIGNATURE | | |

**RETURN SERVICE REQUESTED**
04/19/2005

med9axA12DP0A107KE+014004

JAMES R CAMBRON
PO BOX 464
DALEVILLE AL 36322-0464

||||ll||ll||ll||l|l|ll||l|ll|l||ll||

MAKE CHECK PAYABLE AND REMIT TO:

Medical Revenue Services
PO BOX 1149
SEBRING FL 33871-1149



Page 1 of 1

☐ CHECK HERE IF ADDRESS OR INSURANCE INFORMATION IS
INCORRECT AND INDICATE CHANGE ON REVERSE SIDE

▼ DETACH HERE ▼ AND RETURN TOP PORTION WITH YOUR PAYMENT

Medical Revenue Service is a collection agency, retained to represent the below named creditor. Since you have failed to pay this obligation in full, we now must determine your ability to repay this debt. The information we may be seeking, if available, to determine what further collection effort to take is:

1.) Real estate ownership/equity
2.) Personal property assets
3.) Savings, checking balances

4.) Your source of income
5.) Automobile ownership
6.) Verification of employment

Unless you notify this office within thirty (30) days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within thirty (30) days from receiving this notice, this office will: obtain verification of the debt or obtain a copy of a judgement and mail you a copy of such judgement or verification. If you request this office in writing within thirty (30) days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

Please make your check or money order payable to Medical Revenue Service. In order to assure proper credit to your account, include the reference number with your payment. We also accept "check by telephone" for your convenience. If you have any questions, you may contact an account representative at the above listed phone number.

Pursuant to Section 807(11) FDCPA, this communication is from a debt collector and is an attempt to collect a debt. Any further information obtained will be used for that purpose.

A. U. Clancy
Collection Department

AUC/tb

| Account # | Client Name | Service Date | Balance | Patient Name |
|---|---|---|---|---|
| F9708500163 | Flowers Hospital | 03/26/1997 | 307.68 | Lehr, Timmy J |
| F9708100109 | Flowers Hospital | 03/22/1997 | 1386.55 | Lehr, Timmy J |
| F0307000545 | Flowers Hospital | 03/13/2003 | 58.77 | Cambron, James R |
| F0402500112 | Flowers Hospital | 01/25/2004 | 55.74 | Cambron, James R |
| F0402400129 | Flowers Hospital | 01/24/2004 | 65.85 | Cambron, James R |

TOTAL BALANCE: $1874.59


PLAINTIFF'S
EXHIBIT
4

**Medical Revenue Services**
P.O. Box 1149
Sebring FL 33871

RETURN SERVICE REQUESTED
05/24/2005

medPaxA130XCA10DJV.007736
WENDY L CAMBRON
PO BOX 464
DALEVILLE AL 36322-0464

| Reference | Total Amount Due |
|---|---|
| F0323900637 | $175.00 |

Toll Free Number
(800) 315-6050



CHECK CARD USING FOR PAYMENT

CARD NUMBER

| AMOUNT | | EXP. DATE |
|---|---|---|
| SIGNATURE | | |

MAKE CHECK PAYABLE AND REMIT TO:

Medical Revenue Services
PO BOX 1149
SEBRING FL 33871-1149



☐ CHECK HERE IF ADDRESS OR INSURANCE INFORMATION IS
INCORRECT AND INDICATE CHANGE ON REVERSE SIDE

Page 1 of 1

▼ DETACH HERE ▼ AND RETURN TOP PORTION WITH YOUR PAYMENT

---

Medical Revenue Service is a collection agency, retained to represent the below named creditor. Since you have failed to pay this obligation in full, we now must determine your ability to repay this debt. The information we may be seeking, if available, to determine what further collection effort to take is:

1.) Real estate ownership/equity
2.) Personal property assets
3.) Savings, checking balances
4.) Your source of income
5.) Automobile ownership
6.) Verification of employment

Unless you notify this office within thirty (30) days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within thirty (30) days from receiving this notice, this office will: obtain verification of the debt or obtain a copy of a judgement and mail you a copy of such judgement or verification. If you request this office in writing within thirty (30) days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

Please make your check or money order payable to Medical Revenue Service. In order to assure proper credit to your account, include the reference number with your payment. We also accept "check by telephone" for your convenience. If you have any questions, you may contact an account representative at the above listed phone number.

Pursuant to Section 807(11) FDCPA, this communication is from a debt collector and is an attempt to collect a debt. Any further information obtained will be used for that purpose.

A. U. Clancy
Collection Department

AUC/tb

---

| Account # | Client Name | Service Date | Balance | Patient Name |
|---|---|---|---|---|
| F0323900637 | Flowers Hospital | 08/27/2003 | 175.00 | Cambron, Wendy L |

TOTAL BALANCE: $175.00



PL1

**EXHIBIT "13"**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | 1:07-cv-00369-WHA |
| JAMES R. CAMBRON and | ) | |
| WENDY L. CAMBRON | ) | Case No. 05-11879 |
| | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| ----------------------------------------------- ) | | |
| WILLIAM C. CARN, III, | ) | |
| BANKRUPTCY TRUSTEE, | ) | Adv. Pro. 06-1057 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MEDICAL DATA SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ----------------------------------------------- ) | | |

## MEMORANDUM OPINION AND ORDER

### I. PROCEDURAL HISTORY

These causes are before the court on a Report and Recommendation ("R&R") of the

Chief United States Bankruptcy Judge pursuant to 28 U.S.C. § 157(c)(1)(2006):

> A bankruptcy judge may hear a proceeding that is not a core proceeding but that is
> otherwise related to a case under title 11. In such proceeding, the bankruptcy judge
> shall submit proposed findings of fact and conclusions of law to the district court,
> and any final order or judgment shall be entered by the district judge after
> considering the bankruptcy judge's proposed findings and conclusions and after
> reviewing de novo those matters to which any party has timely and specifically
> objected.

The bankruptcy judge consolidated and heard two non-core adversary proceedings which were

related to a case under Title 11 pending in his court. Following an evidentiary hearing, he

entered his Report and Recommendation, with proposed findings of fact and conclusions of law.
Objections were filed by the Defendant.

The court has considered the proposed findings and conclusions and has reviewed de
novo those matters to which the Defendant has timely and specifically objected. The court finds
no reason to take additional evidence, and has conducted the de novo review upon the record,
including a review of a transcript of the hearing before the bankruptcy judge. FED. R. BANKR. P.
9033(d);

## II. FACTS

On April 19, 2005, Medical Data Systems, Inc., d/b/a Medical Revenue Services
(hereinafter "MDS"), wrote James R. Cambron a letter regarding his medical debt totaling
$1,875.59. (Pl's. Ex. A). Two of the five debts listed were for services allegedly rendered at
Flowers Hospital in March 1997, more than eight years prior to the date of the letter. The statute
of limitations for collection of unsecured debt in Alabama is only six years. ALA. CODE § 6-2-34
(1975). Of the $1,875.59 allegedly owed, over 90% of the total debt was time-barred by the
statute of limitations. On May 24, 2005, MDS sent an almost identical collection letter to Wendy
L. Cambron regarding her medical debt of $175.00 for services allegedly rendered at Flowers
Hospital on August 27, 2003. (Pl's Ex. B).

Both letters contained the same opening paragraph·

Medical Revenue Service is a collection agency, retained to represent the below
named creditor. Since you have failed to pay this obligation in full, we now must
determine your ability to repay this debt. The information we may be seeking, if
available, to determine what further collection effort to take is:

1.) Real estate ownership/equity        4.) Your source of income
2.) Personal property assets            5.) Automobile ownership
3.) Saving, checking balances           6.) Verification of employment

(Pl.'s Exs  A, B).[1]

The sole issue decided today is whether this language violates the Fair Debt Collection Practices Act ("FDCPA"), which prohibits, *inter alia*, the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Section 1692e then enumerates an expressly non-exhaustive list of examples, including "[t]he threat to take any action that cannot be legally taken or that is not intended to be taken," § 1692e(5), and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." § 1692e(10).  Plaintiff contends that the language violates subsections 1692e(5) and e(10), and therefore, as to each debtor, plaintiff seeks statutory damages in the amount of $1,000.00, plus attorney's fees and costs, for each violation. § 1692k.

The Report and Recommendation found that the letters deceptively implied to the "least sophisticated consumer" that "the debtors' assets and wages may be in jeopardy" and therefore they violated § 1692e(10). *R&R* at 7-8.  It found as a fact the defendants intended to take no action other than telephone calls to the Cambrons.  It further found that the same language suggested action which could not lawfully be taken, which constituted a threat violating § 1692e(5). *Id.* at 9-10 (*citing Mailloux v. Arrow Fin. Servs., LLC*, 204 F.R.D. 38, 41-42 (E.D.N.Y. 2001)).

The Defendant filed timely Objections to the Report and Recommendation, to which the Plaintiff timely responded. FED. R. BANKR. PRO. 9003(b).  The Defendant then filed a Reply to the Plaintiff's Response to the Defendant's Objections (hereinafter "Defendant's Reply") at which time the Plaintiff asked for leave to respond to the Defendant's Reply.  Rather than strike Defendant's Reply for exceeding the number of filings provided for under Rule 9003(b), the court accepted the

---

[1]The complete letters are attached as an Appendix to this Memorandum Opinion and Order.

Defendant's Reply and granted Plaintiff leave to file its second response (hereinafter "Plaintiff's Surreply"). Defendant's motion for leave to file an additional response to the Plaintiff's Surreply was denied.

For the reasons stated below, upon an independent evaluation and *de novo* review, the court finds that the bankruptcy judge's Recommendation is due to be adopted as modified herein.

## II. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 157(c)(1), "any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1); *see also Williford v. Funderburk (In re Williford)*, 22 Fed. Appx. 843, 844 (11th Cir. Mar. 13, 2007) (per curiam).

## III. DISCUSSION

### A. Legal Background and Applicable Standards

Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors," 15 U.S.C. § 1692(e), noting that "[a]busive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." § 1692(a); *see also Jeter v. Credit Bureau, Inc.*, 760 F. 2d 1168, 1173-74 (11th Cir. 1985); *Ferguson v. Credit Management Control, Inc.*, 140 F. Supp. 2d 1293, 1297 (M.D. Fla. 2001). The FDCPA is a strict liability statute. *Ferguson*, 140 F. Supp. 2d at 1297; *Kaplan v. Assetcare, Inc.* 88 F. Supp. 2d 1355, 1361-62 (S.D. Fla. 2000); *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 63 (2d Cir. 1993). Further, a single violation of § 1692e is sufficient to establish civil liability. *See 15 U.S.C. § 1692k(a)*.

Plaintiff alleges that the identical language in defendant's debt collection letters violates both 15 U.S.C. § 1692e(5) ("e(5) violation") and 15 U.S.C. § 1692e(10) ("e(10) violation"). As noted earlier, subsection e(5) prohibits "[t]he threat to take any action that cannot legally be taken *or* that is not intended to be taken," whereas subsection e(10) prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. §§ 1692e(5) (emphasis added), 1692e(10) respectively.

In *Jeter*, the Eleventh Circuit adopted the "least sophisticated consumer" standard for determining "deception" under the FDCPA, including e(10) and one of two enumerated e(5) violations. 760 F.2d at 1175. In other words, courts should make FDCPA determinations in accordance with its purpose, "made [not] for the protection of experts, but for the public - that vast multitude which includes the ignorant, the unthinking and the credulous." *Id.* at 1172-73 (internal citations omitted). The lens of the "least sophisticated consumer" still "preserve[s] the concept of reasonableness" for an individual who can "possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care." *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993). Nevertheless, the fact that "a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced." *Jeter* at 1173 (internal citations and quotations omitted).

The *Jeter* court carved an exception from the "least sophisticated consumer" standard for the second "unintended action" prong of e(5):

> The . . . issue is simply whether or not [defendant] *intended* to take the action threatened . . . requir[ing] proof of a fact which amounts to a *per se* violation of § 1692e. The sophistication, or lack thereof, of the consumer is [therefore] irrelevant

5

> to whether [defendant] 'threat[ened] to take any action . . . that [was] not intended to
> be taken.'

*Id.* at 1175.

District courts within the Eleventh Circuit have confirmed the application of the "least

sophisticated consumer standard" to the first ("illegal threats") but not second ("unintended

threats") prong of § 1692e(5). *Compare Ferguson*, 140 F. Supp. 2d at 1299 (applying standard to

threats which "could not legally be taken") *with Rivera v. Amalgamated Debt Collection Servs.*,

462 F. Supp. 2d 1223, 1227 (S.D. Fla. 2006) (noting application of standard for e(10) violations

but citing *Jeter* for "unintended action" threats exception).  In the Eleventh Circuit, therefore, the

"least sophisticated consumer" standard shall be applied when determining violations of e(10)

and threats of illegal action under e(5), but not threats of unintended action under e(5), because

the existence of the intent to perform the action threatened is a question of fact, and threatening

action with no intent to take it is a *per se* violation.

One final dispute with respect to standards involves the interrelationship between §

1692e(5) and § 1692e(10). Defendant MDS claims that e(10) is dependent on e(5), such that

finding no illegal or unintended threat under e(5) precludes the possibility of finding deception

under e(10). *See Obj. to R&R* at 3 (*citing Robinson v. Transworld Systems, Inc.*, 876 F. Supp.

385, 393 (N.D.N.Y. 1995) ("We already have ruled that there are no Section 1692e(5) violations

because [defendant] has not threatened action that it did not intend to take. Therefore, these same

statements cannot violate Section 1692e(10) as false representations or deceptive practices.").

The holding of *Robinson*, however, is more limited.  The facts and circumstances of *Robinson*

rendered e(10) dependent on e(5) because the court found that the defendant had clearly

threatened both legal and intended action, and the plaintiff's basis for deception under e(10) was

that the same statement threatened action it did not intend to take. *Id.* Because the same action was legal, intended, and indeed clearly threatened, the *Robinson* court was quickly noting in shorthand that there was no possibility of misleading, and thus no need for discussion of e(10). *Id.*

This holding does not, however, render e(10) dependent on e(5) in every situation, and they should be evaluated separately and independently. One could conceivably use "deceptive means to collect or attempt to collect any debt" under e(10) without making any threats under e(5), or any threats whatsoever. That the Eleventh Circuit applies a different standard, discussed *supra*, for e(10) and half of e(5) only bolsters this conclusion. So does the fact that many other cases evaluate the two claims separately and distinctly. *See United States v. Nat'l Financial Services, Inc.* 98 F.3d 131, 135-39 (4th Cir 1996); *Withers v. Eveland*, 988 F. Supp. 942, 946-47 (E.D.Va. 1997); *Davis v. Commercial Check Control, Inc.*, No. 98 C 631, 1999 WL 89556, at *3-4 (N.D. Ill. 1996); *Raimondi v. McAllister & Associates, Inc.*, 50 F. Supp. 2d 825, 827 (N.D. Ill. Feb. 16, 1999); *Ferguson*, 140 F. Supp. 2d at 1299-1303 (M.D. Fla. 2001). Finally, further evidence of the separate nature of the two claims lies in the FTC commentary, which states that § 1692e(10) is "particularly broad and encompasses virtually every violation, including those not covered by the other subsections." Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097, 50105 (December 13, 1988). Although the two subsections therefore warrant independent analyses under different standards, this court adopts the bankruptcy judge's findings of violations of both e(5) and e(10), as modified herein.

**B. 15 U.S.C. § 1692e(5) violation**

MDS argues that its letters did not constitute "threats." The FDCPA does not define a "threat" for purposes of § 1692e(5). The court in *Ferguson* notes its definition as "a communicated intent to inflict harm or loss on another or on another's property . . . [or] an indication of an approaching menace [such as] the threat of bankruptcy." 140 F. Supp. 2d at 1293 n.11 (*quoting* Black's Law Dictionary 1289-90 (7th ed. 1999)). It then lists several examples of communications that courts have found to be "threatening communications" under the statute, including among them (1) threats to sue, (2) threats to garnish wages and/or seize assets, (3) threats to contact the debtor's neighbors and/or employer, and (4) threats to investigate the debtor's employment. *See id.* at 1299-1300 (internal citations omitted).

The bankruptcy judge, while noting that the letters "do not, strictly speaking, threaten anything," correctly noted that "the overarching problem . . . is one of deception and not of *express* threats to take action." *R&R* at 9 (emphasis added). While e(10) may prohibit general deception, e(5) more specifically prohibits threats, express or implied, of illegal or unintended action. In *Nance v. Friedman,* for example, the Northern District of Illinois denied summary judgment for the defendant under e(5), holding that even if the letter correctly indicated that the attorney was authorized to sue, and did not expressly threaten litigation, the letters falsely suggested that litigation was imminent, and that an "unsophisticated consumer – indeed even a sophisticated one – would regard this letter [as an implication] both that the attorney had been authorized to file a lawsuit and as actually threatening imminent litigation." No. 98 C 6720, 2000 WL 1700156, at *2 (N.D. Ill. Nov. 8, 2000); *see also Newman v. Checkrite California, Inc.,* 912 F. Supp. 1354, 1380 (E.D. Cal. 1995) (letter *suggesting* that suit was imminent violated § 1692e(5) because sender was not in position to file suit imminently).

8

The defendant's citation of *Robinson* for the proposition that "[g]enerally the threat to take an action that will not or cannot be taken must be explicit" is both unpersuasive and an overstatement. *Obj. to R&R* at 4. (*citing Robinson,* 876 F. Supp. at 392). *Robinson* quoted a series of letters[2], holding that "[n]one of these statements threatens action that could not be taken legally." *Robinson,* 876 F. Supp. at 392. "Thus, it is necessary to examine whether they threaten action which [defendant] did not intend to take." *Id.* The *Robinson* court distinguished its decision from *Pipiles v. Credit Bureau of Lockport, Inc.,* 886 F.2d 22 (2d Cir. 1989), in that the language in *Pipiles* clearly stated that the item "had been referred for collection action" when the defendant had conceded that legal action was not taken for such small accounts. *Id.* at 392-93. In contrast, the language in the *Robinson* letters did "not contain[] a *clear* threat similar to that found in *Pipiles*" and the *Robinson* defendant testified that they do indeed recommend legal action depending on the individual facts and circumstances of the case. *Id.* at 393 (emphasis added). The *Robinson* court therefore granted summary judgment because the "record [was] entirely devoid of proof that [defendant] threatened to initiate a lawsuit or that it did not intend to commence a lawsuit." *Id.* To read the *Robinson* holding as requiring an "express" threat, as opposed to a clearly implied one, thus misinterprets the circumstances of the case.

The defendant cites *Wade v. Regional Credit Assoc.,* in which the Ninth Circuit held that "[i]f a letter does not contain any threatening language, it is deemed merely informative and therefore, cannot violate § 1692e(5) of the FDCPA." 87 F.3d 1098, 1099 (9th Cir. 1996)(finding no violation)). To read *Wade* as requiring expressly threatening language, however, would create

---

[2]The letters warned of a "PROTRACTED AND UNPLEASANT COLLECTION EFFORT"due to the "PROBLEMS AND POSSIBLE CONSEQUENCES CONNECTED WITH NON-PAYMENT OF A LEGITIMATE DEBT." *Robinson,* 876 F. Supp. at 392.

a mere exercise in circular logic, stating that "if it doesn't threaten, it doesn't violate the prohibition against threatening," and ignores the very real possibility that some threats can be implicit.[3] The language in *Wade* merely noted that "failure to pay could adversely affect [plaintiff's] credit reputation," devoid of any threat to sue, garnish wages, or seize assets. In contrast, MDS's letter implied that it would seek any available information on practically all of debtor's assets to "determine what further collection effort to take," if the debt was not paid. The court therefore interprets *Wade* as allowing for the possibility that contents of a debt collection notice, in context, may impose a threat even when the express language does not.

MDS's reliance on the *Bieber* case is distinguishable. *Bieber v. Assoc. Collection Servs.*, 631 F. Supp. 1410, 1416 (D. Kan. 1986). The plaintiffs in *Bieber* claimed "illegal" threats based on the indication that "defendant had the authority to take legal action." *Id.* The language, however, indicated only that legal action "may be filed against you," and that legal action would be "recommended." *Id.* Legal action was, in fact recommended and the creditor sued; these were not illegal or unintended threats because they truly occurred. *Id.*

Here, MDS held on to the account for four years, and its chief operating and financial officer testified that they intended to do so indefinitely, without ever meaningfully returning the account to creditor Flowers Hospital. (Test. of Gary Ball 12:12-13:11; 22:7-9). During those four years, they never so much as ran a credit report, deeming it unprofitable to do so. (*Id.* at 22:16-20; 24:7-12; 47:15-20). Gary Ball testified that MDS had no intentions of taking legal action against the Cambrons. (*Id.* at 18:2-6; 28:18-29:10; *see also R&R* at 3 (stating that with

---

[3]For instance, if a debtor owed money to one of the more illegal and unsavory types of debt collectors, such as a bookie or mobster, who then sent one of his goons over to tell him, "I sure hope your automobile takes you safely home tonight," the lack of an express threat in such a statement should not prevent the debtor from considering hailing a cab.

respect to the non-time barred debt, "the evidence showed that Medical Data had no intention to take that action."); *id.* ("[MDS's] efforts to collect debts appear to consist of two things. First, it sends a letter and then it follows up with telephone calls." )). Therefore, the letter's implication that assets might be seized, possible only through legally obtaining a judgment lien, was false and misleading, since MDS had no intention of even *investigating* their assets.

MDS insists that its "letter did not contain any threats to commence legal action or that Cambron's account would be referred to an attorney if they did not pay their debts in full, unlike the letters at issue in both *Pipiles* and *National Financial Servs., Inc.*" *Obj.* at 8. This may be true, but it misses the point. MDS's comparison to several cases to show stronger language specifically threatening legal action is of only limited comparative value, since e(5) is not limited to threats of legal action specifically, but more broadly prohibits threats "to take *any* action that . . . is not intended to be taken." § 1692e(5) (emphasis added). If MDS's letter sufficiently suggests that *some* type of action will be taken against plaintiff's assets when there is no intention of taking *any* action, it makes little difference that stronger language specifically implying *legal* action was found not violative in other cases.

Finally, MDS argues that the bankruptcy court erred in relying on *Mailloux v. Arrow Financial Services,, LLC,* 204 F.R.D. 38, 41-42 (E.D.N.Y. 2001), claiming it to be distinguishable and of little merit to the case because the *Mailloux* court had found an e(5) violation in order to satisfy the typicality requirement of class certification. (*Obj.* at 2.) The bankruptcy judge cited *Mailloux* for the proposition that it violates e(5) to imply that certain action would be taken, when such action could not lawfully be taken. This would apply to the first prong of e(5). This court, however, finds it unnecessary to consider whether the first prong was violated by threatening either suit or other action on a debt as to which the statute of

11

limitations had run.  To the extent that the Report and Recommendation would hold that either

suit or collection efforts short of suit on a time-barred debt in Alabama would constitute a *per se*

violation of the FDCPA, this court does not adopt it, as the court finds a violation of the second

prong.

In sum, the language in MDS's debt collection letter implied that, due to plaintiff's

failure to "pay this obligation in full," MDS would now begin seeking available information to

determine which specific assets to go after.  Contrary to MDS's attempts to paint the language in

the following way, it never said: "what further collection effort, *if any*, to take."  Instead, it said

that it "*may* be seeking [information], *if available*, to determine what further collection effort to

take." *Id.*  The implications of the two phrases are quite different.  Without deciding whether the

former phrasing would have violated e(5) or not, it is clear that the latter phrasing, taken from the

letter itself, implies that collection is certain, while the type of collection and the particular assets

to be surely seized depend on the information available.  This violates § 1692e(5) precisely

because MDS suggested that investigation into available sources in order to locate assets would

be undertaken, and that collection efforts against assets would be taken, unless the Cambrons

paid the debts, when MDS had no intention of doing so.  While the letter may not necessarily

refer to the same kinds of legal actions that the cited cases do, it just as strongly implies what the

statute plainly prohibits: "the threat to take *any* action . . . that is not intended to be taken."  15

U.S.C. § 1692e(5) (emphasis added).

This court finds from the record that the defendant's letter impliedly threatened to

investigate the debtor's employment, contact others to find assets, garnish wages or seize assets,

or take further collection efforts other than contacting the debtors, if they did not pay the debts,

none of which it had any intention of doing.  Accordingly, this court adopts the bankruptcy

judge's Recommendation to find a violation of § 1692e(5), but does so on that basis and not on

the basis that the letter threatened to take action that cannot legally be taken.[4] The court makes

no finding as to whether the letter threatened to take action that cannot legally be taken, it being

unnecessary to do so.

## C. 15 U.S.C. § 1692e(10) violation

Subsection (10) of 15 U.S.C. § 1692e prohibits "[t]he use of any false representation or

deceptive means to collect or attempt to collect any debt or to obtain information concerning a

consumer." 15 U.S.C. § 1692e(10) (2006). MDS claims it did not violate e(10) because it did

not threaten legal action. Evaluating the letter independently from any e(5) analysis, as discussed

*supra*, this court finds the letter to violate e(10) as well.

As discussed in the e(5) analysis, the letter need not threaten legal action to constitute a

threat under e(5); simply threatening an unintended action is sufficient. Similarly, one need not

threaten anything to constitute an e(10) violation; mere deception, intentional or unintentional,

---

[4]This finding by the court is consistent with the Federal Trade Commission's "Statements of General Policy or Interpretation Staff Commentary on the Fair Debt Collection Practices Act," 53 Fed. Reg. 50097, 50106 (December 13, 1988):

Section 807(5) prohibits the "threat to take any action . . . that is not intended to be taken."

. . . .

(3). *Statement of possible action.* A debt collector may not . . . imply that he or any third party may take any action unless . . . there is a reasonable likelihood, at the time the statement is made, that such action will be taken. A debt collector may state that certain action is possible, if it is true that such action . . . is frequently taken by the collector or creditor with respect to similar debts; however, if the debt collector has reason to know there are facts that make the action unlikely in the particular case, a statement that the action was possible would be misleading.

While not binding, it has been held that the FTC's construction and interpretation of the FDCPA "should be accorded considerable weight." *Hawthorn v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1372 n.2 (11th Cir. 1998) (citing *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782-83 (1984)).

"to collect or attempt to collect any debt *or* to obtain information concerning a consumer" is

sufficient to constitute a violation. § 1692e(10) (emphasis added). For purposes of argument, the

court can assume, even though the letter did not ask the Cambrons to furnish any information

about assets, but only asked for payment, that MDS's sole purpose in sending the letters was

merely to obtain information about the Cambrons' assets in order to assess their likelihood of

voluntary repayment, and consequently whether more phone calls and other non-legal actions

were necessary. Their purpose is irrelevant – the language of the letter would still lead "the least

sophisticated consumer" to believe that their assets were endangered due to some type of

impending collection action. This deception alone constitutes a violation of e(10) under the strict

liability of the FDCPA. *See Ferguson* at 1297; *Kaplan* at 1361-62; *Bentley* at 63.

MDS goes to great lengths over several pages to argue that the bankruptcy court failed to

properly analyze and apply *Kimber v. Fed'l Financial Corp.*, 668 F. Supp. 1480 (M.D. Ala.

1987). *See Obj.* at 12-17. Specifically, MDS argues that the bankruptcy court improperly relied

on *Kimber* for the proposition that *any* attempt to collect on time-barred debt was deceptive

under the FDCPA. *Id.* It argues that *Kimber* has been clearly limited, in states such as Alabama

which interpret statutes of limitation as barring judicial remedies instead of extinguishing debts,

to prohibit only legal actions, and not "any and all" collection efforts. Therefore, MDS claims,

"it is significant that few courts interpret *Kimber* as the bankruptcy court did in its Proposed

Order as barring any and all attempts to collect upon a time-barred debt." *Obj.* at 13.

The bankruptcy court never relied on *Kimber*, but instead cited it as a *see also* cite while

discussing the well-supported "least sophisticated consumer standard." *R&R* at 7. Moreover, this

court finds *Kimber* to be just as unnecessary to its e(10) determination, if not more so, than

14

*Mailloux* is to its e(5) determination.[5] To the extent that MDS, or anyone else, should interpret

the bankruptcy judge's Report and Recommendation to hold that any and all attempts to collect a

debt in Alabama which would be barred by the statutes of limitations to be *per se* violations of

the FDCPA, this court does not adopt such an interpretation, it being unnecessary to consider

such issue.

Finally, MDS asserts that "the bankruptcy court expressly acknowledged there was

nothing deceptive or misleading in MDS's letter." *Def's Reply* at 2. "Therefore," MDS argues,

"the Bankruptcy Court [erroneously] focused on the purpose of MDS's letter, which it

determined was unlawfully to coerce payment of a time-barred debt." *Id.* at 11. These two

mischaracterizations take the judge's comments out of context. The bankruptcy judge did state

that "[t]here is nothing in the letters that is demonstrably false." *R&R* at 4; *Def's Reply* at 11.

The judge also stated that "it strains credibility to believe that the true purpose of the language in

question is to obtain accurate information on a debtors' assets and wages," and that "it appears

that the purpose, and surely the effect of these letters is to coerce payment by giving a false

impression that the debtor's wages and assets are in jeopardy." *R&R* at 4. As the bankruptcy

judge continues to explain, however, "the issue here is whether the letters in question are

deceptive." *Id.* at 7. Although they may not have been "demonstrably false," the bankruptcy

judge found the letters to be deceptive in their implications to the "least sophisticated consumer,"

and therefore a violation of § 1692e(10). No more evaluation of MDS's purpose is necessary.

The statute of limitations and the proper extension of *Kimber* have nothing to do with any

---

[5]If this court had found that MDS had violated e(5) by making an "illegal" threat, then the proper interpretation of *Kimber* with respect to the appropriate pursuit of time-barred debt would be relevant. Because the court finds that MDS violated e(5) by making an unintended threat, however, any address of this issue would be dicta.

dispositive issues as far as this court is concerned. The FDCPA is a strict liability statute. If MDS truly intended, as it claims, merely to elicit information from the debtors about their assets in order to decide whether to make more phone calls or mail more letters, it should have been more clear and less deceptive in the way it made this request to the debtor.

## IV. CONCLUSION

As to the specific objections made by the defendant, the court finds as follows:

1. As to defendant's objection to the bankruptcy judge's characterization of the letters as "demanding payment," the objection is due to be overruled. A reasonable recipient of the letter, and certainly the "least sophisticated consumer," would understand the letter to demand payment in order to avoid an investigation into the debtor's assets and employment, and collection efforts which could jeopardize either or both.

2. As to defendant's objection to the bankruptcy judge's factual finding that MDS's letters sought to deceive the Cambrons into believing that their wages and property were in jeopardy, the objection is due to be overruled, for the reasons previously discussed in this opinion.

3. Defendant's objections to the conclusions of the bankruptcy judge are overruled for the reasons previously discussed in this opinion, and as modified by the opinion.

## V. <u>ORDER</u>

For the reasons discussed, it is hereby ORDERED as follows:

1. The Defendant's Objections to the Report and Recommendation of the bankruptcy

judge are OVERRULED.

2. Pursuant to the authority granted to this court by 28 U.S.C. § 157(c)(1), the Report and

Recommendation of the Bankruptcy Judge is ADOPTED as Modified by this Opinion,

and damages are assessed at $1,000, plus costs and attorney's fees, for the plaintiff in

each case. Judgment will be entered accordingly.

Done this 4th day of December, 2007.


/s/ W. Harold Albritton
W. HAROLD ALBRITTON, III
SENIOR UNITED STATES DISTRICT JUDGE

**Medical Revenue Services**
P.O. Box 1149
Sebring FL 33871

Reference
F9708100109

Toll Free Number
(800) 315-6050

Total Amount Due
$1874.59

RETURN SERVICE REQUESTED
04/19/2005

CHECK CARD USING FOR PAYMENT

☐ ☐ ☐

CARD NUMBER

AMOUNT                    EXP. DATE

SIGNATURE

m∍d9∍xA12DP0A107KE·014004

JAMES R CAMBRON
PO BOX 464
DALEVILLE AL 36322-0464

MAKE CHECK PAYABLE AND REMIT TO:

Medical Revenue Services
PO BOX 1149
SEBRING FL 33871-1149

☐ CHECK HERE IF ADDRESS OR INSURANCE INFORMATION IS
INCORRECT AND INDICATE CHANGE ON REVERSE SIDE

Page 1 of 1
▼DETACH HERE▼ AND RETURN TOP PORTION WITH YOUR PAYMENT

Medical Revenue Service is a collection agency, retained to represent the below named creditor. Since you have failed to pay this obligation in full, we now must determine your ability to repay this debt. The information we may be seeking, if available, to determine what further collection effort to take is:

1.) Real estate ownership/equity        4.) Your source of income
2.) Personal property assets            5.) Automobile ownership
3.) Savings, checking balances          6.) Verification of employment

Unless you notify this office within thirty (30) days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within thirty (30) days from receiving this notice, this office will: obtain verification of the debt or obtain a copy of a judgement and mail you a copy of such judgement or verification. If you request this office in writing within thirty (30) days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

Please make your check or money order payable to Medical Revenue Service. In order to assure proper credit to your account, include the reference number with your payment. We also accept "check by telephone" for your convenience. If you have any questions, you may contact an account representative at the above listed phone number.

Pursuant to Section 807(11) FDCPA, this communication is from a debt collector and is an attempt to collect a debt. Any further information obtained will be used for that purpose.

A. U. Clancy
Collection Department

AUC/tb

| Account # | Client Name | Service Date | Balance | Patient Name |
|-----------|-------------|--------------|---------|--------------|
| F9708500163 | Flowers Hospital | 03/26/1997 | 307.88 | Lehr, Timmy J |
| F9708100109 | Flowers Hospital | 03/22/1997 | 1386.55 | Lehr, Timmy J |
| F0307000545 | Flowers Hospital | 03/13/2003 | 58.77 | Cambron, James R |
| F0402500112 | Flowers Hospital | 01/25/2004 | 55.74 | Cambron, James R |
| F0402400129 | Flowers Hospital | 01/24/2004 | 65.65 | Cambron, James R |

TOTAL BALANCE: $1874.59



PLAINTIFF'S
EXHIBIT

PL1

**Medical Revenue Services**
P.O. Box 1149
Sebring FL 33871

| Reference | F0323900637 | Total Amount Due | $175.00 |
|---|---|---|---|

Toll Free Number
(800) 315-8050

RETURN SERVICE REQUESTED
05/24/2005



CHECK CARD USING FOR PAYMENT

CARD NUMBER

AMOUNT          EXP. DATE

SIGNATURE

MAKE CHECK PAYABLE AND REMIT TO:

ᵐᵉᵈᵐᵃˣ413ᵒˣᶜᴬᴰᴰᴶᵛ·087736

WENDY L CAMBRON
PO BOX 464
DALEVILLE AL 36322-0464

Medical Revenue Services
PO BOX 1149
SEBRING FL 33871-1149

[ ] CHECK HERE IF ADDRESS OR INSURANCE INFORMATION IS
INCORRECT AND INDICATE CHANGE ON REVERSE SIDE

Page 1 of 1

▼ DETACH HERE ▼ AND RETURN TOP PORTION WITH YOUR PAYMENT

---

Medical Revenue Service is a collection agency, retained to represent the below named creditor. Since you have failed to pay this obligation in full, we now must determine your ability to repay this debt. The information we may be seeking, if available, to determine what further collection effort to take is:

1.) Real estate ownership/equity         4.) Your source of income
2.) Personal property assets             5.) Automobile ownership
3.) Savings, checking balances           6.) Verification of employment

Unless you notify this office within thirty (30) days after receiving this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within thirty (30) days from receiving this notice, this office will: obtain verification of the debt or obtain a copy of a judgement and mail you a copy of such judgement or verification. If you request this office in writing within thirty (30) days after receiving this notice, this office will provide you with the name and address of the original creditor, if different from the current creditor.

Please make your check or money order payable to Medical Revenue Service. In order to assure proper credit to your account, include the reference number with your payment. We also accept "check by telephone" for your convenience. If you have any questions, you may contact an account representative at the above listed phone number.

Pursuant to Section 807(11) FDCPA, this communication is from a debt collector and is an attempt to collect a debt. Any further information obtained will be used for that purpose.

A. U. Clancy
Collection Department

AUC/tb

| Account # | Client Name | Service Date | Balance | Patient Name |
|---|---|---|---|---|
| F0323900637 | Flowers Hospital | 08/27/2003 | 175.00 | Cambron, Wendy L |
| | | TOTAL BALANCE: $175.00 | | |



PLAINTIFF'S
EXHIBIT

PL1