IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CYNTHIA F. TONEY,
a/k/a CYNTHIA F. PASSMORE,

        Plaintiff,

v.

MEDICAL DATA SYSTEMS, INC.
d/b/a MEDICAL REVENUE
SERVICES, INC.

CASE NO. 2:06-CV-949

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant Medical Data Systems, Inc. ("MDS") respectfully submits Defendant's Response To Plaintiff's Motion For Summary Judgment. When the evidence is viewed in the light most favorable to MDS – the non-movant – it is apparent that Plaintiff is not entitled to summary judgment because numerous genuine issues of material fact and law exist in this case that cannot be resolved appropriately upon summary judgment.

## I. INTRODUCTION

A genuine issue of material fact exists with respect to every argument raised by Plaintiff for the following reasons. In claiming that MDS's letter violated §§ 1692e(4), e(5), and e(10) of the Fair Debt Collection Practices Act ("FDCPA"), Plaintiff does not offer any evidence in her motion to show how the letter at issue in this case violated the FDCPA under the circumstances of this case. Moreover, Plaintiff does not cite a single case to support her argument that the language in MDS's letter violates the FDCPA as a matter of law. Instead, Plaintiff relies on various cases in which significantly more direct references were made as to the possibility of

litigation, garnishment, and seizure or stated that such actions were imminent. In contrast, MDS's letter stated only that MDS may seek information about various potential assets, if available, to determine what further collection efforts to take. The letter then went on to invite Plaintiff to contest the validity of her debt, which in and of itself negated any sense of imminency of any further action against Plaintiff.

The evidence presented by both parties plainly reveals that genuine issues of material fact exist as to whether MDS's letter even constitutes a threat under the FDCPA, let alone that it threatened garnishment, seizure of assets, or other possibilities that could not or would not be taken by MDS or was otherwise misleading or deceptive. The evidence also reveals material issues of fact as to what the purpose and intent of MDS's letter was and whether MDS did attempt to collect the information listed in its letter to Plaintiff. Even a cursory a review of case law finding implied threats or other falsities in violation of the FDCPA contained in communications from debt collectors reveals how dissimilar the language of MDS's letter is and why it does not, as a matter of law, violate either §§ 1692e(4), e(5), or e(10). Therefore, it is inappropriate to resolve the issue of whether MDS violated these sections of the FDCPA upon Plaintiff's motion for summary judgment, given the significant number of disputed, material issues of fact and law in this case.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

On April 20, 2006, MDS mailed a form collection notice seeking to collect a debt owed by Plaintiff. [See Face Sheet for Pl.'s Debt Account, attached as Exhibit 1]. As recited in Exhibit 1 to Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment, this

collection notice contained the following provision: [1]

> "Medical Revenue Services is a collection agency .... Since you have failed to pay this obligation in full we must determine your ability to repay this debt. The information we may be seeking, if available, to determine what further collection effort to take is:

| | |
|---|---|
| 1.) Real estate ownership equity | 4.) Your source of income |
| 2.) Personal property assets | 5.) Automotive ownership |
| 3.) Savings, checking balances | 6.) Verification of employment |

MDS does not contest that it is a debt collector under the FDCPA and that it attempted to collect upon a consumer debt under that statute. However, MDS disputes all of Plaintiff's allegations as to the purpose and intent of MDS in sending its letter, the effect and meaning of that letter, and what efforts MDS made in accordance with its letter.

## III.    FACTS CREATING A MATERIAL ISSUE OF FACT

The following evidence creates a material issue of fact as to whether the letter MDS sent to Plaintiff was false, misleading, deceptive, or threatening under the FDCPA. First, each debt account handled by MDS involves different debt amounts, the use of different collection strategies, and yields different results. [See Exhibit 2, Deposition of Richard Larry Heath ("Heath Dep.") 11:9-13:11; Exhibit 3, Deposition of Michelle Peacock ("Peacock Dep.") 28:4-32:25; 36:3-41:23]. For example, in some instances, after speaking with a debtor, MDS determines that the appropriate "further collection action" to take on the account is to set up a payment plan or make other voluntary payment arrangements with the debtor. [See Exhibit 3, Peacock Dep. 28:4-32:25; 36:3-41:23]. In other instances, MDS is not able to make any contact with the debtor, or the debtor declares bankruptcy, forcing MDS's collectors to terminate their

---

[1] MDS does not contest that it sent a standard form letter to Plaintiff bearing the same language as that described in Plaintiff's motion, however, MDS does not admit that Plaintiff offers a true and correct copy of the actual letter sent by MDS to Plaintiff in Exhibit 1 to Plaintiff's Brief in Support of her Motion for Summary Judgment.

collection efforts and determine whether to refer the account to the corporate office for legal review. [See Exhibit 4, Deposition of Barbara Thomas ("Thomas Dep.") 48:8-13]. What MDS collectors do with respect to their individual attempts to collect on one debt account often is entirely inappropriate and/or ineffective with respect to another debt account, given that debtor's particular circumstances and financial situation. [See Exhibit 3, Peacock Dep. 28:4-32:25; 36:3-41:23 (explaining what she would do in response to various hypotheticals posed by Plaintiff's counsel)].

Second, Gary Ball, the COO and CFO of MDS, previously testified that it is MDS's policy and preferred method of debt collection to attempt to seek the information described in its collection letter primarily through telephone contact with the debtor on the account. [See Exhibit 5, Gary Ball's Trial Transcript in Carn ("Ball Tr. Trans."), 19:2-3; 35:19-36:3; 37:10-15]. Mr. Ball stated that MDS prefers this method of debt collection because MDS found that a conciliatory approach of working with the debtor directly tends to be a more effective method of pursuing a debt. [See Exhibit 5, Ball Tr. Trans., p. 37:10-15]. However, Mr. Ball also testified that this is not the only way that MDS attempts debt collection – only that it is the primary way. [See Exhibit 5, Ball Tr. Trans. 24:25-25:7; see also Exhibit 3, Peacock Dep. 41:8-23 (stating she could refer accounts to the corporate department for legal review if voluntary collection efforts failed)]. The telephone contact is MDS's initial attempt to learn about the debtor's financial situation and how to continue to pursue that account, if at all. [See Exhibit 5, Ball Tr. Trans. 45:5-11 (explaining why MDS would call a debtor at the debtor's work number); accord Exhibit 3, Peacock Dep. 43:2-5 (stating that the collector conducted the asset investigation as part of setting up the initial payment process)].

Third, substantial deposition testimony from current and former MDS employees corroborates Mr. Ball's testimony as it reveals that MDS collectors did attempt to contact debtors, in accordance with company policy, in order to seek further information about their ability to repay their debts by questioning debtors about the assets mentioned in MDS's letter over the phone. [See Exhibit 2, Heath Dep. 10:3-13, 11:14-23 (stating he asked debtors if they owned real estate in order to set up a payment plan); 11:24-13:16 (stating he asked about vehicle ownership during calls); 14:11-14 (stating he was trained to search for checking and savings through questioning debtors during calls); Exhibit 3, Peacock Dep. 35:22-37:14 (stating she would ask about property ownership and mortgage payments in order to explore payment plans and other settlement opportunities for the debtor); 39:20-40:6 (stating she asked about home equity during calls to accomplish the same); 42:5-8 (stating she asked about vehicle ownership during calls); 43:2-5 (stating that the collector conducted the asset investigation as part of setting up the initial payment process); 44:21-23 (stating she asked if debtors owned their home during calls); 45:18-46:16 (stating she asked about mortgage payments to get idea of value of the debtor's home and ability to use it as collateral to pay the debt);  Exhibit 4, Thomas Dep. 31:2-9 (stating she asked about mortgage payments when setting up a payment plan); 31:22-25 (stating she asked about car payment during calls); Exhibit 6, Deposition of Sherrol Waite ("Waite Dep.") 15:9-17 (stating that employment verification was a mandatory part of the collection process); Exhibit 7, Deposition of Tammy Shaffer ("Shaffer Dep.") 19:15-21 (stating that she would ask about sources of income available from family members when talking a debtor); Exhibit 8, Deposition of Shawn Smith ("Smith Dep.") 34:13-18 (stating he was trained to ask debtors about checking accounts during calls and did so); Exhibit 9, Deposition of Denise

LEGAL_US_E # 78127000.3

Bobelak ("Bobelak Dep.") 43:8-15 (stating she asked about vehicle ownership and checking accounts during debtor calls).

Fourth, the face sheet maintained for Plaintiff's account by MDS demonstrates that MDS acted in accordance with its general debt collection practices in attempting to contact Plaintiff regarding her debt and set up a payment plan. [See Exhibit 1]. Cumulatively, this evidence creates a material issue of fact as to whether the questions MDS's debt collectors testified they will ask during debtor phone calls were asked of Plaintiff in this case.

Fifth, as to Plaintiff's assertion that MDS's letter implied that the assets listed in the letter would be seized or garnished in order to satisfy Plaintiff's debt, the language in MDS's letter stated only that "[t]he information we *may* be seeking, *if available*, to determine *what further collection effort to take is:*". [See Exhibit 1 to Pl.'s Brief (emphasis added)]. From the face of the letter, there is no threat to actually seize, garnish, or otherwise take any legal action against Plaintiff. MDS's letter does not even state that an asset investigation actually will occur. Significantly, as the non-movant, all reasonable inferences that can be drawn from this evidence must be drawn in MDS's favor. As will be discussed in more detail below, these inferences lead to the inevitable conclusion that genuine and material issues of fact exist as to whether MDS's letter implied anything, and if it did, whether MDS implied anything that it could not or would not do or was otherwise deceptive under the FDCPA.

## IV.    STANDARD OF REVIEW

The standard of review in this matter is governed by Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, a court must construe the record, including all evidence and factual allegations, in the light most favorable to the non-moving party. See Sullivan v. City of Satsuma, Civil Action 04-0473-WS-M, 2005 U.S. Dist. LEXIS 33017, at *3 (S.D. Ala. Sept. 9,

2005). Therefore, in determining Plaintiff's motion for summary judgment, this Court must view the evidence in the light most favorable to MDS and draw all reasonable inferences from that evidence in MDS's favor. See, e.g., United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."); 11 James Wm. Moore et al., Moore's Federal Practice ¶ 56.15[3] (3d ed. 2007). Under this standard, MDS's evidence is taken as true and all justifiable inferences must be drawn in MDS's favor. See Sullivan, 2005 U.S. Dist. LEXIS 33017, at *3. Ultimately, summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Smith v. Boyd Bros. Transp., Inc., 406 F. Supp. 2d 1238, 1241 (M.D. Ala. 2005) (citing Fed. R. Civ. Pro. 56(c)).

## V.    ARGUMENT

### A.    Plaintiff Improperly Attempts To Assert The Doctrine Of Non-Mutual Offensive Collateral Estoppel Against MDS Based Upon The District Court's Opinion In Carn.

#### 1.    Plaintiff is not entitled to assert the doctrine of non-mutual offensive collateral estoppel against MDS because different issues of law and fact exist in this case.

In her summary judgment motion, Plaintiff argued that the use of non-mutual collateral estoppel against MDS was appropriate in this case and should bar MDS from independently defending this action on its own merits due to the Opinion in Carn. To successfully invoke the collateral estoppel doctrine, a party must demonstrate that: (1) the issue at stake in a pending action is identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been

a critical and necessary part of the judgment in the action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. Barger v. City of Cartersville, 348 F.3d 1289, 1293 (11th Cir. 2003) (citing In re McWhorter, 887 F.2d 1564 (11th Cir. 1989)). While parties are not precluded from attempting to assert non-mutual offensive collateral estoppel, under federal law, this is not a widely favored application of the collateral estoppel doctrine. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329-31 (1979) (while ultimately holding courts should have broad discretion to determine whether non-mutual offensive collateral estoppel is appropriate in any given case, the Court noted a host of reasons why this doctrine, when used offensively by a party against a defendant when that party was not part of the prior suit against the defendant, should be permitted only sparingly and with great caution).

Plaintiff is not entitled to assert the doctrine of non-mutual offensive collateral estoppel in this case because the factual circumstances and legal issues at issue in this case are not identical to those that were at issue in Carn. First, in Carn, the District Court concluded that MDS violated only two sections of the FDCPA – §§ 1692e(5) and e(10). However, in this matter, Plaintiff seeks summary judgment based on the theory of non-mutual offensive collateral estoppel with respect to MDS's alleged violation of three sections of the FDCPA – §§1692e(4), e(5), and e(10). In Carn, the District Court did not discuss any alleged violations of e(4) or hold that MDS violated that section. Therefore, MDS certainly did not have the opportunity to fully and fairly litigate whether it violated § 1692e(4) of the FDCPA and therefore, these two matters are not identical because this matter seeks summary judgment on an additional legal theory.

Second, unlike in Carn, where MDS was never able to speak with the debtors and therefore, was unable to ask any questions regarding the debtors' financial situation to determine

what further collection efforts to take, in this case, MDS did make contact with Plaintiff and determined that the next collection effort would be to set up a payment plan, on which Plaintiff subsequently defaulted. [Compare Exhibit 1, entry for 4/27/06 and 8/24/06 and Debtor Face Sheets From Carn Plaintiffs, attached as Exhibit 10]. Accordingly, this Court must examine the particular facts of this case and cannot hold that just because MDS's letter violated the FDCPA under to the facts and circumstances presented in another case, that the letter violates the FDCPA in this case as well, especially in light of the significant legal and factual differences between these two cases. [Compare Exhibit 10 with Exhibit 1].

Further, the deposition testimony of MDS's various debt collectors was not available in Carn and therefore, could not be considered by the Bankruptcy Court or District Court.[2] At the very least, this additional deposition testimony creates an issue of fact as to whether MDS did seek information from Plaintiff regarding the various assets described in MDS's letter in accordance with the general practices and policies of MDS for collecting upon debts through telephone communication with the debtor. Plaintiff provides no evidence of what the collectors did or did not ask Plaintiff in this case and cannot prove as a matter of law that the various questions MDS's collectors testified they asked debtors during phone conversations about the assets listed in MDS's letter were not asked in this matter.

Plaintiff asserts that because Plaintiff's face sheet does not contain an express notation that these questions were asked by MDS's collectors, then they must not have been asked. However, this lack of notation proves nothing. Perhaps Plaintiff did not have any information to

---

[2] These depositions were not available because the Bankruptcy Court held trial in Carn on March 15, 2007 and these additional depositions did not occur until April 6, 2007. [See Exhibits 2-9, case captions as to the dates each occurred]. Therefore, upon appealing the Bankruptcy Court's decision in Carn to the District Court under Fed. Bankr. R. 9033, these depositions were not part of the trial record and could not be presented to or considered by the District Court in Carn.

provide. Perhaps Plaintiff refused to answer these questions. Further, it is reasonable to understand the collector's deposition responses regarding what information will be reflected in a face sheet to indicate that they will only note information learned from the debtor. [See Exhibit 9, Bobelak Dep. 31:24-32:11; see also Exhibit 2, Heath Dep. 18:1-21 (indicating in his responses that he would write what he learned from the debtors and not what he asked them). Further, as Plaintiff is aware, these face sheets are not complete transcripts of the full conversation with each debtor – they are only summaries. [See Exhibit 9, Bobelak Dep. 31:24-32:11.] Therefore, there is at least an issue of material fact as to whether Plaintiff's face sheet should and would reflect that these questions were asked of Plaintiff, especially if Plaintiff failed to provide any information in response to MDS's questions.

Plaintiff also claimed that because Denise Bobelak testified that she generally did not ask about the assets listed in MDS's letter and because she worked on Plaintiff's account, that amounts to proof that MDS could not have asked these questions of Plaintiff. [See Pl.'s Brief, p. 23]. However, it is important to recognize that Ms. Bobelak never actually spoke with Plaintiff – all successful communications were between Plaintiff and other collectors. [See Exhibit 1, entries for 4/27/06, 7/17/06, and 8/1/06]. Therefore, this information is entitled to no additional weight in this matter beyond that to be accorded to any other collector's testimony.

> **2.    In the alternative, even if collateral estoppel could apply to this case, this Court should exercise its discretion and not apply this doctrine because of MDS's appeal in <u>Carn</u> to the Eleventh Circuit.**

Moreover, even if this Court did not agree that the doctrine of non-mutual offensive collateral estoppel cannot apply to this case because the facts and legal issues are not identical, this Court still may decline to apply this doctrine because the Opinion in <u>Carn</u> may not remain a final judgment after the resolution of MDS's appeal. When available, the decision of whether to

apply the doctrine of non-mutual offensive collateral estoppel when available in any given case is a matter within the discretion of the trial court. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979); Bush v. Balfour Beatty Bahamas, 62 F.3d 1319, 1325 n.8 (11th Cir. 1995) (noting "that whether to allow issue preclusion is within the sound discretion of the trial court"); In re McWhorter, 887 F.2d 1564, 1566 (11th Cir. 1989) ("The actual decision whether to apply collateral estoppel undoubtedly involves equitable considerations.").

In determining whether to give a prior decision preclusive effect after that decision is appealed, it is important to remember that "[i]f a decision for issue preclusion purposes is subsequently appealed, it is possible that an appellate decision will vitiate the finality required for issue preclusive effect." 18 James Wm. Moore et al., Moore's Federal Practice § 132.03[5][b] (3d ed. 2007); accord P&G v. Amway Corp., 242 F.3d 539, 546 (5th Cir. 2001) (reversal and remand resulted in no collateral estoppel effect of a prior judgment on appeal); Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V., 391 F.3d 871, 881 (7th Cir. 2004) ("once a judgment is reversed it ceases to have collateral estoppel effect."). In contrast, only "[i]f appellate review is available, [will] a failure to pursue an appeal clearly render[] the district court's decision final for purposes of issue preclusion." 18 James Wm. Moore et al., Moore's Federal Practice § 132.03[5][b] (3d ed. 2007).

MDS appealed the District Court's decision in Carn on December 14, 2007 pursuant to 28 U.S.C. § 1291. [See Exhibit 11, MDS's Notices of Appeal in Carn]. The Eleventh Circuit docketed MDS's appeal on December 21, 2007. [See Notices of Docketing, attached as Exhibit 12]. [3] In addition to the new deposition testimony available in this matter and which was not

---

[3] The Eleventh Circuit initially issued a briefing schedule in MDS's appeal on December 21, 2007, however, the Eleventh Circuit rescinded that schedule due to MDS filing a motion to reconsider an amended judgment handed down by the District Court in Carn on December 18,

(continued...)

available for the District Court to consider in <u>Carn</u>, MDS timely appealed the District Court's

Opinion to the Eleventh Circuit. While Plaintiff estimates MDS's chances of success on appeal

to be around 11.1%,[4] MDS views its chances as significantly higher. MDS believes its appeal is

meritorious and warranted, especially given the fact that no case law clearly affirms or rebuts

either parties' arguments regarding whether MDS's letter, which contains no threat or statement

that MDS will take any action whatsoever against Plaintiff at any point, violates the FDCPA.

Assuming the Eleventh Circuit agrees, the Opinion will be reversed and have no effect on this or

any other case.

     Furthermore, despite Plaintiff's claim that the Eleventh Circuit's review of the Opinion

will be for clear error only, under Fed. R. Civ. P. 52(a), only the District Court's conclusions of

*fact* in <u>Carn</u> will be reviewed for clear error by the Court of Appeals – the District Court's

conclusions of *law* will be reviewed *de novo* by the Court of Appeals. <u>See</u> <u>Pullman-Standard v.</u>

<u>Swint</u>, 456 U.S. 273, 287-88 (1982) (holding that Rule 52(a) does not apply to conclusions of

law and the court of appeals was correct in stating that if a district court's findings rest upon an

erroneous view of the law, they may be set aside on that basis); <u>accord</u> <u>Salve Regina College v.</u>

---

(continued)

2007. MDS filed an amended notice of appeal from the amended judgment and the parties have completed briefing in response to MDS's motion to reconsider in the District Court. Upon a decision by the District Court with respect to MDS's motion to reconsider, the Eleventh Circuit will re-issue a briefing schedule for the parties in MDS's appeal.

[4] In her brief, Plaintiff states this is the percentage of cases similar to this matter and <u>Carn</u> that are reversed by the Eleventh Circuit, however, Plaintiff provides no support for that assertion. Instead, the information contained on the website provided by Plaintiff to support this assertion actually addressed the total number of all appeals terminated on the merits in the Eleventh Circuit. This document does not evaluate the percentage of bankruptcy cases overturned on appeal, the percentage of FDCPA cases overturned on appeal, or evaluate anything else as causing a reversal on appeal that indicates this percentage is anything other than a general number and does not reflect anything about the chances for a reversal in <u>Carn</u>. [<u>See</u> footnote 6 to Pl.'s Brief and http://www.uscourts.gov/caseload2007/tables/B05Mar07.pdf].

Russell, 499 U.S. 225, 231 (1991) ("…the courts of appeal are vested with plenary appellate authority over final decisions of district courts.  The obligation of responsible appellate jurisdiction implies the requisite authority to review independently a lower court's determinations.") (citations omitted).

Accordingly, the Court of Appeals will not be required to give any deference to the District Court's conclusions of law in evaluating MDS's appeal.  See Salve Regina College, 499 U.S. at 238 (holding that in reviewing the court of appeal's determination of state law, "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable.") (emphasis in original).  This Court should not give Carn preclusive effect over this litigation based on nothing other than pure speculation as to whether MDS's appeal will prove successful under any standard of review or general estimation of success.  Given that the facts and issues litigated in Carn are not identical to the issues in this action and that the District Court's Opinion in Carn may be reversed on appeal, this Court should decline to apply the doctrine of collateral estoppel offensively against MDS and permit this case to go forward on the merits.

**B.    MDS's Letter Does Not Violate § 1692e(5) As A Matter Of Law Because There Is A Material Issue Of Fact As To Whether The Letter Constitutes A Threat Under The FDCPA And Whether MDS Did Not Do What MDS Said It Might Do In Order To Seek Information About Plaintiff.**

**1.    Applicable standard of review for alleged § 1692e(5) violations.**

Unlike claims raised under § 1692e(10), the least sophisticated consumer standard is not the standard under which alleged violations of § 1692e(5) are analyzed.  The Eleventh Circuit Court of Appeals unequivocally has held that the relative sophistication of a debtor is irrelevant in determining whether a debt collector actually "threatened" to take an action that the debt collector never intended to take.  Jeter v. Credit Bureau, 760 F.2d 1168, 1175 (11th Cir. 1985).  "The subsection (5) issue is simply whether or not [the defendant] intended to take the action

threatened.  Thus, subsection (5) requires proof of a fact which amounts to a per se violation of §

1692e.  The sophistication, or lack thereof, of the consumer is irrelevant to whether [the

defendant] 'threat[ened] to take any action . . . that [was] not intended to be taken.'"  Id.

Applying this standard, Plaintiff must prove two things as a matter of law and without

the benefit of the least sophisticated consumer standard in order to be entitled to summary

judgment on her § 1692e(5) claim.  First, Plaintiff must prove, as a matter of law, that MDS's

letter constitutes a threat under the FDCPA.  Second, if the letter is held to constitute a threat as a

matter of law, Plaintiff must prove, as a matter of law, that MDS threatened to do something it

legally could not do or did not intend to do in the letter.  As will be discussed below, Plaintiff

cannot establish either of these elements as a matter of law.

> **2.      Plaintiff cannot establish as a matter of law that MDS's letter is a
> threatening communication under the FDCPA or that MDS
> threatened to do anything that it could not or did not intend to do.**

> **a.      Plaintiff cannot establish as a matter of law that MDS's letter
> constituted a "threat" under the FDCPA.**

Section 1692e(5) of the FDCPA forbids a debt collector from threatening to take any

action that cannot legally be taken or is not intended to be taken.  15 U.S.C. § 1692e(5) (2004)

(emphasis added).  Courts confronting issues arising under this section first must determine

whether a communication from a debt collector constitutes a "threat."  See Ferguson v. Credit

Mgmt. Control, Inc., 140 F. Supp. 2d 1293, 1299 (M.D. Fla. 2001) (citing various cases for this

principle).  Only once the court determines that the debt collector's communication constitutes a

threat does the court then determine whether the debt collector could legally take the threatened

action or intended to take that action.  See id.

The FDCPA does not define what constitutes a "threat.  A "threat" is defined by Black's

Law Dictionary as a "communicated intent to inflict harm or loss on another or on another's

property . . . [or] an indication of an approaching menace [such as] the threat of bankruptcy."
Ferguson, 140 F. Supp. 2d at 1299 n.11 (citing BLACK'S LAW DICTIONARY 1489-90 (7th ed.
1999)).  In determining whether language can be construed as threatening legal action in
violation of § 1692e(5), courts will look to the facts of the case and the language used in the
communication.  See, e.g., Madonna v. Academy Collection Serv., Case No. 3:95CV00875
(AVC), 1997 U.S. Dist. LEXIS 13315, *16-29 (D. Conn. Aug. 12, 1997) (holding that no
violation occurred where language in a debt collection letter merely referred to remedies
available to the creditor and did "not suggest that legal action *will* be taken") (emphasis in
original).

Additionally, while MDS recognizes that threats can be made indirectly or obliquely,
they still must indicate that "legal action is underway or contemplated in the near future," a
standard that more often than not will be satisfied by an explicit threat that a specific action has
or will be taken.  See id; Robinson v. Transworld Sys., 876 F. Supp. 385, 392 (N.D.N.Y. 1995);
accord Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 24 (2d Cir. 1989) (holding that
the clear import of language in a series of collection letters stating that "Notice is Hereby Given
That This Item Has Already Been Referred For Collection Action;" "We Will At Any Time
After 48 Hours Take Action As Necessary And Appropriate To Secure Payment In Full;" and
"Pay This Amount Now If Action Is To Be Stopped" was that *some* type of legal action had
already been or was about to be initiated and could be averted from running its course only by
payment) (emphasis in original).  Even more significant to this analysis is that "the issue of
intent is one of fact, to be resolved by weighing the conflicting evidence." Spinarski v. Credit
Bureau, No. Civ. 95-0506 RLP/LCS, 1996 U.S. Dist. LEXIS 22547, *11 (D.N.M. Sept. 19,
1996) (internal citations omitted).

Federal case law provides various examples of the type of language contained in collection letters that generally is held to constitute a "threat" under the FDCPA. In attempting to discern what constitutes a "threat" under § 1692e(5), courts have held that a collection notice impermissibly threatens legal action when it falsely communicates that a lawsuit or some other action is not merely a possibility, but that a decision to pursue legal action is either imminent or has already been made. E.g., Combs v. Direct Mktg. Credit Servs., Inc., No 98-2857, 1998 U.S. App. LEXIS 32670, *5 (7th Cir. Dec. 29, 1998) (holding that language in a collection letter that read "THIS IS YOUR OPPORTUNITY TO RESOLVE THIS MATTER AMICABLY," and "WE ADVISE YOU TO CONSULT WITH YOUR ATTORNEY REGARDING YOUR LIABILITY" were simply "moderate communications" that made neither express nor implied threats of current or imminent litigation in violation of either §§ 1692e(5) or e(10)); Pipiles v. Credit Bureau of Lockport, Inc., 886 F.2d 22, 25 (2d Cir. 1989) (language contained in a collection letter stating "We Will At Any Time After 48 Hours Take Action As Necessary And Appropriate To Secure Payment In Full . . . Pay This Amount Now If Action Is To Be Stopped" threatened legal action and therefore was a threat under the FDCPA); Nance v. Lawrence Friedman, P.C., Case No. 98 C 6720, 2000 U.S. Dist. LEXIS 16897, *1-2 (N.D. Ill. Nov. 6, 2000) (letter threatening possible imminent litigation although the debt collector may not have had authority to file suit when it mailed the letter constituted a threat under the FDCPA). The letter at issue in this case contains no such language. [See Exhibit 1 to Pl.'s Brief].

Additionally, a threat to garnish wages and/or seize assets is a threatening communication under the FDCPA. E.g., Van Westrienen v. AmeriContinental Collection Corp., 94 F. Supp. 2d 1087, 1099-1102 (D. Or. 2000) (collection letter threatening to garnish wages and/or seize property within five days was a threatening communication and deceptive under the FDCPA

because such acts could not legally be taken within five days under Oregon law); <u>Bentley v.
Great Lakes Collection Bureau</u>, 6 F.3d 60, 63 (2d Cir. 1993) (explicit references to the various
proceedings available to enforce a judgment violated § 1692e(5) because the record revealed that
the defendant never intended to obtain a judgment or use the collection methods expressly
mentioned in the defendant's letter). Similarly, a threat to contact a debtor's neighbors or
employer regarding his debt can constitute a threatening communication under the FDCPA.
<u>Rutyna v. Collection Accounts Terminal, Inc.</u>, 478 F. Supp. 980, 981-82 (N.D. Ill. 1979).
Likewise, threats to transfer a debtor's account to an attorney for enforcement constitute
threatening communications. <u>E.g.</u>, <u>United States v. Nat'l Fin. Servs. Inc.</u>, 820 F. Supp. 228, 233
(D. Md. 1993) (language contained in a letter stating that the debtor's account "WILL BE
TRANSFERRED TO AN ATTORNEY IF IT IS UNPAID AFTER THE DEADLINE DATE"
and "REMEMBER YOUR ATTORNEY WILL WANT TO BE PAID" constituted threats of
legal action under the FDCPA); <u>Schimmel v. Slaughter</u>, 975 F. Supp. 1357, 1362-63 (M.D. Ga.
1997) (falsely implying that an account had been turned over to an attorney caused a clear-cut
violation of the FDCPA). Again, the letter at issue in this case contains no such language. [See
Exhibit 1 to Pl.'s Brief].

   In contrast, if a collection letter does not contain any threatening language, it is deemed
merely informative and therefore, does not violate § 1692e(5) of the FDCPA. <u>See, e.g.</u>, <u>Wade v.
Regional Credit Assoc.</u>, 87 F.3d 1098, 1099 (9th Cir. 1996).[5]   In <u>Wade</u>, the Ninth Circuit Court
of Appeals held that a collection letter that stated the name of the creditor, the amount due,

---

[5] Furthermore, in the Eleventh Circuit, any argument that the inclusion of language disclosing
that a collection letter is being sent in an attempt to satisfy a debt and therefore, constitutes a
threat to take action under § 1692e(5) has been rejected as being without merit as such language
is required by the FDCPA to appear in all communications from a debt collector to a debtor.
<u>Ferguson v. Credit Mgmt. Control, Inc.</u>, 140 F. Supp. 2d 1293, 1302 (M.D. Fla. 2001).

requested payment in full, and disclosed the location and telephone number where payment could be made was merely informative. Id. Accordingly, the court held that the letter did not violate the FDCPA as it was not a threatening communication to the debtor. Id; accord Madonna v. Academy Collection Serv., Case No. 3:95CV00875 (AVC), 1997 U.S. Dist. LEXIS 13315, *18-30 (D. Conn. Aug. 12, 1997) (holding that "because the statement that the creditor 'may choose to pursue legal action' merely informs the consumer of an option that is indeed clearly available to the creditor to recover the debt, it is in no way false or misleading, and thus, does not run afoul of § 1692e(10). Even the least sophisticated consumer would understand such a statement to mean that because his debt has remained unpaid, a suit may be brought by the creditor to ensure collection of the money.").

Similarly, in a case involving whether a series of collection letters, some of which contained similar language to that in MDS's letter to Plaintiff, a district court in Kansas held that the letters did not violate the FDCPA. See generally Bieber v. Associated Collection Servs. Inc., 631 F. Supp. 1410 (D. Kan. 1986). In Bieber v. Associated Collection Services, Incorporated, the defendant, a debt collection agency, sent a series of collection letters to the plaintiff, which caused the plaintiff to bring suit alleging that various statements contained in those letters stating that the plaintiff's wages could be garnished and that legal action would be commenced if the debt was not paid in full violated §§ 1692e(4), e(5), and 1692d. Id. at 1412. The defendant sent the first letter to the plaintiff on December 31, 1983, which stated that the plaintiff's account had been referred to the defendant for "*immediate* collection" and demanded "payment *in full* today." Id. at 1412 (emphasis in original). A second letter went out on January 25, 1984, stating that immediate collection was required and without payment in full immediately, legal action "may be filed against you." Id. at 1413. After receiving another account for the same debtor, the

defendant sent a third letter to the plaintiff on May 17, 1984 that bore similar language to MDS's
letter to Plaintiff:

> "We remind you for the last time that you have not corresponded with us
> regarding the above account. Sometimes drastic measures are taken to collect
> accounts which could have been avoided with the debtor's cooperation. <u>We are
> proceeding with a thorough and complete investigation concerning your financial
> background. This investigation will list all property, occupation, employment,
> and financial resources, etc., so that our client will be in a position to bring this
> claim to an early conclusion.</u>" <u>Id</u>. (emphasis added).

The defendant then sent a fourth letter to the plaintiff on June 14, 1984, stating that unless
the plaintiff paid the account in full all at once, legal action would be recommended by the
defendant to its customer on the account. <u>Id</u>. Subsequently, the defendant returned the
plaintiff's account to the customer and the customer instituted legal proceedings against the
debtor. <u>Id</u>. On August 27, 1984, approximately eight months after sending its first letter to the
plaintiff, the defendant sent a final letter to the plaintiff, stating that the defendant had returned
the plaintiff's account to the defendant's customer and would request that suit be filed within
five days. <u>Id</u>.

Despite the fact that suit was brought against the plaintiff more than eight months after
the defendant's first letter demanding immediate payment in full and the subsequent letters
discussing the possibility of legal action, the court in <u>Bieber</u> held that the defendant did not make
any threats in violation of the FDCPA in any of its letters because the defendant never threatened
to actually do anything in its letters to the plaintiff. <u>Id</u>. at 1416. The defendant always stated that
it "would recommend," or "could institute" legal proceedings, which the court held was not the
same as making threats to actually do so. <u>Id</u>. Furthermore, the August letter sent to the plaintiff
did not constitute a threat under the FDCPA because it merely stated that the defendant "would

LEGAL_US_E # 78127000.3

request" that suit be filed within five days. Id.[6] The court granted summary judgment in favor of the defendant on all of the plaintiff's claims under the FDCPA. Id.[7] The single letter sent by MDS to Plaintiff obviously was far less strident and much more neutral in tone than the multiple letters in the Bieber case.

MDS's letter to Plaintiff does not constitute a threatening communication under the FDCPA. Instead, MDS's letter was merely informative. MDS's letter did not contain any threat to commence any legal action against Plaintiff or state that Plaintiff's account would be referred to an attorney if Plaintiff did not pay her debt in full, unlike the letters at issue in both Pipiles and National Financial Services, Inc. Nor did MDS's letter establish any time period for Plaintiff to satisfy her debt. Instead, MDS's letter merely invited Plaintiff to pay her debt. MDS's letter did not threaten to take any specific action against Plaintiff but rather, indicated that a variety of information *may* be sought, *if available,* to determine whether Plaintiff *could* pay her debt without mentioning or implying that any specific action had or would be taken against Plaintiff at any point.

---

[6] The fact that a third party eventually filed suit in Bieber was only one of many factors considered by that court in determining that the series of letters sent by the defendant did not violate the FDCPA. See id. at 1416. The court held that one of the letters sent by the defendant did not constitute a threat and was not otherwise deceptive under the FDCPA because it simply advised the plaintiff that the defendant had requested suit be filed if the debt was not paid and did not expressly state that suit *would* be filed. Id. Similarly, the fact that an interoffice memo sent by the defendant to the plaintiff did not say legal action *would* be taken, but rather, only that permission had been given to legal counsel to take that action meant that the memo was not a threat and also did not violate the FDCPA. Id. While obviously an important factor for some of the letters, in no way was the fact that suit was filed dispositive on whether all of the letters sent to the plaintiff in Bieber violated the FDCPA. Two were rejected outright as not constituting threats at all and both contained much stronger language than MDS's letter.

[7] At no point did the court take issue with the language in the defendant's third letter discussing its intention to proceed with a full investigation of the plaintiff's assets.

LEGAL_US_E # 78127000.3

While MDS's letters do state that certain information may be gathered if MDS conducts an investigation of Plaintiff's ability to pay her debt, in contrast to both <u>Van Westrienen</u> and <u>Rutyna</u>, MDS's letters do not, in any way, state that the sources of that information <u>will</u> be informed of the debt or that MDS would be contacting those sources in order to enforce the debt against Plaintiff. In fact, the letter says nothing at all about any intention by MDS to enforce the debt against Plaintiff. Instead, MDS's letter expressly stated that any information obtained about Plaintiff would be used only to assess Plaintiff's ability to repay her debt and help MDS determine what further collection action, if any, should occur. The letter never states further action will occur, is occurring, or that anything else will befall Plaintiff as a result of the possible investigation by MDS.

Moreover, MDS's letters contain far less explicit language then the language in the letters at issue in <u>Bieber</u>, in which the court still found no threats under the FDCPA and granted summary judgment in favor of the debt collector. In no way do MDS's letters even imply an intent to pursue legal action, garnish wages, or suggest that MDS would recommend referring Plaintiff's account to an attorney. As in <u>Wade</u>, MDS's letter to Plaintiff only listed the creditor on Plaintiff's account, the amount due on Plaintiff's account, and described how Plaintiff could pay her debt in full. In light of <u>Bieber</u> and <u>Wade</u>, the lack of any expressed intention by MDS to take any specific action whatsoever against Plaintiff compels the conclusion that MDS's letter was merely informative and did not constitute a threat under the FDCPA. Further, Plaintiff's argument that MDS's letter contained an implied threat on its face raises an issue of fact that cannot be resolved at the summary judgment phase because it is a question for the fact finder to evaluate and decide. The very nature of the term "implied" indicates an exercise of judgment and interpretation. <u>See</u> Merriam-Webster's Online Dictionary, available at http://www.m-

w.com/dictionary/imply (defining "imply" as "to involve or indicate by inference, association, or necessary consequence rather than by direct statement" or "to contain potentially."); accord Spinarksi, 1996 U.S. Dist. LEXIS 22547, at *11 (issues of intent are for the jury to decide). Since Plaintiff cannot establish that MDS's letter is a threat as a matter of law, summary judgment must be denied.

> **b.    Plaintiff cannot establish that MDS's letter "threatened" to take any action against Plaintiff that MDS legally could not take or did not intend to take.**

In addition to the fact that Plaintiff cannot prove MDS's letter constitutes a threat under § 1692e(5) as a matter of law, Plaintiff also cannot avoid the unmistakable issue of material fact created by the evidence in this case as to whether MDS threatened to do anything it legally could not do or did not intend to do because that argument depends entirely on whether MDS implied anything in its letter, which is an issue of fact for the jury.

In response to Plaintiff's argument that MDS never obtained a judgment against Plaintiff and therefore, could not legally garnish Plaintiff's wages or seize her property, it is important to recognize that MDS never represented that any of those actions would be taken against Plaintiff. MDS's letter did not threaten any sort of legal action against Plaintiff, state that judgment had been or would be obtained, that Plaintiff's assets would be seized, that Plaintiff's wages would be garnished, or even that Plaintiff's account had been referred to an attorney.  [See Exhibit 5, Ball Tr. Trans. 44:12-20; Exhibit 1 to Pl.'s Brief].  Further, if MDS obtained a judgment, such remedies would be available against Plaintiff.[8]  Plaintiff's argument fails because Plaintiff cannot

---

[8] Further, while Plaintiff asserts that MDS never files suit in Alabama, in truth, Mr. Ball testified only that he does not believe MDS has a client in Alabama that will file suit and explained that it is the client, not MDS, who decides whether to file suit and that the client, not MDS, actually brings the suit.  [See Exhibit 5, Ball Tr. Trans. 17:19-18:6].

establish that MDS threatened to take any action at all, let alone an action that MDS legally could not take as a matter of law.

Additionally, a significant material issue of fact exists with respect to whether MDS ever intended to conduct the asset search it "implicitly threatened" to conduct in its letter. First, a simple examination of the face sheet for Plaintiff's account reveals that MDS did contact Plaintiff to discuss her debt account on several occasions. Specifically, MDS attempted to contact Plaintiff on six different occasions prior to Plaintiff declaring bankruptcy and succeeded in speaking with Plaintiff during three of those attempts. [See Exhibit 1, Face Sheet, entries 4/27/06, 7/5/06, 7/17/06, 8/1/06, 8/11/06, 8/18/06. Gary Ball also testified that it is MDS's policy and preferred method for seeking the information described in its letters primarily through telephone contact with the debtor on the account. [See Exhibit 5, Ball Tr. Trans. 19:2-3; 35:19-36:3; 37:10-15]. Mr. Ball stated that this method was preferred because MDS found that a conciliatory approach of working with the debtor directly was a more effective method of pursuing a debt. [See Exhibit 5, Ball Tr. Trans. p. 37:10-15]. However, Mr. Ball also testified that this is not the only way that MDS attempts debt collection – only that it is the primary way. [See Exhibit 5, Ball Tr. Trans. 24:25-25:7].

As a result of these telephone calls, MDS negotiated a payment plan with Plaintiff. [See Face Sheet, entry for 5/9/06]. According to substantial prior deposition testimony from numerous MDS debt collectors in this matter, in order to establish a payment plan, the collectors conduct the asset search mentioned in MDS's letter through the various questions asked of a debtor when discussing a debt by telephone with the debtor. [See Exhibit 2, Heath Dep. 10:3-13, 11:14-23 (stating he asked debtors if they owned real estate in order to set up a payment plan); 11:24-13:16 (stating he asked about vehicle ownership during calls); 14:11-14 (stating he was

trained to search for checking and savings through questioning debtors during calls); Exhibit 3, Peacock Dep. 35:22-37:14 (stating she asked about property ownership and mortgage payments in order to explore payment plans and other settlement opportunities for debtors); 39:20-40:6 (stating she asked about home equity during calls to accomplish the same); 42:5-8 (stating she asked about vehicle ownership during calls); 43:2-5 (stating that the collector conducted the asset investigation as part of setting up the initial payment process); 44:21-23 (stating she asked if debtors own a home during calls); 45:18-46:16 (stating she asked about mortgage payments to get idea of the value of the debtor's home and ability to use it as collateral to pay the debt); Exhibit 4, Thomas Dep. 31:2-9 (stating she asked about mortgage payment when setting up payment plan); 31:22-25 (stating she asked about car payment during calls); Exhibit 6, Waite Dep. 15:9-17 (stating that employment verification was a mandatory part of the collection process); Exhibit 7, Shaffer Dep. 19:15-21 (stating that she asked about sources of income available from family members when talking a debtor); Exhibit 8, Smith Dep. 34:13-18 (stating he was trained to ask debtors about checking accounts during calls and did so); Exhibit 9, Bobelak Dep. 43:8-15 (stating she asked about vehicle ownership and checking accounts during debtor calls)].

As the non-movant, all reasonable inferences must be made in MDS's favor and it is beyond reasonable to assume that MDS acted in accordance with its internal policies and did ask about the information listed in its letter in the same manner – by phone – and for the same reasons – to secure a reasonable and voluntary repayment plan – when MDS negotiated

Plaintiff's payment plan. At most, Plaintiff's evidence shows no more than the fact that MDS's

collectors were not uniform in their approach to collecting on various debt accounts.[9]

Plaintiff entirely discounts all of this deposition testimony because of Plaintiff's apparent

belief that the only way to discover information about debtor assets is by searching the property

index and motor vehicle department records. [See Pl.'s Brief, pp. 15-17 (arguing that "[t]he

individual debt collectors never search assets.")]. However, whether Plaintiff and her counsel

ultimately approve of the methods used by MDS to investigate Plaintiff's ability to repay her

debts or think those methods are the most efficient method for obtaining this information is

irrelevant. At a minimum, MDS's evidence creates a material issue of fact with respect to

whether MDS intended to do and in fact, did do, exactly what its letter allegedly "threatened" to

preclude summary judgment on Plaintiff's § 1692e(5) claim.

_____

[9] As previously discussed in § V.A(1) supra, Plaintiff asserted in her brief that because Plaintiff's face sheet does not contain an express notation that these questions were asked, they must not have been asked. However, this lack of notation proves nothing. Perhaps Plaintiff did not have any information to provide. Perhaps Plaintiff refused to answer these questions. It is reasonable to understand the collector's deposition responses regarding what information will be reflected in a face sheet to indicate that they will only note information learned from the debtor. [See Exhibit 9, Bobelak Dep. 31:24-32:11; see also Exhibit 2, Heath Dep. 18:1-21 (indicating in his responses that he would write what he learned from the debtors and not what he asked them). Further, as Plaintiff is aware, these face sheets are not complete transcripts of the full conversation with each debtor – they are summaries. [See Exhibit 9, Bobelak Dep. 31:24-32:11.] Therefore, there is at least an issue of material fact as to whether Plaintiff's face sheet should and would reflect that these questions were asked of Plaintiff, especially if Plaintiff failed to provide any information in response to MDS.

Plaintiff also claimed that because Denise Bobelak testified that she generally did not ask about the assets listed in MDS's letter and because she worked on Plaintiff's account, that amounts to proof that MDS could not have asked these questions of Plaintiff. [See Pl.'s Brief, p. 23]. However, it is important to recognize that Ms. Bobelak never spoke with Plaintiff – all successful communications were between Plaintiff and other collectors. [See Exhibit 1, entries for 4/27/06, 7/17/06, and 8/1/06]. Therefore, this information is entitled to no additional weight in this matter beyond that to be accorded to any other collector testimony.

**C.    Plaintiff Is Not Entitled To Summary Judgment On Her § 1692e(4) Claim Because Plaintiff Cannot Establish As A Matter Of Law That MDS's Letter Threatened To Seize Or Garnish Plaintiff's Wages Or Arrest Plaintiff If Plaintiff Did Not Pay Her Debt.**

Section 1692e(4) of the FDCPA provides that a debt collector may not represent or imply:

> "that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector intends to take such action."

MDS submits that its letter does not violate § 1692e(4) of the FDCPA for the following two reasons. First, MDS's letter made no express threat to imprison or arrest Plaintiff and made no express threat to garnish, seize, or sell anything of Plaintiff's in order to satisfy Plaintiff's debt. These words do not even appear on the face of MDS's letter. Second, for the reasons set forth in § V.B(2) supra , MDS's letter also does not implicitly make any threats to take any of these actions. In the end, it is difficult to see how summary judgment possibly can be appropriate on this claim when the words necessary to support a violation of § 1692e(4) – the threat of either garnishment, seizure, arrest, or imprisonment – do not appear in MDS's letter and there is no evidence that anyone ever represented to Plaintiff that such actions would be taken against her.    This argument is further highlighted by Plaintiff's citation to Weiss v. Collection Ctr., 667 N.W.2d 567 (N.D. 2003), in which the defendant expressly stated that it had made an inquiry to the motor vehicle department and therefore, implied a threat to seize the plaintiff's vehicle, no such statement is made in MDS's letter. In no way does MDS's letter state it will or even is considering seeking garnishment, seizure of assets, arrest, or any other legal action against Plaintiff or her assets. Since "the issue of intent is one of fact, to be resolved by weighing the conflicting evidence", the issue of what, if anything, MDS's letter allegedly

implied must be left to the jury to decide.  Spinarski v. Credit Bureau, No. Civ. 95-0506

RLP/LCS, 1996 U.S. Dist. LEXIS 22547, *11 (D.N.M. Sept. 19, 1996) (internal citations

omitted).

> **D.    MDS Presents Sufficient Evidence, As Well As Supporting Case Law, To
> Create A Genuine Issue Of Material Fact To Preclude Summary Judgment
> On The Issue Of Whether MDS's Letter Violated § 1692e(10) Of The
> FDCPA.**

> > **1.    Appropriate standard for analyzing alleged violations of §
> > 1692e(10).**

Plaintiff correctly asserts that in evaluating whether MDS's letter to Plaintiff violated §

1692e(10) of the FDCPA, this Court must apply the least sophisticated consumer standard.  Jeter

v. Credit Bureau  760 F.2d 1168, 1177 (in determining whether certain collections letters

violated § 1692e(10), the court held that "we must consider whether the 'least sophisticated

consumer' would be deceived by [the defendant's] letters, *i.e.*, whether the letters were a

'deceptive means' to collect alleged debts, valid or invalid, by the use of false or deliberately

ambiguous threats to recommend legal action.").  Plaintiff wants this Court to believe that the

"least sophisticated consumer" would be deceived by MDS's letter as a matter of law in this case

for the following reasons: (1) MDS's letter allegedly is capable of multiple interpretations that

would mislead the least sophisticated consumer; (2) MDS's actual collection tactics did not

mirror what MDS said it would do in the letter; and (3) that MDS's use of ordinary and simple

English language in its letter would confuse the least sophisticated consumer.  However, before

analyzing these claims, it is important for this Court to have a complete picture of the "least

sophisticated consumer."

Courts have carefully preserved the concept of reasonableness when applying the least

sophisticated consumer standard.  Clomon v. Jackson, 988 F.2d 1314, 1319 (2d Cir. 1993) (citing

- 27 -

Rosa v. Gaynor, 784 F. Supp. 1, 3 (D. Conn. 1989) (holding that the FDCPA does not extend to every bizarre or idiosyncratic interpretation of a collection notice but does reach a reasonable interpretation of a notice by even the least sophisticated). "Indeed, courts have consistently applied the least sophisticated consumer standard in a manner that protects debt collectors against liability for unreasonable misinterpretations of collection notices." Clomon, 988 F.2d at 1319. Even the "least sophisticated consumer" can be presumed to possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care. Id.

> ## 2. Plaintiff cannot establish that MDS's letter violated § 1692e(10) because significant evidence exists to create a material issue of fact as to whether MDS's letter was false or deceptive to the least sophisticated consumer.

Plaintiff cannot prevail in her motion for summary judgment because genuine issues of material fact exist in this case as to whether MDS's letter was false and deceptive under § 1692e(10) of the FDCPA. Section 1692e(10) provides in relevant part that:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> * * *
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

The only fact that Plaintiff can prove as a matter of law in support of her motion for summary judgment is that MDS sent a letter to Plaintiff that contained the language discussed above. A reasonable understanding of MDS's letter does not give rise to deceptive, multiple interpretations. Instead, MDS's purpose and intent in sending its letter is made clear on the face of the letter. In addition, Plaintiff does not offer any evidence that is sufficient to conclude, as a matter of law, that certain actions were or were not taken in relation to Plaintiff's account.

Moreover, Plaintiff does not cite a single case in her brief to support her argument that the language in MDS's letter violated § 1692(e)(10) as a matter of law. MDS unequivocally disputes Plaintiff's allegations as to the purpose of its letter, the meaning of its letter, whether its letter implied any legal action, and whether MDS did attempt to conduct an investigation of Plaintiff's ability to repay her debt. In support of this disagreement, MDS provides the following facts and law which raise a clear issue of material fact as to Plaintiff's § 1692e(10) allegations.

**a.    Plaintiff cannot establish as a matter of law that MDS's letter is subject to multiple interpretations and therefore, violated § 1692e(10).**

Plaintiff wrongfully <u>interprets</u> MDS's letter as <u>impliedly</u> threatening to seize Plaintiff's assets and garnish her wages, and thus, being capable of multiple interpretations. Plaintiff reaches this conclusion in spite of the fact that the true purpose of MDS's asset investigation was stated on the face of the letter to Plaintiff. [<u>See</u> Exhibit 1 to Pl.'s Brief]. In the letter, MDS plainly stated that the information it may seek, if available, would be used to determine Plaintiff's ability to repay her debt. [<u>See</u> Exhibit 1 to Pl.'s Brief]. Further, MDS's letter invited Plaintiff to contest the validity of her debt and informed her how to do so, dispelling any sense of imminent action against Plaintiff. [<u>See</u> Exhibit 1 to Pl.'s Brief]. The simple fact is that there is nothing in MDS's letter stating that MDS was preparing to take any action against Plaintiff's assets or wages. Therefore, it is wholly unreasonable for even the least sophisticated consumer to interpret MDS's letter in a manner that directly contradicts the express, written purpose of the letter in order to create an implied threat by MDS in determining whether summary judgment is appropriate.

Similarly, it is inappropriate for the least sophisticated consumer to read MDS's letter as threatening to garnish wages and seize assets when the letter expressly stated it first needed to

- 29 -

determine if Plaintiff had any assets to pay her debt before taking any further collection efforts. Although little is expected from the least sophisticated consumer, she still is expected "to possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care" and refrain from making bizarre or unreasonable inferences in response to a collection letter. See Clomon, 988 F.2d at 1319. Even the case law cited by Plaintiff requires that a letter be subject to two or more *reasonable* interpretations. [See Pl.'s Brief, p. 10]. MDS submits that interpreting its letter to threaten a possible "parade of horribles" that are not even alluded to in the explicit language of the letter and in fact, expressly dispelled by the actual language of the letter inviting Plaintiff to contest her debt, is unreasonable and bizarre, even for the least sophisticated consumer.

Plaintiff relies on Dutton v. Wolhar, 809 F. Supp. 1130 (D. Del. 1992) to support her argument that because the language in MDS's letter is, as Plaintiff claims, allegedly capable of multiple interpretations, that summary judgment is appropriate in this case. However, in finding the phrase "once judgment is obtained" to be deceptive, the Court held that its determination of deceptiveness was based on the fact that there was a legal question as to whether the plaintiff in Dutton could be held responsible for the debt since the defendant realized the debt belonged to plaintiff's father. Therefore, the court found that the defendant's representation that judgment was inevitable, when such was not necessarily true under the facts of that case, was misleading. Id. at 1141. In contrast, MDS's letter does not represent that any action inevitably will be taken against Plaintiff. It is unreasonable to read a letter that makes absolutely no mention of referring Plaintiff's account to an attorney, filing suit, considering filing suit, or mention of any other specific remedy as being capable of being understood to imply that such remedies are inevitable.

Further, while Plaintiff states that there are no factual disputes concerning MDS's collection tactics, such a dispute is apparent on the face of the record in this case. First, when preliminary efforts to secure voluntary repayment fail, MDS's collectors have the authority to refer the account to legal for further action. [See Exhibit 3, Peacock Dep. 41:8-23]. In contrast to Plaintiff's claim, MDS does not merely telephone a debtor and then drop all collection efforts. As discussed previously, whether Plaintiff would search for assets in a different manner than MDS does not mean that MDS does not search for assets or seek the information listed in its letter to Plaintiff. See supra, § V.A(1).

Further, even in spite of the FTC commentary cited by Plaintiff, MDS can imply that it may search for information about the items listed in its letter. "A debt collector may state that certain action is possible, if it is true that such action is legal and is frequently taken by the collector…". 53 Fed. Reg. at 50106. MDS does regularly conduct the searches mentioned in its letters through its telephone inquiries to its debtors. [See Exhibit 2, Heath Dep. 10:3-13, 11:14-23 (stating he asked debtors if they owned real estate in order to set up a payment plan); 11:24-13:16 (stating he asked about vehicle ownership during calls); 14:11-14 (stating he was trained to search for checking and savings through questioning debtors during calls); Exhibit 3, Peacock Dep. 35:22-37:14 (stating she asked about property ownership and mortgage payments in order to explore payment plans and other settlement opportunities for the debtor); 39:20-40:6 (stating she asked about home equity during calls to accomplish the same); 42:5-8 (stating she asked about vehicle ownership during calls); 43:2-5 (stating that the collector conducted the asset investigation as part of setting up the initial payment process); 44:21-23 (stating she asked if debtors own a home during calls); 45:18-46:16 (stating she asked about mortgage payments to get idea of the value of the debtor's home and ability to use it as collateral to pay debt); Exhibit

4, Thomas Dep. 31:2-9 (stating she asked about mortgage payment when setting up a payment

plan); 31:22-25 (stating she asked about car payment during calls); Exhibit 6, Waite Dep. 15:9-

17 (stating that employment verification was a mandatory part of the collection process); Shaffer

Dep. 19:15-21 (stating that she asked about sources of income available from family members

when talking a debtor); Smith Dep. 34:13-18 (stating he was trained to ask debtors about

checking accounts during calls and did so); Bobelak Dep. 43:8-15 (stating she asked about

vehicle ownership and checking accounts during debtor calls)]. Contrary to Plaintiff's assertion,

just because every collector does not know how to pull a credit report or conduct a title search

does not establish as a matter of law that those collectors do not gather financial information

through other means, including direct communication with debtors.[10] Therefore, Plaintiff cannot

show as a matter of law that MDS had no reason to believe that the collectors would not ask the

questions they were trained to ask relating to the various items mentioned in MDS's letter when

speaking with a debtor.

Plaintiff states that Drennan v. Van Ru Credit Corp., 950 F. Supp. 858 (N.D. Ill. 1996)

stands for the proposition that the use of the word "may" in MDS's letter does not relieve MDS

of liability under § 1692e(10) because in Drennan, language stating that "[t]he legal review

process may may [sic] result in a recommendation to your creditor to file a lawsuit" was found to

be deceptive. Id. at 860. However the contingent language in the letter at issue in Drennan was

used in an entirely different context and manner from the contingent language in MDS's letter.

First, there was an express threat of possible legal action against the debtor in Drennan

accompanying the contingent language in the letter in that case. Id. In contrast, there is no such

threat in MDS's letter. Second, the Drennan letter detailed a parade of horribles that the debtor

---

[10] Further, collectors do not have authority to pull credit reports. [See Thomas Dep. 48:8-13].

would face if judgment was obtained, which the court held caused the letter to read as an "ominous harbinger of things to come" when coupled with the threat of litigation.  <u>Id</u>.  The contingent language did not alleviate the effect of the language in the <u>Drennan</u> letter.  <u>See id</u>.

In contrast, MDS's letter, which stated no more than the fact that information may be sought regarding Plaintiff's assets does not rise to the level of being an "ominous harbinger" of a "parade of horribles" that Plaintiff would face if Plaintiff did not pay her debt.  MDS's letter does not so much as even the mention the possibility of seeking a judgment against Plaintiff, let along that a judgment will be rendered against Plaintiff.  There is a plain issue as to whether MDS's letter can be understood to have the same "pay now or you'll be sorry" tone as the letter in <u>Drennan</u> in the absence of any express threat.  The fact remains that any implied understanding of MDS's letter must be determined by the trier of fact and even the least sophisticated consumer standard cannot cause MDS's letter to imply anything as a matter of law.

> **b.** **A material issue of fact exists as to whether MDS did exactly what it said it might do in the letter.**

As discussed in § V.B(2)(b) <u>supra</u>, a significant material issue of fact exists with respect to whether MDS ever intended to conduct the asset search it "implicitly threatened" to conduct in its letter.  First, a simple examination of the face sheet for Plaintiff's account reveals that MDS did contact Plaintiff numerous times to discuss her debt account, in accordance with MDS's standard debt collection practices.  [<u>See</u> Exhibit 1].  Further, Gary Ball testified that it is MDS's policy and preferred method for seeking the information described in its letters primarily through telephone contact with the debtor on the account.  [<u>See</u> Exhibit 5, Ball Tr. Trans. 19:2-3; 35:19-36:3; 37:10-15].  However, Mr. Ball also testified that this is not the only way that MDS attempts debt collection – only that it is the primary way.  [<u>See</u> Exhibit 5, Ball Tr. Trans. 24:25-25:7].  As a result of these telephone calls, MDS negotiated a payment plan with Plaintiff.  [<u>See</u>

Exhibit 1, entry for 5/9/06].  Lastly, the deposition testimony from MDS's collectors indicates

that upon contacting a debtor, the collectors will ask questions about the items mentioned in

MDS's letter.  [See supra pp. 31-32].

          **c.**      **Case law reveals that MDS's letter to Plaintiff did not include the sort of language and tone that is considered deceptive and misleading under the FDCPA.**

      Several cases highlight how the language in MDS's letter differs from language that other

courts have found deceptive and false under the FDCPA.  First, in Bentley v. Great Lakes

Collection Bureau, 6 F.3d 60 (2d Cir. 1993), the Second Circuit Court of Appeals held that two

collection letters sent by the defendant to the plaintiff violated the FDCPA as ;being deceptive

and misleading under § 1692e and by implying threat in violation of § 1692e(5).  Specifically,

the relevant text of the first letter that was at issue in Bentley reads as follows:

> YOUR CREDITOR IS NOW TAKING THE NECESSARY
> STEPS TO RECOVER THE OUTSTANDING AMOUNT OF $
> 483.43.  THEY HAVE INSTRUCTED US TO PROCEED WITH
> WHATEVER LEGAL MEANS IS [sic] NECESSARY TO
> ENFORCE COLLECTION.

Id. at 61.  In the second follow-up letter, the defendant in Bentley threatened as follows:

> THIS OFFICE HAS BEEN UNABLE TO CONTACT YOU BY
> TELEPHONE, THEREFORE YOUR DELINQUENT ACCOUNT
> HAS BEEN REFERRED TO MY DESK WHERE A DECISION
> MUST BE MADE AS TO WHAT DIRECTION MUST BE
> TAKEN TO ENFORCE COLLECTION.
>
> WERE OUR CLIENT TO RETAIN LEGAL COUNSEL IN
> YOUR AREA, AND IT WAS DETERMINED THAT SUIT
> SHOULD BE FILED AGAINST YOU, IT COULD RESULT IN
> A JUDGMENT.  SUCH JUDGMENT MIGHT, DEPENDING
> UPON THE LAW IN YOUR STATE, INCLUDE NOT ONLY
> THE AMOUNT OF YOUR INDEBTEDNESS, BUT THE
> AMOUNT OF ANY STATUTORY COSTS, LEGAL INTEREST,
> AND WHERE APPLICABLE, REASONABLE ATTORNEY'S
> FEES.
>
> AGAIN, DEPENDING UPON THE LAW IN YOUR STATE, IF

> SUCH JUDGMENT WERE NOT THEREUPON SATISFIED, IT
> MIGHT BE COLLECTED BY ATTACHMENT OF AN
> EXECUTION UPON YOUR REAL AND PERSONAL
> PROPERTY. GARNISHMENT MAY ALSO BE AN
> AVAILABLE REMEDY TO SATISFY AN UNSATISFIED
> JUDGMENT, IF APPLICABLE IN THE STATE IN WHICH
> YOU RESIDE.
>
> WE THEREFORE SUGGEST YOU CALL OUR OFFICE
> IMMEDIATELY TOLL FREE AT 1-800-874-7080 TO DISCUSS
> PAYMENT ARRANGEMENTS OR MAIL PAYMENT IN FULL
> IN THE ENCLOSED ENVELOPE.
>
> NO LEGAL ACTION HAS BEEN OR IS NOW BEING TAKEN
> AGAINST YOU.

Id. at 61-62.

In these two letters, the court held that the tone of the letters would mislead the least sophisticated consumer and therefore violated the FDCPA because in context, all of the statements by the defendant that legal proceedings were imminent, could include the seizing of assets and garnishment of wages, that the collector had authority to initiate those proceedings, and that the debtor's account had been referred to a "desk" for a final determination created an implicit threat that legal action was imminent when in fact, that was not the case. Id. at 62-63. Further, the second letter's explicit references to the various proceedings available to enforce a judgment violated § 1692e(5) because the record revealed that the defendant never intended to obtain a judgment and be able to utilize the various collection methods the defendant expressly mentioned as available to it in the letter. Id. at 63. Therefore, the appellate court reversed the trial court's grant of summary judgment to the defendant on the plaintiff's FDCPA claims. Id. Moreover, the court held that a purported disclaimer stating that "[n]o legal action has been or is not being taken against you" did not insulate the defendant from the overall tone of the letter and instead, due to the defendant's express references to various legal remedies in conjunction with a statement that the defendant had authority to take whatever means were necessary to collect upon

the plaintiff's debt, served to strengthen the threatening tone of the letter and further mislead the

least sophisticated consumer. See id. (emphasis added). Therefore, not only was the disclaimer

not effective to overcome the tone set by the defendant's express threats of possible legal action,

it actually had the opposite effect of strengthening the plaintiff's argument that the letters falsely

implied that actions could and would be taken by the defendant. Id. at 63.

Additionally, another case that warrants discussion as it further highlights the difference

between the letter sent to Plaintiff and letters that contain a "tone" that violates § 1692e(10) of

the FDCPA is Becker v. Montgomery, Lynch, Civil Action No. 1:02CV874, 2003 U.S. Dist.

LEXIS 24992 (N.D. Ohio Feb. 26, 2003). In Becker, the district court for the Northern District

of Ohio held that the tone of the defendant's letter violated the FDCPA because it implied that

the failure to pay the debt would cause plaintiff to be humiliated and/or incur extra costs. 2003

U.S. Dist. LEXIS 24992, at *2, 5 The full text of the letter, originally all caps except for the

validation section, is as follows:

> Please be advised that above client has retained this office in a
> claim against you, and has further authorized us to employ the
> quickest means available in order to secure full liquidation of this
> obligation.
>
> Experience has shown us that when the proper attitude is displayed
> by all parties concerned, a rapid disposition of such matters can be
> arranged, and no extra cost, humiliation, or hard feelings need
> arise.
>
> Accordingly all action on your account will be suspended for 72
> hours. I urge that you remit the balance in full or talk this matter
> over with me at once.

Id. at *2. The court held that the defendant's letter violated the FDCPA because, in addition to

not including the statutorily required language stating "this is an attempt to collect a debt and any

information obtained will be used for that purpose," the tone of the letter implied that the failure

to pay the debt would result in humiliation and additional costs to the plaintiff. Id. at *5. The court held that naturally, anyone would be upset and concerned at the prospect of both and therefore, a damages award was justified. Id.

In contrast, the language contained in MDS's letter to Plaintiff is not even remotely comparable to that contained in the letters at issue in <u>Bentley</u> and <u>Becker</u>. First, in contrast to the letters at issue in <u>Bentley</u> and <u>Becker</u>, MDS's letter did not threaten or allude to any sort of legal action that MDS was or might contemplate taking against Plaintiff. At most, MDS's letter informed Plaintiff only that MDS would seek to determine if Plaintiff could pay her debt, which would include possibly seeking available information about Plaintiff's assets.

Additionally, not only did MDS not threaten to take any action against Plaintiff, MDS also did not demand immediate payment and instead, invited Plaintiff to contest the validity of the claimed debt. This is in contrast to the letters in <u>Bentley</u> and <u>Becker</u>, in which the courts held that the letters at issue created the impression that if the debtors did not pay their debts immediately, the defendants would seek immediate legal action against them or otherwise embarrass those debtors. Further, in contrast to <u>Becker</u>, MDS's letter made no statements as to any possible repercussions that could follow if Plaintiff did not act to repay her debts or otherwise threaten to embarrass Plaintiff. Even to the least sophisticated consumer, MDS's letter unequivocally expressed MDS's intention to conduct an initial, preliminary evaluation prior to taking any possible steps to collect upon Plaintiff's debt and dispelled any sense of urgency or notion that Plaintiff's failure to pay her debt immediately would result in anything happening to Plaintiff, let alone that she would be faced with severe legal sanctions and personal embarrassment. At a minimum, the absence of any threat in MDS's letters, express or implied, coupled with the differences between MDS's letter and the letters at issue in these cases gives

rise to a material issue of fact as to whether the language in MDS's letter is deceptive under §

1692e(10).

## VI.    CONCLUSION

Based on the foregoing, MDS respectfully requests that this Court deny Plaintiff's

summary judgment motion.

Respectfully submitted this 5th day of February, 2008.

*s/ J. Kirkman Garrett*
James C. Huckaby, Jr.
J. Kirkman Garrett

*Local Counsel for*
*Medical Data Systems, Inc.*

CHRISTIAN & SMALL LLP
505 North 20th Street
Suite 1800
Birmingham, AL 35203
Tel. (205) 795-6588
Fax (205) 328-7234

John G. Parker
(Admitted *pro hac vice*)
Georgia Bar No. 562425
Stefanie Jackman
(Admitted *pro hac vice*)
Georgia Bar No. 335652

*Counsel for Medical Data Systems, Inc.*

Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
(Tel.) 404-815-2400
(Fax) 404-815-2424

## Certificate of Service

I hereby certify that on this 5th day of February, 2008, I electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Michael D. Brock, Esq.
Cary Wyatt Stout, Esq.
Walter Allen Blakeney, Esq.
David Gerald Poston, Esq.
BROCK & STOUT
P.O. Drawer 311167
Enterprise, AL 36331-1167

*s/ J. Kirkman Garrett*
J. Kirkman Garrett

Exhibit 1

03/06/2007     **Medical Data Systems, Inc. / dba Medical Revenue Services**     2:06PM
**Debtor Information Face Sheet**

**PASSMORE, CYNTHIA F**

| Debtor Name | | Client Code | Client Number | | |
|---|---|---|---|---|---|
| PASSMORE, CYNTHIA F | | 03590 | Medical Center Enterprise | | |
| Street Address | | P.O. Box, Suite Number, Mailbox Number | | Telephone Number | |
| 43 SOUTHLAND TRAILOR | | | | (334) 670-0573 | |
| City, State Zip Code | | Current Employer | | Employer Telephone | |
| TROY, AL 36079-0000 | | | | | |
| Date Of Birth | Social Security | Placement Date | Lift Days | Extension | Status |
| 06/24/1984 | 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 | 01/30/2006 | 1 Days | 09/06/2006 | Z |

| Letter Assigned | Last Activity |
|---|---|
| | 03/06/2007 |

Additional Comments
FLD CHAP 13 DT FDL 11-11-02 CS# 02-12547 ATNY MICHAEL D BROCK PH# 334-393-4357

| Account N° | Service Date | Placement Date | Account Status | Amount Placed | Total Payments | Total Adjustments | Current Balance | Patient Name |
|---|---|---|---|---|---|---|---|---|
| E0323100026 | 08/19/2003 | 01/27/2006 | | $55.00 | $0.00 | $55.00 | $0.00 | PASSMORE, CYNTHIA F |
| E0333200039 | 11/26/2003 | 01/27/2006 | | $75.00 | $0.00 | $75.00 | $0.00 | PASSMORE, CYNTHIA F |
| E0322400161 | 09/12/2003 | 01/27/2006 | | $447.65 | $150.00 | $297.65 | $0.00 | PASSMORE, CYNTHIA F |
| **Total Accounts:** | | | | **$577.65** | **$150.00** | **$427.65** | **$0.00** | |

Debtor Notes

| | | |
|---|---|---|
| 02/16/2006 | Charge Status Set to RBAL | Betty Morris |
| 02/16/2006 | Debtor Status Changed From UL To P1 | Betty Morris |
| 02/16/2006 | Insurance Paid Balance Due By Guarantor | Betty Morris |
| 02/16/2006 | Insurance Paid Balance Due By Guarantor | Betty Morris |
| 02/16/2006 | Checked Facility For Additional Info | Betty Morris |
| 02/16/2006 | Checked Facility For Additional Info | Betty Morris |
| 02/16/2006 | Checked Facility For Additional Info | Betty Morris |
| 03/23/2006 | Charge Status Changed From RBAL To INSX | Monica Marquez |
| 03/23/2006 | Talked To Guarantors Insurance Carrier | Monica Marquez |
| 03/23/2006 | per bcbs recorder clm pressed on 9/25/03 and 472.65 went towards | Monica Marquez |
| 03/23/2006 | pt ded amt, pt liable | Monica Marquez |
| 04/19/2006 | Letter PL1 Assigned To Debtor | Denise Bobelak |
| 04/19/2006 | Debtor Status Changed From P1 To P2 | Denise Bobelak |
| 04/19/2006 | Debtor Extension Re-Assigned To 05/19/2006 | Denise Bobelak |
| 04/19/2006 | No Answer At Residence | Denise Bobelak |
| 04/20/2006 | Letter PL1 Sent To The Debtor | Letter Manager |
| 04/27/2006 | Debtor Status Changed From P2 To E | Trisda Marshall |
| 04/27/2006 | Debtor Extension Re-Assigned To 05/17/2006 | Trisda Marshall |
| 04/27/2006 | Return Call From Guarantor | Trisda Marshall |
| 04/27/2006 | mln gvn dbtr vrfyd dob dbtr wntd to be pt on PPLAN std that she | Trisda Marshall |
| 04/27/2006 | cld mail out first pymnt of 50.00 on 5/12/06 informd dbtr she | Trisda Marshall |
| 04/27/2006 | wld be set up on a PPLAN aftr we receive frst pymnt | Trisda Marshall |
| 05/08/2006 | Debtor Extension Re-Assigned To 05/09/2006 | Victoria Rana Williams |
| 05/09/2006 | Debtor Extension Re-Assigned To 05/31/2006 | Denise Bobelak |
| 05/09/2006 | Charge Status Changed From INSX To PPLAN | Denise Bobelak |
| 05/09/2006 | Charge Status Set to PPLAN | Denise Bobelak |
| 05/09/2006 | Charge Status Set to PPLAN | Denise Bobelak |
| 05/09/2006 | Payment Arrangement Setup For $50.00 Every 30 Days | Denise Bobelak |
| 05/09/2006 | Letter PPLAN Assigned To Debtor | Denise Bobelak |
| 05/09/2006 | Debtor Status Changed From E To PPLAN | Denise Bobelak |
| 05/09/2006 | Debtor Extension Re-Assigned To 05/09/2006 | Denise Bobelak |
| 05/16/2006 | Debtor Extension Re-Assigned To 06/05/2006 | Denise Bobelak |
| 06/06/2006 | Letter PPLAN Sent To The Debtor | Letter Manager |
| 06/08/2006 | Debtor Extension Re-Assigned To 06/28/2006 | Denise Bobelak |
| 06/15/2006 | Debtor Extension Re-Assigned To 07/16/2006 | Victoria Rana Williams |
| 07/05/2006 | No Answer At Residence | Belinda Anderson |
| 07/10/2006 | Letter PPLAN Sent To The Debtor | Letter Manager |
| 07/17/2006 | Debtor Extension Re-Assigned To 07/31/2006 | Belinda Anderson |
| 07/17/2006 | Talked To Guarantor At Residence | Belinda Anderson |
| 07/17/2006 | Clld askd fr debtor sh answd ph sh identcf hrslf as debtor l | Belinda Anderson |

Page 1

03/06/2007     **Medical Data Systems, Inc. / dba Medical Revenue Services**     2:06PM
**Debtor Information Face Sheet**

*PASSMORE, CYNTHIA F*

| Date | Description | Name |
|---|---|---|
| 07/17/2006 | sd whr I ws clng frm ph discond convrs ended | Belinda Anderson |
| 08/01/2006 | Talked To Guarantor At Residence | Belinda Anderson |
| 08/01/2006 | spk with debtor sh identfd hrslf I mmd hr sd thp  cll was a followup | Belinda Anderson |
| 08/01/2006 | cll per pmt pln agred sd sh forgot bt wll snd pmyt in  nxt wk | Belinda Anderson |
| 08/01/2006 | 8-4-06 I sd I'll do another follow up cll per tht pymt of $50.00 | Belinda Anderson |
| 08/01/2006 | convrs ended | Belinda Anderson |
| 08/07/2006 | Debtor Status Changed From PPLAN To DFLT | Medical Data Administrator |
| 08/07/2006 | Charge Status PPLAN Removed From Account | Medical Data Administrator |
| 08/08/2006 | Letter PPLAN Not Sent  Debtor Defaulted On Payment Plan | Letter Manager |
| 08/11/2006 | No Answer At Residence | Belinda Anderson |
| 08/18/2006 | Letter DEFAULT Assigned To Debtor | Belinda Anderson |
| 08/18/2006 | Debtor Status Changed From DFLT To P2 | Belinda Anderson |
| 08/18/2006 | Debtor Extension Re-Assigned To 09/06/2006 | Belinda Anderson |
| 08/18/2006 | No Answer At Residence | Belinda Anderson |
| 08/24/2006 | Letter DEFAULT Sent To The Debtor | Letter Manager |
| 09/06/2006 | Debtor Status Changed From P2 To E | Theresa Turner |
| 09/05/2006 | Debtor Extension Re-Assigned To 09/06/2006 | Theresa Turner |
| 09/07/2006 | Guarantor Bankrupt | Theresa Turner |
| 09/07/2006 | FLD CHAP 13 DT FDL 11-11-02 CS# 02-12547 ATNY MICHAEL D BROCK | Theresa Turner |
| 09/07/2006 | PH# 334-393-4357 | Theresa Turner |
| 09/07/2006 | Debtor Status Changed From E To Z | Theresa Turner |
| 09/07/2006 | Charge Status Set to BNK | Theresa Turner |
| 09/07/2006 | Charge Status Set to BNK | Theresa Turner |
| 09/07/2006 | Charge Status Set to BNK | Theresa Turner |
| 09/07/2006 | Cancellation Request Made On This Account | Medical Data Administrator |
| 09/07/2006 | Cancellation Request Made On This Account | Medical Data Administrator |
| 09/07/2006 | Cancellation Request Made On This Account | Medical Data Administrator |
| 03/06/2007 | Debtor Information Face Sheet Requested | Nancy Matos |

Exhibit 2

```
1              IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF ALABAMA
2
                                      CERTIFIED   COPY
3

4    LETICIA ANDREWS,          )  CASE NO:  1:06-CV-729
                               )
5         Plaintiff,           )
         vs.                   )
6                              )
     MEDICAL DATA SYSTEMS,     )
7    INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.            )
8                              )
          Defendant.          )
9    _____ )
     CYNTHIA F. TONEY, a/k/a   )
10   CYNTHIA F. PASSMORE,      )  CASE NO:  2:06-CV-949
                               )
11        Plaintiff,           )
         vs.                   )
12                             )
     MEDICAL DATA SYSTEMS,     )
13   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.            )
14                             )
          Defendant.          )
15   _____ )


16                    DEPOSITION OF

17                   _____

18              RICHARD LARRY HEATH

19                   _____


20        Taken on Behalf of the Plaintiffs


21
     DATE TAKEN:        April 6, 2007
22   TIME:              4:25 PM - 4:45 PM
     PLACE:             Inn on the Lakes Hotel
23                      3100 Golfview Road
                        Sebring, Florida 33875
24

25
```

2

```
1              IN THE UNITED STATES BANKRUPTCY COURT
                     MIDDLE DISTRICT OF ALABAMA
2

3       TRICIA VAUGHN,              ) A.P. #: 06-1192
                                    )
4            Plaintiff,             )
           vs.                      )
5                                   )
        MEDICAL DATA SYSTEMS,       )
6       INC., d/b/a MEDICAL REVENUE )
        SERVICES, INC.              )
7                                   )
             Defendant.             )
8       _____)
        LERINDA EVANS,              ) A.P. #: 06-1196
9                                   )
             Plaintiff,             )
10         vs.                      )
                                    )
11      MEDICAL DATA SYSTEMS,       )
        INC., d/b/a MEDICAL REVENUE )
12      SERVICES, INC.              )
                                    )
13           Defendant.             )
        _____)
14      SHNEQUA BONE,               ) A.P. #: 06-1206
                                    )
15           Plaintiff,             )
           vs.                      )
16                                  )
        MEDICAL DATA SYSTEMS,       )
17      INC., d/b/a MEDICAL REVENUE )
        SERVICES, INC.              )
18                                  )
             Defendant.             )
19      _____)
        JERRY BROADWAY,             ) A.P. #: 06-1085
20                                  )
             Plaintiff,             )
21         vs.                      )
                                    )
22      MEDICAL DATA SYSTEMS,       )
        INC., d/b/a MEDICAL REVENUE )
23      SERVICES, INC.              )
                                    )
24           Defendant.             )
        _____)
25
```

3

1    ROY BOSWELL,                              ) A.P. #: 06-1088
2                                              )
            Plaintiff,                         )
3       vs.                                    )
                                               )
4    MEDICAL DATA SYSTEMS,                     )
     INC., d/b/a MEDICAL REVENUE               )
5    SERVICES, INC.                            )
                                               )
6          Defendant.                          )
                                               )
7    MATTHEW ELLSWORTH,                        ) A.P. #: 06-1089
                                               )
8            Plaintiff,                        )
        vs.                                    )
9                                              )
     MEDICAL DATA SYSTEMS,                     )
10   INC., d/b/a MEDICAL REVENUE               )
     SERVICES, INC.                            )
11                                             )
           Defendant.                          )
12                                             )
     JOHN DYKES,                               ) A.P. #: 06-1094
13                                             )
            Plaintiff,                         )
14      vs.                                    )
                                               )
15   MEDICAL DATA SYSTEMS,                     )
     INC., d/b/a MEDICAL REVENUE               )
16   SERVICES, INC.                            )
                                               )
17         Defendant.                          )
                                               )
18   RICHARD B. PARRISH,                       ) A.P. #: 06-1163
                                               )
19           Plaintiff,                        )
        vs.                                    )
20                                             )
     MEDICAL DATA SYSTEMS,                     )
21   INC., d/b/a MEDICAL REVENUE               )
     SERVICES, INC.                            )
22                                             )
           Defendant.                          )
23                                             )
24
25

4

```
 1
      AARON KELLY,                    ) A.P. #: 06-1164
 2                                    )
            Plaintiff,                )
 3        vs.                         )
                                      )
 4    MEDICAL DATA SYSTEMS,           )
      INC., d/b/a MEDICAL REVENUE     )
 5    SERVICES, INC.                  )
                                      )
 6          Defendant.               )
                                     _)
 7    JEFFERY DIXON,                  ) A.P. #: 06-1165
                                      )
 8          Plaintiff,                )
          vs.                         )
 9                                    )
      MEDICAL DATA SYSTEMS,           )
10    INC., d/b/a MEDICAL REVENUE     )
      SERVICES, INC.                  )
11                                    )
            Defendant.                )
12                                   _)
      SHARON MCCARTER,                ) A.P. #: 06-1172
13                                    )
            Plaintiff,                )
14        vs.                         )
                                      )
15    MEDICAL DATA SYSTEMS,           )
      INC., d/b/a MEDICAL REVENUE     )
16    SERVICES, INC.                  )
                                      )
17          Defendant.                )
                                     _)
18    LORETTA MCCLURE,                ) A.P. #: 06-1174
                                      )
19          Plaintiff,                )
          vs.                         )
20                                    )
      MEDICAL DATA SYSTEMS,           )
21    INC., d/b/a MEDICAL REVENUE     )
      SERVICES, INC.                  )
22                                    )
            Defendant.                )
23                                   _)

24              Susan Rankine, Court Reporter
              Accurate Reporting Service, Inc.
25                   439 Rose Avenue
               Sebring, Florida 33870
```

1   money?

2       A.   Yes, sir.

3       Q.   During those occasions did you ever ask the

4   debtors whether they owned any real estate?

5       A.   Yes, I did.

6       Q.   And what was the purpose of asking if they

7   owned real estate?

8       A.   To assist the debtors to be able to make a

9   suggestion as to how we may be able to help them to

10  settle outstanding bills.

11      Q.   Were these questions generally when you were

12  trying to set up payment plans?

13      A.   Yes, primarily.

14      Q.   If you reached a situation where the debtor did

15  not wish to set up a payment plan, would you ask them

16  questions about their real estate?

17          MR. McGILL:  Say that again.  I'm not following

18      you.

19      Q.   When you reached a situation where a debtor did

20  not wish to set up a payment plan, that is on the phone

21  call you have ascertained they're not going to set up a

22  payment plan, would you still, nonetheless, ask them

23  questions pertaining to ownership of real estate?

24          MR. McGILL:  Before or after you reach the

25      payment plan or at any time other than the payment

1    plan?

2        Q.   Is it my understanding that you try to set the

3    payment plan up fairly early in the conversation?

4        A.   No.  First we would ask for balance in full.

5        Q.   How long will that usually take?  About 15

6    seconds?

7        A.   Well, that was situational.  It depends on the

8    situation that you were talking to or addressing.

9        Q.   So assume that you do not have a debtor who is

10   going to pay you in full, you've still got the debtor on

11   the telephone, so now you've moved to the payment plan

12   option.

13       A.   Okay.

14       Q.   The debtor insists that they are not setting up

15   a payment plan.  Did you typically ask the debtor

16   whether they owned any real estate?

17       A.   Yes, there would have been an occasion when I

18   would have asked that.

19       Q.   What would that occasion be?

20       A.   The suggestion or ask the question did they

21   have the option to delay a monthly payment to be able to

22   settle a medical bill, would their mortgage company

23   allow that.

24       Q.   Would that same answer also apply to

25   automobiles?

1        A.    Yes.

2        Q.    So the purpose of asking about real estate

3   would be to try and figure out whether they could defer

4   payment?

5        A.    Correct.

6        Q.    Would that be the sole purpose?

7        A.    In the capacity as a collector, yes.

8        Q.    In your capacity as a collector.  Would that

9   also be the sole purpose in asking them about the car

10  payment?

11       A.    Yes, for deferment purposes.

12       Q.    For deferment purposes.  Did you have any

13  reason at all to ask them about ownership of vehicles

14  that were paid for?

15            MR. McGILL:  In any situation?

16       Q.    Collections.  We're talking about collections.

17       A.    The only occasion there would be perhaps a

18  loan, a personal loan, with the vehicle as collateral.

19       Q.    So you might suggest to the debtors that they

20  go out and get a loan?

21       A.    If they had the collateral, yes.

22       Q.    If they owned the assets?

23       A.    (Witness nods head.)

24       Q.    Would you -- we're talking about a debtor who

25  has refused the payment plan now.  We've gotten past

1    they're not paying in full.  We've gotten past they have

2    refused a payment plan.  Would you, as a collector, ask

3    them, "Do you own a vehicle?"

4        A.    Yes.

5        Q.    And the purpose of that would be to find out

6    what?

7        A.    If they had sufficient collateral that they

8    were willing to use to pay a medical bill.

9        Q.    That is to say you would suggest to them that

10   they could maybe borrow some money on it?

11       A.    Correct.

12       Q.    Would you do the same thing with real estate?

13       A.    Yes.

14       Q.    Did you, for the most part, believe them if

15   they told you they didn't own a vehicle?

16       A.    Yes.  I had no choice.

17       Q.    Have you ever been trained to search for

18   assets?

19       A.    Yes.

20       Q.    Have you been trained to search for assets in

21   your capacity as a collector for Medical Data?

22       A.    Yes.  With property, yes.

23       Q.    With property being land?

24       A.    Correct.

25       Q.    So you have been trained to search for land as

14

1    a collector with Medical Data?

2        A.    Yes.

3        Q.    How long ago were you trained in that?

4        A.    2003, January 2004.  I don't know exactly when

5    that part of the training occurred.

6        Q.    Have you ever been trained to search for

7    automobile ownership?

8        A.    Not as a collector, no.

9        Q.    As a collector with Medical Data?

10       A.    Correct.

11       Q.    Have you been trained to search for checking

12   accounts or savings accounts?

13       A.    Only from the questioning of the debtor if they

14   had assets and that.

15       Q.    So if they told you that they didn't, you had

16   no choice but to believe them?

17       A.    Correct.

18       Q.    Have you ever called an employer --

19       A.    Yes.

20       Q.    -- in your capacity as a collector?

21       A.    Yes, sir.

22       Q.    When you called the employer would you ask the

23   employer about the debtor's personal property assets?

24       A.    No, sir.

25       Q.    Did you ever have any reason at all to do that?

1      Q.    If you talked to someone about real estate

2    ownership would you have written it down on the

3    computer?

4      A.    Yes.

5      Q.    If you talked to someone about the amount of

6    money they had in their checking account would you have

7    written it down on the computer?

8      A.    Not the dollar amount, only that they

9    acknowledged they had an account.

10     Q.    If they acknowledged they actually had money in

11   the checking account would you have noted that fact on

12   the computer?

13     A.    A valid checking account, yes.

14     Q.    If they told you that they had other personal

15   property assets would you have noted that on the

16   computer?

17     A.    Yes.

18     Q.    If they told you that they had a source of

19   income besides employment would you have noted it on

20   their face sheet?

21     A.    Yes.

22     Q.    Fair enough.

23           (Plaintiff's Exhibit No. 11 was marked for

24   identification.)

25           MR. POSTON:   Plaintiff's Exhibit Number 11.

Exhibit 3

1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF ALABAMA
 2
                                 CERTIFIED  COPY
 3

 4   LETICIA ANDREWS,           )  CASE NO:  1:06-CV-729
                                )
 5        Plaintiff,            )
           vs.                  )
 6                              )
     MEDICAL DATA SYSTEMS,       )
 7   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.             )
 8                              )
          Defendant.            )
 9   _____)
     CYNTHIA F. TONEY, a/k/a     )
10   CYNTHIA F. PASSMORE,        )  CASE NO:  2:06-CV-949
                                )
11        Plaintiff,            )
           vs.                  )
12                              )
     MEDICAL DATA SYSTEMS,       )
13   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.             )
14                              )
          Defendant.            )
15   _____)

16
                     DEPOSITION OF
17
                   MICHELLE PEACOCK
18                 _____

19

20
              Taken on Behalf of the Plaintiffs
21

22        DATE TAKEN:       April 6, 2007
          TIME:             12:25 PM - 1:40 PM
23        PLACE:            Inn on the Lakes Hotel
                            3100 Golfview Road
24                          Sebring, Florida 33875

25
```

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
                 MIDDLE DISTRICT OF ALABAMA
 2

 3     TRICIA VAUGHN,              ) A.P. #: 06-1192
                                   )
 4          Plaintiff,             )
          vs.                      )
 5                                 )
       MEDICAL DATA SYSTEMS,       )
 6     INC., d/b/a MEDICAL REVENUE )
       SERVICES, INC.             )
 7                                 )
            Defendant.             )
 8     _____ )
       LERINDA EVANS,              ) A.P. #: 06-1196
 9                                 )
            Plaintiff,             )
10          vs.                    )
                                   )
11     MEDICAL DATA SYSTEMS,       )
       INC., d/b/a MEDICAL REVENUE )
12     SERVICES, INC.              )
                                   )
13          Defendant.             )
       _____ )
14     SHNEQUA BONE,               ) A.P. #: 06-1206
                                   )
15          Plaintiff,             )
          vs.                      )
16                                 )
       MEDICAL DATA SYSTEMS,       )
17     INC., d/b/a MEDICAL REVENUE )
       SERVICES, INC.              )
18                                 )
            Defendant.             )
19     _____ )
       JERRY BROADWAY,             ) A.P. #: 06-1085
20                                 )
            Plaintiff,             )
21          vs.                    )
                                   )
22     MEDICAL DATA SYSTEMS,       )
       INC., d/b/a MEDICAL REVENUE )
23     SERVICES, INC.              )
                                   )
24          Defendant.             )
       _____ )
25
```

3

```
1
        ROY BOSWELL,                    ) A.P. #: 06-1088
2                                       )
                Plaintiff,              )
3           vs.                         )
                                        )
4       MEDICAL DATA SYSTEMS,           )
        INC., d/b/a MEDICAL REVENUE     )
5       SERVICES, INC.                  )
                                        )
6           Defendant.                  )
                                        )
7       MATTHEW ELLSWORTH,              ) A.P. #: 06-1089
                                        )
8               Plaintiff,              )
            vs.                         )
9                                       )
        MEDICAL DATA SYSTEMS,           )
10      INC., d/b/a MEDICAL REVENUE     )
        SERVICES, INC.                  )
11                                      )
            Defendant.                  )
12                                      )
        JOHN DYKES,                     ) A.P. #: 06-1094
13                                      )
                Plaintiff,              )
14          vs.                         )
                                        )
15      MEDICAL DATA SYSTEMS,           )
        INC., d/b/a MEDICAL REVENUE     )
16      SERVICES, INC.                  )
                                        )
17          Defendant.                  )
                                        )
18      RICHARD B. PARRISH,             ) A.P. #: 06-1163
                                        )
19              Plaintiff,              )
            vs.                         )
20                                      )
        MEDICAL DATA SYSTEMS,           )
21      INC., d/b/a MEDICAL REVENUE     )
        SERVICES, INC.                  )
22                                      )
            Defendant.                  )
23      _____)
24
25
```

4

```
 1
       AARON KELLY,                      )  A.P. #: 06-1164
 2                                       )
               Plaintiff,                )
 3          vs.                          )
                                         )
 4     MEDICAL DATA SYSTEMS,             )
       INC., d/b/a MEDICAL REVENUE       )
 5     SERVICES, INC.                    )
                                         )
 6          Defendant.                   )
       _____)
 7     JEFFERY DIXON,                    )  A.P. #: 06-1165
                                         )
 8             Plaintiff,                )
            vs.                          )
 9                                       )
       MEDICAL DATA SYSTEMS,             )
10     INC., d/b/a MEDICAL REVENUE       )
       SERVICES, INC.                    )
11                                       )
            Defendant.                   )
12     _____)
       SHARON MCCARTER,                  )  A.P. #: 06-1172
13                                       )
               Plaintiff,                )
14          vs.                          )
                                         )
15     MEDICAL DATA SYSTEMS,             )
       INC., d/b/a MEDICAL REVENUE       )
16     SERVICES, INC.                    )
                                         )
17          Defendant.                   )
       _____)
18     LORETTA MCCLURE,                  )  A.P. #: 06-1174
                                         )
19             Plaintiff,                )
            vs.                          )
20                                       )
       MEDICAL DATA SYSTEMS,             )
21     INC., d/b/a MEDICAL REVENUE       )
       SERVICES, INC.                    )
22                                       )
            Defendant.                   )
23     _____)

24             Susan Rankine, Court Reporter
             Accurate Reporting Service, Inc.
25                  439 Rose Avenue
                Sebring, Florida 33870
```

28

1    an account, a debtor is going to owe a certain amount of

2    money.  Fair enough?

3        A.    Absolutely.

4        Q.    Is there a certain amount of money that a

5    debtor should owe before you will contact a clerk of

6    court regarding land ownership?

7        A.    Yes.

8        Q.    What is that amount?

9        A.    In my particular circumstance it's a minimum of

10   $500.

11       Q.    So your testimony is that anything over $500

12   you might contact the clerk of court to determine land

13   ownership?

14       A.    I might, yes.

15       Q.    And anything under five hundred you would not

16   contact the clerk of the court?

17       A.    No.

18       Q.    Would you say that you never contact the clerk

19   of court for anything under $500?

20       A.    Yes.

21       Q.    Or, stated another way, you do not contact the

22   clerk of court for any debt less than $500?

23            MR. McGILL:   Ever --

24            MR. POSTON:   Ever.

25            MR. McGILL:   -- during the history or life of

29

```
 1        the account?
 2        Q.   If you receive an account for less than $500
 3   will you contact a clerk of the court to determine land
 4   ownership?
 5        A.   I would not contact the clerk of court
 6   regarding ownership with a debtor balance less than $500
 7   ever.
 8        Q.   Okay.  Thank you for clarifying that for me,
 9   because I told you that I had trouble getting these
10   questions just right.  Thank you.
11             Okay.  Now, let's then just talk about accounts
12   over $500.  Now, is it safe to say you do not contact
13   the clerk of court for every debtor that you're
14   collecting on?
15        A.   I do not contact them for every debtor.
16        Q.   Obviously, if you called me and you said that I
17   owed you $1,500 and I said, "Here you go," there would
18   be no need to contact them?
19        A.   Absolutely.
20        Q.   Why waste your time, right?
21        A.   Take your money, yes, sir.
22        Q.   Okay.  So, what circumstance -- you're an
23   experienced collector, I know that.  What circumstance
24   would prompt you to contact the clerk of court?
25        A.   The criteria of account balance owed by the
```

1    debtor, whether it's one or collectively five hundred,

2    gainful full-time employment, and a refusal to make any

3    type of reasonable payment arrangement.

4        Q.    Okay.  In your mind that's going to be the top

5    three right there?  There may be others, but that's the

6    top three?

7        A.    Those three must be present to prompt me even

8    to think about it.

9        Q.    So if a debtor is not employed, you would not

10   contact -- let's go through those three.  I'm just going

11   to set up a hypothetical.  A debtor owes $10,000, the

12   debtor tells you he's not employed and he would be more

13   than happy to pay you ten dollars a month.  Would you

14   contact the clerk of court under that scenario?

15       A.    First, I wouldn't be required to qualify him.

16       Q.    Because?

17       A.    Because a ten-dollar monthly payment on a

18   $10,000 balance isn't reasonable.  It would take over a

19   hundred years to pay that.  That's not reasonable.

20       Q.    Okay.  Fair enough.  But if he told you, "All I

21   can pay is ten dollars a month because I'm not

22   employed" --

23       A.    I would still have to attempt to qualify him

24   for a reasonable payment arrangement.

25       Q.    But if he said, "Look, ten dollars is all that

1    I've got, all I can pay," would you contact the clerk of

2    court to determine real estate ownership?

3        A.    At that point, age, prior history on the

4    account, would come into play.  The high balance on the

5    account would come into play.

6        Q.    Sure.

7        A.    And more often than not I believe I would.

8        Q.    Fair enough.  Now, let's back up a second.  Now

9    we're talking about training.  Okay?  You said that you

10   have been trained on contacting the clerk of court

11   regarding land ownership.  Have you received any other

12   training regarding assets?  Since your initial training

13   have you received any other training?

14       A.    Regarding assets in general?

15       Q.    Regarding assets in general, yes, ma'am.

16       A.    Yes.

17       Q.    You have?  Would you tell me about that,

18   please?

19       A.    In our qualification process to determine

20   reasonable payment plan arrangements --

21       Q.    Yes, ma'am.

22       A.    -- we review income versus expenses.

23       Q.    Yes, ma'am.

24       A.    Part of reviewing income versus expenses

25   includes actual wage income, obviously.  When you're

1    qualifying the expenses would be mortgage, rent, car

2    payment, insurance payment, health benefits, child

3    support and other things that an individual would

4    qualify as required monthly expenses and then you have a

5    ratio of what's available to make a reasonable payment

6    out of what's left.

7        Q.    Okay.

8        A.    So obviously, because of that process, you are

9    obtaining information they own their home or they are

10   owning it, trying to own it --

11       Q.    Sure.

12       A.    -- or they are paying on a vehicle, just to

13   qualify them on that income expense ratio.

14       Q.    Okay.  So if I get a picture, if I get a

15   picture here of the collection process, when you're

16   dealing with a debtor you are dealing with someone who

17   is -- obviously, you are first trying to get the payment

18   in full.  That doesn't occur, then you are falling back

19   on a secondary position to try to determine a payment

20   plan.

21       A.    A reasonable payment arrangement, yes, sir.

22       Q.    What you call a reasonable payment arrangement.

23   You yourself are not going to just take any old payment

24   plan?

25       A.    No, sir.

35

| | |
|---|---|
| 1 | MR. McGILL:  Would it be better, maybe she'll |
| 2 | understand it better as a proposed payment |
| 3 | arrangement.  Maybe that will help her, help her |
| 4 | understand. |
| 5 | Q.    Whatever you want to call it.  Before you take |
| 6 | it to your supervisor do you find out the information |
| 7 | that's going to go into the payment arrangement? |
| 8 | A.    Yes. |
| 9 | Q.    Okay.  And if I understood your testimony |
| 10 | correctly, you would be asking for income, is that true? |
| 11 | A.    Yes. |
| 12 | Q.    You would be asking about rent and mortgage |
| 13 | payment? |
| 14 | A.    Yes. |
| 15 | Q.    And you would be asking about other monthly |
| 16 | expenses? |
| 17 | A.    Yes. |
| 18 | Q.    To get to a bottom line of what's left over, |
| 19 | which you're going to try to direct them to a reasonable |
| 20 | payment arrangement? |
| 21 | A.    Yes. |
| 22 | Q.    Okay.  During that process in talking to |
| 23 | debtors do you ever ask them do they own real estate? |
| 24 | A.    Yes. |
| 25 | Q.    And they say, "Yes.  I'm buying a house.  I |

1    sure do."  What would you ask them at that point?

2        A.    That's really broad.  Could you --

3        Q.    Sure.  You're trying to find out a payment

4    arrangement and you would ask them, "Do you own a

5    house?"  And they say yes.  Are you going to ask them

6    what their mortgage payment is?

7        A.    No.

8        Q.    You're not?

9        A.    I already know that.

10       Q.    How would you know it?

11       A.    Because in my expense assessment you have

12   already told me.

13       Q.    I'm talking about during the first initial

14   contact with the debtor as you're working out the

15   payment arrangement, the expense assessment, assessment,

16   you are asking them what their mortgage payments are?

17       A.    Mortgage or rent, yeah.

18       Q.    Mortgage or rent.  During the assessment

19   process do you ask them if they own a house?

20       A.    Probably on certain occasions.  If you have no

21   rent or mortgage payment, i.e. do you own your home?

22       Q.    If a debtor tells you that they are paying a

23   $500 mortgage payment and you list that down on the

24   assessment, do you then inquire about other real estate?

25       A.    Generally, no.

```
1        Q.    Would there ever be an occasion that you would?

2        A.    Yes.

3        Q.    What would lead you to ask if they owned other

4    real estate?

5        A.    Settlement opportunities for them.

6        Q.    Why would you ask them if they owned other real

7    estate?

8        A.    Settlement opportunities for them.

9        Q.    What purpose does that serve?

10       A.    Settlement opportunities?

11       Q.    Yes.

12       A.    The opportunity for a debtor to enter into an

13   arrangement to save a portion of their bill or have a

14   portion of their bill written off.

15       Q.    Let's take an example then.  You have gone

16   through the assessment phase, you have obtained their

17   monthly expenses and there is only $20 left over every

18   month.

19       A.    Okay.

20       Q.    And they owe a $10,000 debt.  That wouldn't be

21   reasonable, would it, $20 a month on a $10,000 debt?

22       A.    No.  I couldn't establish a payment plan for

23   them, no, sir.

24       Q.    What would be your next step at that point?

25       A.    I would review an option available to them to
```

```
1    settle the account.
2        Q.   But they only have $20 left over.
3        A.   They have other options available to them other
4    than just that.
5        Q.   Okay.  Would you tell me some of those other
6    options?
7        A.   Sure.  Using your example of a $10,000 debt --
8        Q.   Yes.
9        A.   -- and a mortgage payment in the assessment
10   they own their home.
11       Q.   Yes.
12       A.   The particular facility I work at allows you to
13   offer a 50-percent bill reduction.
14       Q.   So that would be $5,000?
15       A.   Right.  An opportunity for them to rid
16   themselves of the overall debt owed.
17       Q.   Yes.
18       A.   I would enter a discussion if they would be
19   comfortable finding out if they were able to secure a
20   type of equity loan --
21       Q.   Okay.
22       A.   -- to take advantage of a bill reduction and
23   clear that out, extend their payment then on the five
24   thousand then over a 15- or 20-year period less
25   burdening to them --
```

```
 1         Q.    Yes.

 2         A.    -- and making me go away.

 3         Q.    Yes.

 4         A.    So it's an opportunity for them to settle the

 5    large debt, save a significant amount of money --

 6         Q.    Sure.

 7         A.    -- and extend the obligation to repay that over

 8    a longer period of time.  If they were comfortable with

 9    that that's an available option.

10         Q.    So under my hypothetical then you would then

11    begin asking them about equity in their home?

12         A.    Not on every occasion, no.

13              MR. McGILL:    In this example.

14         Q.    Under this hypothetical you would say, "Hey, do

15    you own any equity in your home?"  You would ask them

16    that?

17         A.    I first would offer them the settlement that,

18    "There's another option available.  I don't know if you

19    could take advantage of it."

20         Q.    And you would tell them, "I'll settle this for

21    $5,000 right now," or, "I'll settle this for a

22    50-percent reduction right now."  And the debtor tells

23    you, "Gosh, I don't have $5,000." What would you ask

24    them then?

25         A.    That's when I would determine any other equity
```

1    they have in their home or their property or if they

2    could defer a payment, which is usually interest free,

3    that would give them a pool of money.  A lot of

4    people -- I personally wasn't aware of it -- aren't

5    aware of those things.  If they say they can't, they

6    can't.  We're done.

7        Q.   Okay.  Good.  Let's go back to the obstinate

8    debtor.  "I don't have any money.  I'm not working.  You

9    can't get blood out of a turnip.  You can ask me all day

10   long for money, but I don't have it."  What do you do at

11   that point?

12       A.   "The balance of the debt is still due in full

13   today."  When you first contact them it's due and --

14       Q.   Let's use our $10,000 hypothetical.  It's a big

15   old balance.  The guy says, "I'm not working.  You can't

16   get blood out of a turnip.  Nothing you can get from

17   me."

18       A.   "I appreciate your circumstances, but you

19   received services and the facility does need to be paid

20   for those."

21       Q.   Sure.

22       A.   That's our script.

23       Q.   I understand.

24       A.   "Collection efforts will continue.  If you're

25   only able to make an effort payment on your balance, I

1   would suggest you do that.  It will show you're

2   interested in paying for the care you received."  That's

3   basically the script.

4       Q.   Okay.  Great.  Would you at that point contact

5   the clerk of court to determine real estate ownership?

6   Excuse me.  Land ownership?

7       A.   Yes.

8       Q.   Okay.  Would you conduct any other

9   investigation into assets at that point?

10      A.   Yes.

11      Q.   Such as?

12      A.   I have the capacity to refer accounts to

13  corporate office for legal review.

14      Q.   Okay.  What else would you do?

15      A.   I would refer them to corporate for legal

16  review.

17      Q.   Besides that?  Is there anything else you would

18  do?

19      A.   Me personally, no.

20      Q.   Yes.  Anything that you personally would do.

21  I'm not worried about what the suits do up in corporate.

22  I'm talking about the frontline soldier.

23      A.   No.  I'm done.

24      Q.   You're done at that point?

25      A.   I'm going to chase after someone else and get

1   his money.  Yes, sir, I'm done.

2        Q.   Okay.  Good.  Do you have the ability to look

3   for automobile ownership?

4        A.   No.

5        Q.   Would you ask the debtor, "Hey, do you own a

6   car?"

7        A.   Again, I would do that in the assessment.  "Do

8   you have a car note?"

9        Q.   Let's suppose the debtor says, "No, I don't

10  have a car note."  So you have worked through that.

11  "No, I don't have a car note.  I don't have a house

12  note.  I live with my mom and I draw social security.  I

13  buy cigarettes.  I buy beer.  I don't have a car note.

14  I don't have a house note.  That's it."  Would you ask

15  them at that point, "Well, do you own real estate?"

16       A.   Nope.

17       Q.   Would you ask them, "Do you own a car?"

18       A.   No.

19       Q.   Would you ask them if they had a savings

20  account?

21       A.   No.

22       Q.   Would you ask them if they owned a plasma TV?

23       A.   No.

24       Q.   Would you ask them if they owned any other

25  personal property assets?

```
1       A.    No.

2       Q.    So really the determination of personal

3    property assets and real property, land assets, comes

4    about during the monthly payment assessment process?

5       A.    The initial payment process.

6       Q.    The initial payment process.  Do you have an

7    instinct for when someone is lying?

8       A.    Absolutely.

9       Q.    I believe you.  I really do believe you.  So if

10   you thought someone was lying -- "I'm not working.  I

11   live with my mama, and all I've got is social security."

12   If you had the idea that they were lying, what would you

13   do at that point?  Besides refer them to legal, what

14   would you personally do at that point?

15      A.    At this point I put it in SA status because I

16   get a credit report.

17      Q.    SA status then generates a credit report?

18      A.    Uh-huh.

19      Q.    Okay.  How long have you had the ability to put

20   an account in SA status?

21      A.    Twelve to eighteen months.

22      Q.    Twelve to eighteen months?  Prior to that --

23      A.    Nope.

24      Q.    -- you never got a credit report?

25      A.    No.  I'm sorry.
```

44

1     Q.   Pardon me?

2     A.   No.

3     Q.   Do you actually get to look at the credit

4  report or does someone else look at it?

5     A.   Someone else does.

6     Q.   Okay.  And they report back to you?

7     A.   Document it in my notes.

8     Q.   Well, I say report it back to you, but it's

9  documented in the notes and then maybe another collector

10  might handle it?

11     A.   No.

12     Q.   You would handle it?

13     A.   Oh, yes.

14     Q.   So if you called me, I may not be able to just

15  shake you, huh?

16     A.   No, sir.

17     Q.   Do you collect for Flowers Hospital?

18     A.   I have.

19     Q.   Do you currently?

20     A.   No, sir.

21     Q.   Good.  Have you ever personally asked a debtor,

22  "Do you own a home?"

23     A.   Yes.

24     Q.   Sure.  Okay.  And they said, "Yes, I do."  And

25  you say, "How much do you pay for it?"  And they say,

```
1    "$500."  Do you ask them if they own any other real

2    estate?

3        A.   No.

4        Q.   So you are usually satisfied with the real

5    estate answer if they say, "I make this much monthly

6    payment," no need to ask about any other real estate?

7        A.   I can't answer that yes or no.  You tell me you

8    own a home and it's valued at $500, I'm not going to ask

9    you additional questions because you're not being

10   honest.

11       Q.   Sure.

12       A.   It's not reasonable to believe that house is

13   only worth $500.

14       Q.   You normally ask them what the house is worth?

15       A.   No.

16       Q.   Do you don't usually ask them that?

17       A.   No.

18       Q.   Do you usually ask them what the total mortgage

19   is?

20       A.   No.  The mortgage payment.

21       Q.   All you're concerned about is the mortgage

22   payment?

23       A.   It gives you a ballpark of what it's worth.

24       Q.   Because that gives you an idea how much money

25   they can pay toward a reasonable payment plan?
```

```
 1        A.    The mortgage payment gives you an idea of how
 2   much the house is worth.
 3        Q.    It does?  How so?
 4        A.    Basic common sense.
 5        Q.    So if I told that you I had a $500-a-month
 6   house payment, what would my house be worth?
 7        A.    I would guesstimate about $50,000.
 8        Q.    Okay.  If I told you I had a $1,500 mortgage
 9   payment, how much would my house be worth?
10        A.    About thirteen to fourteen.  I don't have a
11   calculator.
12        Q.    Thirteen to fourteen thousand or a hundred and
13   thirty?
14        A.    A hundred.  Add the zero.  It's about ten
15   percent.  Your mortgage payment is about ten percent of
16   the value of your house.
17        Q.    Is that right?
18        A.    That's what I would calculate.
19        Q.    So a $2,500 mortgage payment would be?
20        A.    $250,000 house.
21        Q.    Okay.  Fair enough.  When you start asking
22   about cars you're generally asking about car payments,
23   right, or at least car lease payments, is that right?
24        A.    If they -- to qualify them for the expense if
25   they have a car payment, yes.
```

Exhibit 4

1

```
1              IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF ALABAMA
2
                                    CERTIFIED  COPY
3

4    LETICIA ANDREWS,            ) CASE NO:  1:06-CV-729
                                 )
5         Plaintiff,             )
        vs.                      )
6                                )
     MEDICAL DATA SYSTEMS,       )
7    INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.             )
8                                )
          Defendant.            )
9    _____)
     CYNTHIA F. TONEY, a/k/a     )
10   CYNTHIA F. PASSMORE,        ) CASE NO:  2:06-CV-949
                                 )
11        Plaintiff,             )
        vs.                      )
12                               )
     MEDICAL DATA SYSTEMS,       )
13   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.             )
14                               )
          Defendant.            )
15   _____)

16
                      DEPOSITION OF
17                  _____

18                  BARBARA THOMAS
                    _____
19

20         Taken on Behalf of the Plaintiffs

21
        DATE TAKEN:      April 6, 2007
22      TIME:            11:08 AM - 12:15 PM
        PLACE:           Inn on the Lakes Hotel
23                       3100 Golfview Road
                         Sebring, Florida 33875
24

25
```

Accurate Reporting Service, Inc.
863 382-4441

2

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
                 MIDDLE DISTRICT OF ALABAMA
 2

 3    TRICIA VAUGHN,              ) A.P. #: 06-1192
                                  )
 4          Plaintiff,            )
          vs.                     )
 5                                )
      MEDICAL DATA SYSTEMS,       )
 6    INC., d/b/a MEDICAL REVENUE )
      SERVICES, INC.              )
 7                                )
            Defendant.            )
 8    _____)
      LERINDA EVANS,              ) A.P. #: 06-1196
 9                                )
            Plaintiff,            )
10          vs.                   )
                                  )
11    MEDICAL DATA SYSTEMS,       )
      INC., d/b/a MEDICAL REVENUE )
12    SERVICES, INC.              )
                                  )
13          Defendant.            )
      _____)
14    SHNEQUA BONE,               ) A.P. #: 06-1206
                                  )
15          Plaintiff,            )
          vs.                     )
16                                )
      MEDICAL DATA SYSTEMS,       )
17    INC., d/b/a MEDICAL REVENUE )
      SERVICES, INC.              )
18                                )
            Defendant.            )
19    _____)
      JERRY BROADWAY,             ) A.P. #: 06-1085
20                                )
            Plaintiff,            )
21          vs.                   )
                                  )
22    MEDICAL DATA SYSTEMS,       )
      INC., d/b/a MEDICAL REVENUE )
23    SERVICES, INC.              )
                                  )
24          Defendant.            )
      _____)
25
```

3

```
1
          ROY BOSWELL,                    ) A.P. #: 06-1088
2                                          )
                  Plaintiff,               )
3              vs.                         )
                                           )
4         MEDICAL DATA SYSTEMS,            )
          INC., d/b/a MEDICAL REVENUE      )
5         SERVICES, INC.                   )
                                           )
6              Defendant.                  )
          _____)
7         MATTHEW ELLSWORTH,               ) A.P. #: 06-1089
                                           )
8                 Plaintiff,               )
               vs.                         )
9                                          )
          MEDICAL DATA SYSTEMS,            )
10        INC., d/b/a MEDICAL REVENUE      )
          SERVICES, INC.                   )
11                                         )
               Defendant.                  )
12        _____)
          JOHN DYKES,                      ) A.P. #: 06-1094
13                                         )
                  Plaintiff,               )
14             vs.                         )
                                           )
15        MEDICAL DATA SYSTEMS,            )
          INC., d/b/a MEDICAL REVENUE      )
16        SERVICES, INC.                   )
                                           )
17             Defendant.                  )
          _____)
18        RICHARD B. PARRISH,              ) A.P. #: 06-1163
                                           )
19                Plaintiff,               )
               vs.                         )
20                                         )
          MEDICAL DATA SYSTEMS,            )
21        INC., d/b/a MEDICAL REVENUE      )
          SERVICES, INC.                   )
22                                         )
               Defendant.                  )
23        _____)

24

25
```

4

```
1
     AARON KELLY,                    ) A.P. #: 06-1164
2                                    )
            Plaintiff,               )
3        vs.                         )
                                     )
4    MEDICAL DATA SYSTEMS,           )
     INC., d/b/a MEDICAL REVENUE     )
5    SERVICES, INC.                  )
                                     )
6           Defendant.               )
     _____)
7    JEFFERY DIXON,                  ) A.P. #: 06-1165
                                     )
8           Plaintiff,               )
         vs.                         )
9                                    )
     MEDICAL DATA SYSTEMS,           )
10   INC., d/b/a MEDICAL REVENUE     )
     SERVICES, INC.                  )
11                                   )
            Defendant.               )
12   _____)
     SHARON MCCARTER,                ) A.P. #: 06-1172
13                                   )
            Plaintiff,               )
14       vs.                         )
                                     )
15   MEDICAL DATA SYSTEMS,           )
     INC., d/b/a MEDICAL REVENUE     )
16   SERVICES, INC.                  )
                                     )
17          Defendant.               )
     _____)
18   LORETTA MCCLURE,                ) A.P. #: 06-1174
                                     )
19          Plaintiff,               )
         vs.                         )
20                                   )
     MEDICAL DATA SYSTEMS,           )
21   INC., d/b/a MEDICAL REVENUE     )
     SERVICES, INC.                  )
22                                   )
            Defendant.               )
23   _____)

24            Susan Rankine, Court Reporter
           Accurate Reporting Service, Inc.
25                 439 Rose Avenue
               Sebring, Florida 33870
```

```
 1    month.  You work with them.
 2        Q.   During the payment plan process, during the
 3    payment plan process, do you inquire about how much rent
 4    they pay?
 5        A.   Yes, we do try to base this on a monthly
 6    income.
 7        Q.   During the payment plan process do you inquire
 8    about what their mortgage payment may be?
 9        A.   Yes.
10        Q.   During the payment plan process do you ever ask
11    them if they own any other real estate?
12             MR. McGILL:  Aside from the house?
13             THE WITNESS:  Right.
14             MR. McGILL:  Is that the question?
15             MR. POSTON:  That is the question.
16        A.   No.  No.
17        Q.   Okay.  So if you called me and I said, "Look,
18    my mortgage payment is $2,005 a month," would you ask
19    me, for example, "Well, do you own any other real
20    estate?"
21        A.   No.
22        Q.   During the payment plan process do you ever
23    inquire about the amount of their car payment?
24        A.   Again, only to establish their monthly income
25    and deferring a payment.
```

48

```
 1    correct?

 2        A.   Yes.

 3        Q.   He had asked you about pulling credit reports.

 4    I want to make sure everybody is on the same page on

 5    that.  You, as a collector, you don't have authority to

 6    decide on your own to pull a credit report, do you?

 7        A.   No.

 8        Q.   Is that somebody else's job?

 9        A.   To my knowledge I don't even know who does

10    that.

11        Q.   So you don't have the authority to pull a

12    credit report?

13        A.   Absolutely not.

14        Q.   Now, we have talked about a -- we have talked

15    about payment plans.

16        A.   Yes, sir.

17        Q.   Now, with payment plans is there -- before you

18    talk about a payment plan do you need information to

19    discover what they can pay?  In other words, is there

20    some information you need to get to determine whether or

21    not you can actually present a payment plan to them?  Do

22    you have to have supervisor authority to give a payment

23    plan?

24        A.   Now, yes.

25        Q.   Okay.  What process do you go through to get
```

Exhibit 5

FILE COPY

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| CAMBRON, James R. and Wendy L., | ) Case No. 05-11879 |
| | ) |
| Debtors. | ) |
| | |
| JAMES R. CAMBRON | ) |
| vs. | ) AP No. 06-1057 |
| MEDICAL DATA SYSTEMS, INC. | ) |
| | |
| WENDY L. CAMBRON | ) |
| vs. | ) AP No. 06-1058 |
| MEDICAL DATA SYSTEMS, INC. | ) |

Montgomery, AL
March 15, 2007, 9:47 a.m.

---

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

David G. Poston
Michael D. Brock
BROCK & STOUT
P.O. Drawer 311167
Enterprise, AL 36330

Russell A. McGill
Brunson & Associates
P.O. Box 1189
301 Broad St.
Gadsden, AL 35902

---

Electronic Recorder
Operator:                    Linda A. Bodden

Transcriber:                 Patricia Basham
                             6411 Quail Ridge Drive
                             Bartlett, TN  38135
                             901-372-0613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

Ball - Direct                                              17

1    A.        That is correct.

2    Q.        Your letter states that you are going to seek certain

3    information, if available, to determine what further collection

4    action to take?

5    A.        That is negative.  Our letter states that we may.

6    Q.        Okay.  So your letter states that you may - the letter

7    says, "The information we may be seeking, if available, to

8    determine what further collection to take."  Is that correct?

9    A.        That is correct.

10   Q.        Then you list six different things in your letter that

11   you will seek or may seek, if available; is that correct?

12   A.        That is correct, yes.

13   Q.        Okay.  To determine what further collection effort to

14   take.  Okay.  And when you sent these letters to the Cambrons,

15   did you have a judgment against them?

16   A.        No.

17   Q.        Okay.  Had you filed a lawsuit against them?

18   A.        No.  We hardly ever.

19   Q.        As a matter of fact, Medical Revenue Service does not

20   file lawsuits; isn't that correct?

21   A.        You get into a twist of law here, and I think you

22   answered this question and I forget exactly how my lawyer

23   answered it, but I will try to paraphrase it simply.  In the

24   vast majority of the situations that we operate under, the

25   lawsuit is instituted by the hospital, not us.  It is very rare

Ball - Direct                    18

1    that we institute the lawsuit.

2    Q.      Well, my question to you is simple.  Does Medical

3    Revenue Service file lawsuits in the state of Alabama?

4    A.      I do not believe that we have a client in Alabama that

5    has us do lawsuits.  So, therefore, I believe the answer to

6    that is no.

7    Q.      And this letter that you send out is the initial

8    letter, Plaintiff's Exhibit "A" and "B" is the initial letter

9    that you send out on all accounts that are due the hospital; is

10   that correct?

11   A.      Yes.  Every account that we get, we have an obligation

12   to send out a letter on every account that we get.  And on the

13   vast majority of the accounts, the only letter that they will

14   get is this letter and, if we didn't have to send out letters,

15   we wouldn't send the vast majority of them out.

16   Q.      I am sorry.  What did you say?

17   A.      I said if it wasn't for the fact that we are required

18   by the Fair Debt Collection Practices Act to notify them by a

19   letter, the vast majority of these letters that are sent out,

20   we would not send out.

21           THE COURT:  Excuse me.  Then do you follow up with a

22   telephone call?

23           THE WITNESS:  Yeah.  All of our business is done on

24   the phone, not by letters, for all intents and purposes.

25   Q.      All of your business is done by the phone; is that

Ball - Direct                                    19

1    correct?

2    A.       The vast, vast majority of the money that we collect

3    is money that we collect by talking to the guarantor.

4    Q.       All right.  Now the letter states the information you

5    may seek, if available, to determine what further collection

6    efforts to take and then you list real estate ownership and

7    equity; is that correct?

8    A.       That is affirmative.

9    Q.       Okay.  Now my question to you is would foreclosing on

10   the Cambrons' home be a further collection effort?

11           MR. McGILL:  I would object, Your Honor.

12   A.       Yes.

13           MR. McGILL:  I don't understand the relevance of that

14   question.

15           MR. BROCK:  Well, I think it is -

16           THE COURT:  Excuse me.  I will overrule the objection.

17   Answer it again.  Why don't you re-ask the question?

18   BY MR. BROCK:

19   Q.       My question is, and I base this upon your letter, you

20   list real estate ownership and equity.  My question to you and,

21   again, Judge, the basis of this is a least sophisticated

22   consumer.  My question to you is would foreclosing or taking

23   the Cambrons' real estate be a further collection effort?

24           MR. McGILL:  I am going to again object and state to

25   Your Honor that there is nowhere in this letter that even

Ball - Direct                                    24

1    Q.        What about automobile ownership?  Your letter states

2    that  this  is  some  information,  number  five,  automobile

3    ownership.    Information  we  may  be  seeking  if  available  to

4    determine what further collection efforts to take is automobile

5    ownership.   Did either Mr. Cambron or Mrs. Cambron own any

6    automobiles?

7    A.        I don't know the answer to that.  Your Honor, we are

8    going to go through six different questions here and I guess I

9    can answer all of them to say that, you know, we send out a

10   letter and it says we may do these things, and the answer is

11   no.  So we can take a lot of time asking it six times or we can

12   answer it no.

13   Q.        Okay.  So you are testifying in this case that you did

14   not do any of these six items listed on Plaintiff's Exhibit "A"

15   and "B" on either Mr. Cambron or Mrs. Cambron?

16   A.        Because I don't believe, and then I will have to maybe

17   stop here, those are things that we would normally do when we

18   get a hold of the person on the telephone, and those are the

19   standard questions that the collector is asked to ask when they

20   talk to them because that is how we collect our money, and it

21   would appear that we didn't get the opportunity to do that.

22   Q.        Over  a  four-year  period,  you  didn't  get  the

23   opportunity to do that?

24   A.        That is correct.

25   Q.        So are you telling me that the only way you get the

Ball - Direct                                    25

1    items listed in one through six is if you call them up and ask

2    them, the debtors, on the telephone?

3    A.        No, sir, I'm not saying that.  I said that is the

4    primary way.

5    Q.        Okay.

6    A.        Sometimes there would be other reasons that would

7    bring that up.

8    Q.        Okay.  Well, why doesn't your letter say that we will

9    be calling you up on the telephone and asking you if you own

10   any of these assets?

11   A.        This is the way that we –

12             MR. MCGILL:  I will object to that question, Your

13   Honor.  He is asking a question in the negative.  I could say

14   why don't you put in a letter, you know –

15             THE COURT:  Okay.  I will sustain the objection.

16   Q.        Your letter doesn't state that you were going to call

17   them up on the telephone and ask them if they have any of these

18   assets; is that correct?

19   A.        That would be correct, yes.

20   Q.        So I will go back to my previous question and in the

21   Cambrons case, the case we are here about today, Medical

22   Revenue Service didn't find out any of the information listed

23   on one through six, is that correct?

24   A.        That is correct.

25   Q.        Well, that would actually be incorrect because you did

1   us, we have to send a that letter out.

2   Q.      And why do you send the letter out to begin with, any

3   letter?

4   A.      The Fair Debt Collection Practices Act requires that

5   we notify.

6   Q.      Okay.   Now you have a procedure with regard to

7   collecting accounts; correct?

8   A.      That is correct.

9   Q.      When you get an account in initially, your first

10  action is to do what?

11  A.      Send a letter.

12  Q.      And after that letter, what is your responsibility?

13  A.      Then we attempt to collect the debt.

14  Q.      Okay.   Now we have talked a lot about this letter

15  here.

16  A.      That's correct.

17  Q.      Now there are six things listed there.   When do you

18  try to find out about those six things?

19  A.      The first time and the ideal time is when we get them

20  on the telephone, when we talk to the person, because the

21  intent of getting a person on the telephone is to talk to them

22  and to determine can they in fact pay the debt and to counsel

23  them, explain why the debt is there, that it is in fact a real

24  debt because a large number of people don't pay medical bills

25  because they don't think they owe the money.   They think their

Ball - Cross                                          36

1    insurance company paid the - and on and on. So very
2    frequently, especially on small balances like this, nobody has
3    talked to them yet.
4    Q.      Now, Mr. Cambron, you have seen your PL-1 letter, what
5    we have referred to as PL-1 letter, Plaintiff's Exhibit "E."
6    When you first take a look at that page, taking aside
7    bankruptcy, do you think he would have the ability to pay this
8    debt?
9    A.      Yes.
10   Q.      Why?
11   A.      Because he has employment.
12   Q.      And?
13   A.      And it has got a co-pay, meaning the insurance has
14   been paid. In our statistics, of accounts that are placed with
15   us in secondary collection on an overall basis, we collect,
16   over a period of about six to seven years, we will collect
17   approximately six percent of the balance that is passed to us.
18   If the person did not have insurance, we will collect about one
19   point five percent, and if the person did have insurance, we
20   will collect about eighteen percent.
21   Q.      Okay. Now when you get this letter in or when you get
22   a debt in, your first responsibility is to send the letter and
23   you have testified to that. But in every case will you have to
24   go through any of those steps that you have listed, one through
25   six; will that always be a necessity for you?

Ball - Cross                                     37

1    A.        I am sorry?

2    Q.        When you send this letter out, you have got these six

3    things listed.

4    A.        Right.

5    Q.        That you may seek, if available?

6    A.        They are all things that we may do.

7    Q.        But in every case you are not going to have to go

8    through all of this stuff; are you?

9    A.        No, absolutely not.

10   Q.        Sometimes you can call people up and just get a

11   payment; can't you?

12   A.        Yeah, particularly, as I just answered, particularly

13   with co-pays if you can establish phone communication with them

14   and convince them that the amount is payable, in a large amount

15   of the circumstances they will pay the bill.

16   Q.        Okay.  Now Mr. Brock had asked you in the past about

17   filing lawsuits in Alabama.  I want to clarify that for the

18   judge and make sure he understands that situation.  When you

19   file a lawsuit, do you file it in the name of Medical Data or

20   do you file it in the name of the actual creditor?  Tell me how

21   the process works.

22   A.        Well, because we are representing the hospital, then

23   we will ultimately in some situations we will tell the hospital

24   that we think they should initiate suit against the individual

25   or sometimes the hospital will tell us that they think there

Ball - Cross                                    44

1   agency for long-term collection.

2   Q.          So at the point you get this, how many letters like

3   yours do you think have gone out by other agencies?

4   A.          They have received – a typical person has received at

5   least eight letters in ninety percent of the hospitals that you

6   deal with.  Sometimes ten or twelve letters.

7           That's why I said in the beginning the vast majority

8   of these, we would never send a letter out in the first place

9   if we didn't have to because, if they were going to pay the

10  account as a result of a letter, they would have already paid

11  it.

12  Q.          With regard to this particular letter, this letter

13  doesn't say you are seizing real estate; does it?

14  A.          No, it does not.

15  Q.          This letter doesn't say that you are going to seize

16  their vehicle; does it?

17  A.          No, it does not.

18  Q.          It doesn't say you are going to seize personal

19  property?

20  A.          No, it does not.

21  Q.          Savings account?

22  A.          No.

23  Q.          And under verification of employment, at least in the

24  Cambron case, when you call, you still have the obligation to

25  follow the FDCPA; correct?

Ball - Cross                              45

1      A.         Yeah, when we call the place of - if the guarantor

2      has left a phone number for the place of employment and we

3      can't get them at the residence, we will attempt to contact

4      them at their place of employment in case we can talk to them

5      on the phone at the place of employment.  It will also give us

6      the opportunity at the same time on the same phone call to

7      verify that they are employed because that is another thing

8      that will add into, okay, how do we continue to pursue this

9      account if we are going to continue to pursue the account.  You

10     know, if they have got a job, it is going to be more payable

11     than if they are not working anymore.

12     Q.         And this information is important to you, these six

13     items are important to you for one purpose; aren't they; it is

14     important for you to know whether or not these people can pay?

15     A.         Those are some indicators as to whether or not they

16     would be able to pay that we would ask them about.  That is

17     why, when we get them on the telephone, we tell our collectors

18     to ask them about those things.  You know, do you own a house;

19     you know, how much equity have you got in your house. Maybe you

20     can refinance your house.  Maybe, you know, you could take out

21     a second mortgage on your house to pay your hospital bill.  You

22     know, have you got four motorcycles.  Maybe you could sell one

23     of the motorcycles to pay your debt.  You are counseling them.

24              MR. McGILL: Your Honor, that's all I have.

25              THE COURT:   Mr. Brock.

Exhibit 6

1

```
 1        IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF ALABAMA
 2
                              CERTIFIED  COPY
 3

 4    LETICIA ANDREWS,          ) CASE NO:  1:06-CV-729
                                )
 5         Plaintiff,           )
         vs.                    )
 6                              )
      MEDICAL DATA SYSTEMS,     )
 7    INC., d/b/a MEDICAL REVENUE )
      SERVICES, INC.            )
 8                              )
           Defendant.          )
 9    _____)
      CYNTHIA F. TONEY, a/k/a   )
10    CYNTHIA F. PASSMORE,      ) CASE NO:  2:06-CV-949
                                )
11         Plaintiff,           )
         vs.                    )
12                              )
      MEDICAL DATA SYSTEMS,     )
13    INC., d/b/a MEDICAL REVENUE )
      SERVICES, INC.            )
14                              )
           Defendant.          )
15    _____)

16
                    DEPOSITION OF
17                _____

18                SHERROL WAITE
                  _____
19

20        Taken on Behalf of the Plaintiffs

21
         DATE TAKEN:        April 6, 2007
22       TIME:              2:36 PM - 2:57 PM
         PLACE:             Inn on the Lakes Hotel
23                          3100 Golfview Road
                            Sebring, Florida 33875
24

25
```

2

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
               MIDDLE DISTRICT OF ALABAMA
 2

 3   TRICIA VAUGHN,            ) A.P. #: 06-1192
                               )
 4        Plaintiff,           )
          vs.                  )
 5                             )
     MEDICAL DATA SYSTEMS,     )
 6   INC., d/b/a MEDICAL REVENUE)
     SERVICES, INC.            )
 7                             )
          Defendant.          )
 8   _____)
     LERINDA EVANS,            ) A.P. #: 06-1196
 9                             )
          Plaintiff,           )
10        vs.                  )
                               )
11   MEDICAL DATA SYSTEMS,     )
     INC., d/b/a MEDICAL REVENUE)
12   SERVICES, INC.            )
                               )
13        Defendant.          )
     _____)
14   SHNEQUA BONE,             ) A.P. #: 06-1206
                               )
15        Plaintiff,           )
          vs.                  )
16                             )
     MEDICAL DATA SYSTEMS,     )
17   INC., d/b/a MEDICAL REVENUE)
     SERVICES, INC.            )
18                             )
          Defendant.          )
19   _____)
     JERRY BROADWAY,           ) A.P. #: 06-1085
20                             )
          Plaintiff,           )
21        vs.                  )
                               )
22   MEDICAL DATA SYSTEMS,     )
     INC., d/b/a MEDICAL REVENUE)
23   SERVICES, INC.            )
                               )
24        Defendant.          )
     _____)

25
```

3

```
 1
        ROY BOSWELL,                    ) A.P. #: 06-1088
 2                                      )
                  Plaintiff,            )
 3          vs.                         )
                                        )
 4      MEDICAL DATA SYSTEMS,           )
        INC., d/b/a MEDICAL REVENUE     )
 5      SERVICES, INC.                  )
                                        )
 6          Defendant.                  )
        _____)
 7      MATTHEW ELLSWORTH,              ) A.P. #: 06-1089
                                        )
 8                Plaintiff,            )
            vs.                         )
 9                                      )
        MEDICAL DATA SYSTEMS,           )
10      INC., d/b/a MEDICAL REVENUE     )
        SERVICES, INC.                  )
11                                      )
            Defendant.                  )
12      _____)
        JOHN DYKES,                     ) A.P. #: 06-1094
13                                      )
                  Plaintiff,            )
14          vs.                         )
                                        )
15      MEDICAL DATA SYSTEMS,           )
        INC., d/b/a MEDICAL REVENUE     )
16      SERVICES, INC.                  )
                                        )
17          Defendant.                  )
        _____)
18      RICHARD B. PARRISH,             ) A.P. #: 06-1163
                                        )
19                Plaintiff,            )
            vs.                         )
20                                      )
        MEDICAL DATA SYSTEMS,           )
21      INC., d/b/a MEDICAL REVENUE     )
        SERVICES, INC.                  )
22                                      )
            Defendant.                  )
23      _____)

24

25
```

4

```
1
     AARON KELLY,                    ) A.P. #: 06-1164
2                                    )
             Plaintiff,              )
3        vs.                         )
                                     )
4    MEDICAL DATA SYSTEMS,           )
     INC., d/b/a MEDICAL REVENUE     )
5    SERVICES, INC.                  )
                                     )
6            Defendant.              )
     _____)
7    JEFFERY DIXON,                  ) A.P. #: 06-1165
                                     )
8            Plaintiff,              )
         vs.                         )
9                                    )
     MEDICAL DATA SYSTEMS,           )
10   INC., d/b/a MEDICAL REVENUE     )
     SERVICES, INC.                  )
11                                   )
             Defendant.              )
12   _____)
     SHARON MCCARTER,                ) A.P. #: 06-1172
13                                   )
             Plaintiff,              )
14       vs.                         )
                                     )
15   MEDICAL DATA SYSTEMS,           )
     INC., d/b/a MEDICAL REVENUE     )
16   SERVICES, INC.                  )
                                     )
17           Defendant.              )
     _____)
18   LORETTA MCCLURE,                ) A.P. #: 06-1174
                                     )
19           Plaintiff,              )
         vs.                         )
20                                   )
     MEDICAL DATA SYSTEMS,           )
21   INC., d/b/a MEDICAL REVENUE     )
     SERVICES, INC.                  )
22                                   )
             Defendant.              )
23   _____)

24           Susan Rankine, Court Reporter
           Accurate Reporting Service, Inc.
25                 439 Rose Avenue
               Sebring, Florida 33870
```

15

1    Q.    And when you would phone a debtor in an attempt

2    to collect a debt would you ask the debtor whether he or

3    she owned any personal property asset?

4    A.    No.

5    Q.    When you would phone a debtor in an attempt to

6    collect a debt would you ask the debtor whether he or

7    she owned a checking or savings account?

8    A.    No.

9    Q.    In your capacity as a collector did you ever

10   have the occasion to call and verify employment?

11   A.    Yes.

12   Q.    Do you recall whether you were required to

13   verify employment as part of the collection process?

14   A.    Yes.

15   Q.    As far as you remember that was a mandatory

16   part of the collection process to verify employment?

17   A.    Yes.

18   Q.    What purpose -- what technique would you use to

19   verify employment?

20   A.    I would ask for the HR manager and I would

21   verify if Bob Evans worked there.  It's a yes or no

22   question.  If they said yes, then I would say, "Thank

23   you very much."

24   Q.    If the HR manager asked you your name would you

25   give it to them?

Exhibit 7

1

1          IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF ALABAMA
2
                              CERTIFIED   COPY
3

4   LETICIA ANDREWS,           ) CASE NO:  1:06-CV-729
                                )
5          Plaintiff,           )
         vs.                    )
6                               )
    MEDICAL DATA SYSTEMS,        )
7   INC., d/b/a MEDICAL REVENUE  )
    SERVICES, INC.              )
8                               )
           Defendant.           )
9   _____)
    CYNTHIA F. TONEY, a/k/a     )
10  CYNTHIA F. PASSMORE,        ) CASE NO:  2:06-CV-949
                                )
11         Plaintiff,           )
         vs.                    )
12                              )
    MEDICAL DATA SYSTEMS,        )
13  INC., d/b/a MEDICAL REVENUE  )
    SERVICES, INC.              )
14                              )
           Defendant.           )
15  _____)

16                DEPOSITION OF

17            _____

18             TAMMY SHAFFER

19            _____

20       Taken on Behalf of the Plaintiffs

21

        DATE TAKEN:        April 6, 2007
22      TIME:              3:10 PM - 3:41 PM
        PLACE:             Inn on the Lakes Hotel
23                         3100 Golfview Road
                           Sebring, Florida 33875

24

25

2

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
                 MIDDLE DISTRICT OF ALABAMA
 2

 3   TRICIA VAUGHN,              ) A.P. #: 06-1192
                                 )
 4          Plaintiff,           )
          vs.                    )
 5                               )
     MEDICAL DATA SYSTEMS,        )
 6   INC., d/b/a MEDICAL REVENUE  )
     SERVICES, INC.              )
 7                               )
            Defendant.           )
 8   _____)
     LERINDA EVANS,              ) A.P. #: 06-1196
 9                               )
            Plaintiff,           )
10        vs.                    )
                                 )
11   MEDICAL DATA SYSTEMS,        )
     INC., d/b/a MEDICAL REVENUE  )
12   SERVICES, INC.              )
                                 )
13          Defendant.           )
     _____)
14   SHNEQUA BONE,               ) A.P. #: 06-1206
                                 )
15          Plaintiff,           )
          vs.                    )
16                               )
     MEDICAL DATA SYSTEMS,        )
17   INC., d/b/a MEDICAL REVENUE  )
     SERVICES, INC.              )
18                               )
            Defendant.           )
19   _____)
     JERRY BROADWAY,             ) A.P. #: 06-1085
20                               )
            Plaintiff,           )
21        vs.                    )
                                 )
22   MEDICAL DATA SYSTEMS,        )
     INC., d/b/a MEDICAL REVENUE  )
23   SERVICES, INC.              )
                                 )
24          Defendant.           )
     _____)
25
```

Accurate Reporting Service, Inc.
863 382-4441

3

```
1
                                    )
    ROY BOSWELL,                     )  A.P. #: 06-1088
2                                    )
              Plaintiff,             )
3         vs.                        )
                                     )
4   MEDICAL DATA SYSTEMS,            )
    INC., d/b/a MEDICAL REVENUE      )
5   SERVICES, INC.                   )
                                     )
6             Defendant.             )
                                     )
7   MATTHEW ELLSWORTH,               )  A.P. #: 06-1089
                                     )
8             Plaintiff,             )
          vs.                        )
9                                    )
    MEDICAL DATA SYSTEMS,            )
10  INC., d/b/a MEDICAL REVENUE      )
    SERVICES, INC.                   )
11                                   )
              Defendant.             )
12                                   )
    JOHN DYKES,                      )  A.P. #: 06-1094
13                                   )
              Plaintiff,             )
14        vs.                        )
                                     )
15  MEDICAL DATA SYSTEMS,            )
    INC., d/b/a MEDICAL REVENUE      )
16  SERVICES, INC.                   )
                                     )
17            Defendant.             )
                                     )
18  RICHARD B. PARRISH,              )  A.P. #: 06-1163
                                     )
19            Plaintiff,             )
          vs.                        )
20                                   )
    MEDICAL DATA SYSTEMS,            )
21  INC., d/b/a MEDICAL REVENUE      )
    SERVICES, INC.                   )
22                                   )
              Defendant.             )
23                                   )

24

25
```

4

```
1
            AARON KELLY,                    ) A.P. #: 06-1164
2                                           )
                    Plaintiff,              )
3                vs.                        )
                                            )
4           MEDICAL DATA SYSTEMS,           )
            INC., d/b/a MEDICAL REVENUE     )
5           SERVICES, INC.                  )
                                            )
6                Defendant.                 )
                                            )
7           JEFFERY DIXON,                  ) A.P. #: 06-1165
                                            )
8                    Plaintiff,             )
                 vs.                        )
9                                           )
            MEDICAL DATA SYSTEMS,           )
10          INC., d/b/a MEDICAL REVENUE     )
            SERVICES, INC.                  )
11                                          )
                 Defendant.                 )
12                                          )
            SHARON MCCARTER,                ) A.P. #: 06-1172
13                                          )
                    Plaintiff,              )
14               vs.                        )
                                            )
15          MEDICAL DATA SYSTEMS,           )
            INC., d/b/a MEDICAL REVENUE     )
16          SERVICES, INC.                  )
                                            )
17               Defendant.                 )
                                            )
18          LORETTA MCCLURE,                ) A.P. #: 06-1174
                                            )
19                   Plaintiff,             )
                 vs.                        )
20                                          )
            MEDICAL DATA SYSTEMS,           )
21          INC., d/b/a MEDICAL REVENUE     )
            SERVICES, INC.                  )
22                                          )
                 Defendant.                 )
23          _____)

24                  Susan Rankine, Court Reporter
                  Accurate Reporting Service, Inc.
25                        439 Rose Avenue
                      Sebring, Florida 33870
```

1      A.    Not at that time when I was collecting, no.

2      Q.    During your time as a collector when you would

3    telephone a debtor, would you ever ask the debtor what

4    type of vehicle that he owned?

5      A.    No.  I haven't, no.

6      Q.    In your time as a collector did you ever ask a

7    debtor whether he owned a vehicle at all?

8      A.    No.

9      Q.    In your time as a collector would you ever ask

10   a debtor how much money he made?

11     A.    No.

12     Q.    In your time as a collector did you ever ask a

13   debtor what type of personal property assets he owned?

14     A.    No.  Not when I was collecting I didn't, no.

15     Q.    If a debtor told you that he was unemployed,

16   would you ask the debtor if he had other sources of

17   income?

18     A.    Yes.

19     Q.    What other types of sources of income might be

20   available?

21     A.    Family, someone that could help.

22     Q.    That's the first thought that popped in your

23   head was family?

24     A.    Yeah.

25     Q.    So if you asked a debtor if he was employed and

Exhibit 8

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF ALABAMA
 2
                                    CERTIFIED   COPY
 3

 4    LETICIA ANDREWS,           ) CASE NO:  1:06-CV-729
                                 )
 5          Plaintiff,           )
         vs.                     )
 6                               )
      MEDICAL DATA SYSTEMS,      )
 7    INC., d/b/a MEDICAL REVENUE)
      SERVICES, INC.             )
 8                               )
            Defendant.           )
 9    _____)
      CYNTHIA F. TONEY, a/k/a    )
10    CYNTHIA F. PASSMORE,       ) CASE NO:  2:06-CV-949
                                 )
11          Plaintiff,           )
         vs.                     )
12                               )
      MEDICAL DATA SYSTEMS,      )
13    INC., d/b/a MEDICAL REVENUE)
      SERVICES, INC.             )
14                               )
            Defendant.           )
15    _____)

16

                       DEPOSITION OF
17                 _____

18                     SHAWN SMITH
                   _____
19

20          Taken on Behalf of the Plaintiffs

21

         DATE TAKEN:        April 6, 2007
22       TIME:              10:20 AM - 11:05 AM
         PLACE:             Inn on the Lakes Hotel
23                          3100 Golfview Road
                            Sebring, Florida 33875
24

25
```

2

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
                MIDDLE DISTRICT OF ALABAMA
 2

 3   TRICIA VAUGHN,              ) A.P. #: 06-1192
                                 )
 4          Plaintiff,           )
         vs.                     )
 5                               )
     MEDICAL DATA SYSTEMS,       )
 6   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.              )
 7                               )
            Defendant.           )
 8   _____)
     LERINDA EVANS,              ) A.P. #: 06-1196
 9                               )
            Plaintiff,           )
10       vs.                     )
                                 )
11   MEDICAL DATA SYSTEMS,       )
     INC., d/b/a MEDICAL REVENUE )
12   SERVICES, INC.              )
                                 )
13          Defendant.           )
     _____)
14   SHNEQUA BONE,               ) A.P. #: 06-1206
                                 )
15          Plaintiff,           )
         vs.                     )
16                               )
     MEDICAL DATA SYSTEMS,       )
17   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.              )
18                               )
            Defendant.           )
19   _____)
     JERRY BROADWAY,             ) A.P. #: 06-1085
20                               )
            Plaintiff,           )
21       vs.                     )
                                 )
22   MEDICAL DATA SYSTEMS,       )
     INC., d/b/a MEDICAL REVENUE )
23   SERVICES, INC.              )
                                 )
24          Defendant.           )
     _____)
25
```

3

| | | |
|---|---|---|
| 1 | ROY BOSWELL, | ) A.P. #: 06-1088 |
| 2 | | ) |
| | Plaintiff, | ) |
| 3 | vs. | ) |
| | | ) |
| 4 | MEDICAL DATA SYSTEMS, | ) |
| | INC., d/b/a MEDICAL REVENUE | ) |
| 5 | SERVICES, INC. | ) |
| | | ) |
| 6 | Defendant. | ) |
| | _____ | ) |
| 7 | MATTHEW ELLSWORTH, | ) A.P. #: 06-1089 |
| | | ) |
| 8 | Plaintiff, | ) |
| | vs. | ) |
| 9 | | ) |
| | MEDICAL DATA SYSTEMS, | ) |
| 10 | INC., d/b/a MEDICAL REVENUE | ) |
| | SERVICES, INC. | ) |
| 11 | | ) |
| | Defendant. | ) |
| 12 | _____ | ) |
| | JOHN DYKES, | ) A.P. #: 06-1094 |
| 13 | | ) |
| | Plaintiff, | ) |
| 14 | vs. | ) |
| | | ) |
| 15 | MEDICAL DATA SYSTEMS, | ) |
| | INC., d/b/a MEDICAL REVENUE | ) |
| 16 | SERVICES, INC. | ) |
| | | ) |
| 17 | Defendant. | ) |
| | _____ | ) |
| 18 | RICHARD B. PARRISH, | ) A.P. #: 06-1163 |
| | | ) |
| 19 | Plaintiff, | ) |
| | vs. | ) |
| 20 | | ) |
| | MEDICAL DATA SYSTEMS, | ) |
| 21 | INC., d/b/a MEDICAL REVENUE | ) |
| | SERVICES, INC. | ) |
| 22 | | ) |
| | Defendant. | ) |
| 23 | _____ | ) |
| 24 | | |
| 25 | | |

4

```
 1
        AARON KELLY,                      ) A.P. #: 06-1164
 2                                        )
              Plaintiff,                  )
 3          vs.                           )
                                          )
 4      MEDICAL DATA SYSTEMS,             )
        INC., d/b/a MEDICAL REVENUE       )
 5      SERVICES, INC.                    )
                                          )
 6           Defendant.                   )
        _____ )
 7      JEFFERY DIXON,                    ) A.P. #: 06-1165
                                          )
 8              Plaintiff,                )
            vs.                           )
 9                                        )
        MEDICAL DATA SYSTEMS,             )
10      INC., d/b/a MEDICAL REVENUE       )
        SERVICES, INC.                    )
11                                        )
             Defendant.                   )
12      _____ )
        SHARON MCCARTER,                  ) A.P. #: 06-1172
13                                        )
              Plaintiff,                  )
14          vs.                           )
                                          )
15      MEDICAL DATA SYSTEMS,             )
        INC., d/b/a MEDICAL REVENUE       )
16      SERVICES, INC.                    )
                                          )
17           Defendant.                   )
        _____ )
18      LORETTA MCCLURE,                  ) A.P. #: 06-1174
                                          )
19              Plaintiff,                )
            vs.                           )
20                                        )
        MEDICAL DATA SYSTEMS,             )
21      INC., d/b/a MEDICAL REVENUE       )
        SERVICES, INC.                    )
22                                        )
             Defendant.                   )
23      _____ )

24              Susan Rankine, Court Reporter
               Accurate Reporting Service, Inc.
25                   439 Rose Avenue
                  Sebring, Florida 33870
```

1    say your primary goal was to get the person to pay

2    money?

3        A.    Yes.

4        Q.    During your collection process were you ever

5    trained to ask about automobiles?

6        A.    No.

7        Q.    During your collection process were you ever

8    trained to ask about real estate?

9        A.    No.

10       Q.    And during your collection process were you

11   ever trained to ask about personal property?

12       A.    No.

13       Q.    During your collection process were you ever

14   trained to ask about checking?

15       A.    Yes.

16       Q.    And when you would ask them about checking what

17   would you ask them?

18       A.    If they have a checking account.

19       Q.    If a debtor told you they had a checking

20   account, what would you then say?

21       A.    Would you like to pay it with a check.

22       Q.    And suppose the debtor said no, what would you

23   ask then?

24       A.    If they could mail in a money order or --

25       Q.    If the debtor said that, "Hey, I don't have a

Exhibit 9

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF ALABAMA
 2
                                   CERTIFIED  COPY
 3

 4   LETICIA ANDREWS,          ) CASE NO:  1:06-CV-729
                               )
 5        Plaintiff,           )
            vs.                )
 6                             )
     MEDICAL DATA SYSTEMS,     )
 7   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.            )
 8                             )
          Defendant.           )
 9   _____)
     CYNTHIA F. TONEY, a/k/a   )
10   CYNTHIA F. PASSMORE,      ) CASE NO:  2:06-CV-949
                               )
11        Plaintiff,           )
            vs.                )
12                             )
     MEDICAL DATA SYSTEMS,     )
13   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.            )
14                             )
          Defendant.           )
15   _____)

16
                      DEPOSITION OF
17                 _____

18                   DENISE BOBELAK
                   _____
19

20           Taken on Behalf of the Plaintiffs

21
          DATE TAKEN:     April 6, 2007
22        TIME:           9:09 AM - 10:06 AM
          PLACE:          Inn on the Lakes Hotel
23                        3100 Golfview Road
                          Sebring, Florida 33875
24

25
```

2

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
              MIDDLE DISTRICT OF ALABAMA
 2

 3   TRICIA VAUGHN,              ) A.P. #: 06-1192
                                 )
 4        Plaintiff,             )
        vs.                      )
 5                               )
     MEDICAL DATA SYSTEMS,       )
 6   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.              )
 7                               )
          Defendant.            )
 8   _____)
     LERINDA EVANS,              ) A.P. #: 06-1196
 9                               )
          Plaintiff,             )
10        vs.                    )
                                 )
11   MEDICAL DATA SYSTEMS,       )
     INC., d/b/a MEDICAL REVENUE )
12   SERVICES, INC.              )
                                 )
13        Defendant.             )
     _____)
14   SHNEQUA BONE,               ) A.P. #: 06-1206
                                 )
15        Plaintiff,             )
        vs.                      )
16                               )
     MEDICAL DATA SYSTEMS,       )
17   INC., d/b/a MEDICAL REVENUE )
     SERVICES, INC.              )
18                               )
          Defendant.             )
19   _____)
     JERRY BROADWAY,             ) A.P. #: 06-1085
20                               )
          Plaintiff,             )
21        vs.                    )
                                 )
22   MEDICAL DATA SYSTEMS,       )
     INC., d/b/a MEDICAL REVENUE )
23   SERVICES, INC.              )
                                 )
24        Defendant.             )
     _____)
25
```

3

```
1
        ROY BOSWELL,                    ) A.P. #: 06-1088
2                                       )
                Plaintiff,              )
3          vs.                          )
                                        )
4       MEDICAL DATA SYSTEMS,           )
        INC., d/b/a MEDICAL REVENUE     )
5       SERVICES, INC.                  )
                                        )
6              Defendant.               )
        _____  )
7       MATTHEW ELLSWORTH,              ) A.P. #: 06-1089
                                        )
8              Plaintiff,               )
           vs.                          )
9                                       )
        MEDICAL DATA SYSTEMS,           )
10      INC., d/b/a MEDICAL REVENUE     )
        SERVICES, INC.                  )
11                                      )
               Defendant.               )
12      _____  )
        JOHN DYKES,                     ) A.P. #: 06-1094
13                                      )
               Plaintiff,               )
14         vs.                          )
                                        )
15      MEDICAL DATA SYSTEMS,           )
        INC., d/b/a MEDICAL REVENUE     )
16      SERVICES, INC.                  )
                                        )
17             Defendant.               )
        _____  )
18      RICHARD B. PARRISH,             ) A.P. #: 06-1163
                                        )
19             Plaintiff,               )
           vs.                          )
20                                      )
        MEDICAL DATA SYSTEMS,           )
21      INC., d/b/a MEDICAL REVENUE     )
        SERVICES, INC.                  )
22                                      )
               Defendant.               )
23      _____  )

24

25
```

4

```
 1
           AARON KELLY,                    ) A.P. #: 06-1164
 2                                         )
                   Plaintiff,              )
 3             vs.                         )
                                           )
 4         MEDICAL DATA SYSTEMS,           )
           INC., d/b/a MEDICAL REVENUE     )
 5         SERVICES, INC.                  )
                                           )
 6             Defendant.                  )
                                           )
           _____)
 7         JEFFERY DIXON,                  ) A.P. #: 06-1165
                                           )
 8                 Plaintiff,              )
               vs.                         )
 9                                         )
           MEDICAL DATA SYSTEMS,           )
10         INC., d/b/a MEDICAL REVENUE     )
           SERVICES, INC.                  )
11                                         )
               Defendant.                  )
12                                         )
           _____)
           SHARON MCCARTER,               ) A.P. #: 06-1172
13                                         )
                   Plaintiff,              )
14             vs.                         )
                                           )
15         MEDICAL DATA SYSTEMS,           )
           INC., d/b/a MEDICAL REVENUE     )
16         SERVICES, INC.                  )
                                           )
17             Defendant.                  )
                                           )
           _____)
18         LORETTA MCCLURE,               ) A.P. #: 06-1174
                                           )
19                 Plaintiff,              )
               vs.                         )
20                                         )
           MEDICAL DATA SYSTEMS,           )
21         INC., d/b/a MEDICAL REVENUE     )
           SERVICES, INC.                  )
22                                         )
               Defendant.                  )
23         _____)

24               Susan Rankine, Court Reporter
               Accurate Reporting Service, Inc.
25                     439 Rose Avenue
                   Sebring, Florida 33870
```

1      Q.   Would you say never?

2      A.   Never.

3      Q.   Okay.  Is that also a no-no?

4      A.   Excuse me?

5      Q.   I said is that also prohibited?

6      A.   Right.  We can't leave anything on the desk.

7      Q.   Any pertinent information that you obtain from

8    a debtor, is it noted in the computer?

9      A.   Yes.

10     Q.   Is there ever information stored anywhere other

11   than in the computer?

12     A.   No.

13     Q.   Like is there a second computer system or a

14   second face sheet?

15     A.   That, I don't have knowledge of.

16     Q.   Okay.

17     A.   But everything gets shredded or noted in the

18   computer.

19     Q.   So if you receive pertinent information from a

20   debtor, is it safe to say that you would enter it into

21   the face sheet -- or enter it into the computer?  Excuse

22   me.

23     A.   Yes.

24     Q.   So, for example, anything the debtor said you

25   would write down in notes?

1    A.    Anything?

2    Q.    Yes.

3         MR. McGILL:  Are you asking if she verbatim

4    types out a conversation?

5         MR. POSTON:  I'm not asking --

6         MR. McGILL:  I think the answer to that

7    question would be no.

8    Q.    I'm not asking you did you verbatim.  I'm

9    saying pertinent information regarding the debtor, is it

10   written down in the notes?

11   A.    It should be.

12   Q.    So any relevant information pertaining to the

13   debtor would be in the notes?

14        MR. McGILL:  I'm going to object to the word

15        "pertinent" because that's something that an

16        individual would determine on an individual basis.

17        What is pertinent to you is not pertinent to her.

18        But, other than that objection, you can answer if

19        you can.

20   A.    Yes.

21   Q.    What information might you not put into the

22   computer?

23   A.    If they discuss their medical --

24   Q.    Problems?

25   A.    -- problem, concern, I can't put that in there.

1        Q.   Do you personally ask the debtor whether she

2    owns an automobile?

3              MR. McGILL:  And these are just general

4         questions in every circumstance --

5         Q.   In your collection --

6              MR. McGILL:  -- or at any point in time in her

7         efforts to collect?

8         Q.   In your collection process with any debtor do

9    you ask them do they own an automobile?

10        A.   When we're qualifying for a payment plan there

11   are questions that we ask to get to a reasonable

12   payment, monthly payment from them.  We're helping them.

13        Q.   During your collection process do you ask

14   whether they own a checking account?

15        A.   When we take a check over the phone, yes.

16        Q.   During your collection process do you ask if

17   they own a savings account?

18        A.   No.

19        Q.   During your collection process do you ever ask

20   the debtor, "What other types of personal property do

21   you own?"

22        A.   No.

23             MR. McGILL:  Again, asking for at any point at

24        all during any possible --

25             MR. POSTON:  During her collection process --

Exhibit 10

Medical Data Systems, Inc. / dba Medical Revenue Services

## Debtor Information Face Sheet

### CAMBRON, JAMES R

| Debtor Name | | Client Code | Client Member | | |
|---|---|---|---|---|---|
| CAMBRON, JAMES R | | 03572 | Flowers Hospital | | |

| Address | P.O. Box, Suite Number, Mailbox Number | Telephone Number |
|---|---|---|
| P BOX 464 | | (334) 598-5411 |

| City, State Zip Code | Current Employer | Employer Telephone |
|---|---|---|
| DALEVILLE, AL 36322-0464 | J And S Enterprise*Vrzn Wrls Disc | |

| Date Of Birth | Social Security | Placement Date | Lift Days | Extension | Status | Letter Assigned | Last Activity |
|---|---|---|---|---|---|---|---|
| 12/01/1947 | 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 | 10/17/2001 | 20 Days | 09/21/2005 | Z | | 01/17/2007 |

Additional Comments
fld ch 7 9/8/05

| Account Nº | Service Date | Placement Date | Account Status | Amount Placed | Total Payments | Total Adjustments | Current Balance | Patient Name |
|---|---|---|---|---|---|---|---|---|
| F9708100109 | 03/22/1997 | 10/15/2001 | | $1,386.55 | $0.00 | $1,386.55 | $0.00 | LEHR, TIMMY J |
| F9708500163 | 03/26/1997 | 10/15/2001 | | $307.68 | $0.00 | $307.68 | $0.00 | LEHR, TIMMY J |
| F0307000545 | 03/13/2003 | 07/02/2004 | | $58.77 | $0.00 | $58.77 | $0.00 | CAMBRON, JAMES R |
| F0402400129 | 01/24/2004 | 04/04/2005 | | $65.85 | $0.00 | $65.85 | $0.00 | CAMBRON, JAMES R |
| F0402500112 | 01/25/2004 | 04/04/2005 | | $55.74 | $0.00 | $55.74 | $0.00 | CAMBRON, JAMES R |
| Total Accounts: | | | | $1,874.59 | $0.00 | $1,874.59 | $0.00 | |

Debtor Notes

| Date | Note | Author |
|---|---|---|
| 11/25/2002 | MAIL RETURN NEW ADDRESS | Toni Neal |
| 11/25/2002 | removing 276 nathan dr zip 36322-6410 | Toni Neal |
| 11/25/2002 | Debtor Lift Days Changed From 22 To 25 | Toni Neal |
| 11/25/2002 | Debtor Extension Re-Assigned To 12/20/2002 | Toni Neal |
| 11/25/2002 | Letter PL3 Sent To Guarantor | System Administrator |
| 07/02/2004 | POSSIBLE NEW ADDRESS: P O Box 464 | System Administrator |
| 07/02/2004 | Po Box 464 | System Administrator |
| 07/02/2004 | Daleville AL 36322-0000 | System Administrator |
| 07/02/2004 | Debtor Status Changed From Z To UL | Medical Data Administrator |
| 07/20/2004 | Left Message At Residence | Louisa Christina Rivera |
| 07/20/2004 | Left Message At Residence | Louisa Christina Rivera |
| 0/2004 | Left Message At Place Of Employment | Louisa Christina Rivera |
| 20/2004 | Letter PL1 Assigned To Debtor | Louisa Christina Rivera |
| 07/20/2004 | Debtor Status Changed From UL To P2 | Louisa Christina Rivera |
| 07/20/2004 | Debtor Extension Re-Assigned To 08/19/2004 | Louisa Christina Rivera |
| 07/21/2004 | Letter PL1 Sent To The Debtor | Letter Manager |
| 04/04/2005 | POSSIBLE NEW ADDRESS: P O Box 464 | System Administrator |
| 04/04/2005 | Po Box 464 | System Administrator |
| 04/04/2005 | Daleville AL 36322-0000 | System Administrator |
| 04/04/2005 | POSSIBLE NEW ADDRESS: P O Box 464 | System Administrator |
| 04/04/2005 | Po Box 464 | System Administrator |
| 04/04/2005 | Daleville AL 36322-0000 | System Administrator |
| 04/04/2005 | Debtor Status Changed From P2 To UL | Medical Data Administrator |
| 04/06/2005 | POSSIBLE NEW ADDRESS: P O Box 464 | System Administrator |
| 04/06/2005 | Po Box 464 | System Administrator |
| 04/06/2005 | Daleville AL 36322-0000 | System Administrator |
| 04/06/2005 | POSSIBLE NEW ADDRESS: P O Box 464 | System Administrator |
| 04/06/2005 | Po Box 464 | System Administrator |
| 04/06/2005 | Daleville AL 36322-0000 | System Administrator |
| 04/14/2005 | Debtor Status Changed From UL To P1 | Emily M Lewis |
| 04/14/2005 | Debtor Extension Re-Assigned To 04/14/2005 | Emily M Lewis |
| 04/14/2005 | Checked Facility For Additional Info | Emily M Lewis |
| 04/14/2005 | Checked Facility For Additional Info | Emily M Lewis |
| 04/14/2005 | Insurance Paid Balance Due By Guarantor | Emily M Lewis |
| 04/14/2005 | Insurance Paid Balance Due By Guarantor | Emily M Lewis |
| 04/19/2005 | Letter PL1 Assigned To Debtor | Barbara Ann Thomas |
| 04/19/2005 | Debtor Status Changed From P1 To P2 | Barbara Ann Thomas |
| 04/19/2005 | Debtor Extension Re-Assigned To 05/19/2005 | Barbara Ann Thomas |

**Medical Data Systems, Inc. / dba Medical Revenue Services**

## Debtor Information Face Sheet

*CAMBRON, JAMES R*

| Date | Description | Name |
|---|---|---|
| 04/19/2005 | Address Changed From P.O.Box 464 Po Box 464 | Barbara Ann Thomas |
| '19/2005 | Daleville, AL 36322-0464 | Barbara Ann Thomas |
| )/2005 | New Address P.O.Box 464 | Barbara Ann Thomas |
| 04/19/2005 | Daleville, AL 36322-0464 | Barbara Ann Thomas |
| 04/19/2005 | Employment Number Disc or nlis vrzn wrls (334) 790-9153 | Barbara Ann Thomas |
| 04/19/2005 | No Answer At Residence mlbx full | Barbara Ann Thomas |
| 04/20/2005 | Letter PL1 Sent To The Debtor | Letter Manager |
| 09/01/2005 | Letter PL2 Assigned To Debtor | Kristin Nicole Gwartney |
| 09/01/2005 | Debtor Status Changed From P2 To P3 | Kristin Nicole Gwartney |
| 09/01/2005 | Debtor Extension Re-Assigned To 09/21/2005 | Kristin Nicole Gwartney |
| 09/01/2005 | No Answer At Residence | Kristin Nicole Gwartney |
| 09/06/2005 | Letter PL2 Sent To The Debtor | Letter Manager |
| 09/21/2005 | Debtor Status Changed From P3 To SU | Daniel F. Dacey |
| 09/21/2005 | Cancellation Request Made On This Account | Daniel F. Dacey |
| 09/21/2005 | Cancellation Request Made On This Account | Daniel F. Dacey |
| 09/21/2005 | Cancellation Request Made On This Account | Daniel F. Dacey |
| 09/21/2005 | Cancellation Request Made On This Account | Daniel F. Dacey |
| 09/21/2005 | Cancellation Request Made On This Account | Daniel F. Dacey |
| 09/21/2005 | Guarantor Bankrupt | Daniel F. Dacey |
| 09/21/2005 | cs#05-11879 ;dtfld9/8/05 ;ch7 ;attnyr gil 188 n foster st ste | Daniel F. Dacey |
| 09/21/2005 | 100 dothan al 36303 334-673-0100 ; | Daniel F. Dacey |
| 09/22/2005 | Debtor Status Changed From SU To Z | Gary C. Rowe |
| 05/19/2006 | Debtor Information Face Sheet Requested | Lisa Flanagan |
| 06/30/2006 | Debtor Information Face Sheet Requested | Helen Perrotta |
| 01/17/2007 | Debtor Information Face Sheet Requested | Helen Perrotta |
| 01/17/2007 | Debtor Information Face Sheet Requested | Helen Perrotta |
| 01/17/2007 | Debtor Information Face Sheet Requested | Helen Perrotta |

**CAMBRON, WENDY L**

| btor Name | | | Client Code | Client Member | | | | |
|---|---|---|---|---|---|---|---|---|
| C**BRON, WENDY L | | | 03572 | Flowers Hospital | | | | |
| **  *9 | | | P.O. Box, Suite Number, Mailbox Number | | | Telephone Number | | |
| PU BOX 464 | | | | | | (334) 598-5411 | | |
| y, State Zip Code | | | Current Employer | | | Employer Telephone | | |
| DALEVILLE, AL 36322-0000 | | | CIA COLLECTIONS | | | (334) 598-5411 | | |
| te Of Birth | Social Security | Placement Date | Lift Days | Extension | Status | Letter Assigned | Last Activity | |
| 05/08/1971 | 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 | 05/02/2005 | | 09/01/2005 | SU | | 12/13/2006 | |

dditional Comments
fid ch 7 9/8/05

| ccount N° | Service Date | Placement Date | Account Status | Amount Placed | Total Payments | Total Adjustments | Current Balance | Patient Name |
|---|---|---|---|---|---|---|---|---|
| 0323900837 | 08/27/2003 | 05/02/2005 | | $175.00 | $0.00 | $175.00 | $0.00 | CAMBRON, WENDY L |
| otal Accounts: | | | | $175.00 | $0.00 | $175.00 | $0.00 | |

ebtor Notes

| | | |
|---|---|---|
| 05/20/2005 | Debtor Status Changed From UL To P1 | Emily M Lewis |
| 05/20/2005 | Debtor Extension Re-Assigned To 05/20/2005 | Emily M Lewis |
| 05/20/2005 | Checked Facility For Additional Info | Emily M Lewis |
| 05/20/2005 | Insurance Paid Balance Due By Guarantor | Emily M Lewis |
| 05/24/2005 | Letter PL1 Assigned To Debtor | Louisa Christina Rivera |
| 05/24/2005 | Debtor Status Changed From P1 To P2 | Louisa Christina Rivera |
| 05/24/2005 | Debtor Extension Re-Assigned To 06/23/2005 | Louisa Christina Rivera |
| 05/24/2005 | No Answer At Residence | Louisa Christina Rivera |
| 05/25/2005 | Letter PL1 Sent To The Debtor | Letter Manager |
| 09/01/2005 | Debtor Status Changed From P2 To NC | Kristin Nicole Gwartney |
| 09/01/2005 | Debtor Extension Re-Assigned To 09/01/2005 | Kristin Nicole Gwartney |
| 09/01/2005 | Residence Number Disc / Wrong# / Nonpub | Kristin Nicole Gwartney |
| 09/21/2005 | Debtor Status Changed From NC To SU | Daniel F. Dacey |
| 09/21/2005 | Cancellation Request Made On This Account | Daniel F. Dacey |
| 09/21/2005 | Guarantor Bankrupt | Daniel F. Dacey |
| ½/2005 | cs#05-11879 ;dtfld9/8/05 ;ch7 ;attnyr gil 188 n foster st ste | Daniel F. Dacey |
| ⸝1/2005 | n100 dothan al 36303 334-673-0100 ; | Daniel F. Dacey |
| 12/13/2006 | Debtor Information Face Sheet Requested | Dave Miller |

**Medical Data Systems, Inc. / dba Medical Revenue Services**
## Debtor Information Face Sheet

**CAMBRON, WENDY R**

| Debtor Name | | | Client Code | Client Member | | |
|---|---|---|---|---|---|---|
| CAMBRON, WENDY R | | | 03590 | Medical Center Enterprise | | |

| Address | | | P.O. Box, Suite Number, Mailbox Number | | Telephone Number | |
|---|---|---|---|---|---|---|
| BOX 464 | | | 276 Nathan Drive | | (334) 598-5411 | |

| City, State Zip Code | | | Current Employer | | Employer Telephone | |
|---|---|---|---|---|---|---|
| DALEVILLE, AL  36322-0000 | | | | | (334) 494-4351 | |

| Date Of Birth | Social Security | Placement Date | Lift Days | Extension | Status | Letter Assigned | Last Activity |
|---|---|---|---|---|---|---|---|
| 05/08/1971 | 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 | 12/15/2006 | | 12/15/2006 | Z | | 01/03/2007 |

**Additional Comments**
FLD CHAP 7 CS# 05-11879 ATNY DAVID G POSTON PH# 334-671-5555

| Account Nº | Service Date | Placement Date | Account Status | Amount Placed | Total Payments | Total Adjustments | Current Balance | Patient Name |
|---|---|---|---|---|---|---|---|---|
| E0810900023 | 04/19/2006 | 12/15/2006 | | $2,349.51 | $0.00 | $0.00 | $2,349.51 | CAMBRON, WENDY R |
| E0808000233 | 03/01/2006 | 12/15/2006 | | $9,728.14 | $0.00 | $0.00 | $9,728.14 | CAMBRON, WENDY R |
| Total Accounts: | | | | $12,077.65 | $0.00 | $0.00 | $12,077.65 | |

**Debtor Notes**

| Date | Note | Author |
|---|---|---|
| 12/15/2006 | Letter PL1 Assigned To Debtor | Medical Data Administrator |
| 12/15/2006 | EMP. PHONE CHANGED FROM: TO:3344944351 | Medical Data Administrator |
| 12/19/2006 | Letter PL1 Sent To The Debtor | Letter Manager |
| 01/03/2007 | Debtor Status Changed From UL To Z | Theresa Turner |
| 01/03/2007 | Charge Status Set to BNK | Theresa Turner |
| 01/03/2007 | Charge Status Set to BNK | Theresa Turner |
| 01/03/2007 | Guarantor Bankrupt | Theresa Turner |
| 01/03/2007 | FLD CHAP 7 CS# 05-11879 ATNY DAVID G POSTON PH# 334-671-5555 | Theresa Turner |

JAN 1 9 2007

Exhibit 11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**WILLIAM C. CARN, III,**
**CHAPTER 7 TRUSTEE,**

        **Plaintiff,**

v.

**MEDICAL DATA SYSTEMS, INC.,**

        **Defendant.**

**CASE NO. 1:07-CV-00369-WHA**

### NOTICE OF APPEAL

Notice is hereby given that Defendant MEDICAL DATA SYSTEMS, INC.,
hereby appeals to the United States Court of Appeals for the Eleventh Circuit, pursuant to
28 U.S.C. § 1291, from the Order entered by this Court on December 4, 2007 overruling
Defendant's Objections to the Proposed Report and Recommendation of the Bankruptcy
Court.

Respectfully submitted this _14_ day of December, 2007.

                              James C. Huckaby, Jr.
                              J. Kirkman Garrett

                              *Local Counsel for*
                              *Medical Data Systems, Inc.*

                              CHRISTIAN & SMALL LLP
                              505 North 20th Street
                              Suite 1800
                              Birmingham, AL 35203
                              Tel. (205) 795-6588
                              Fax (205) 328-7234

John G. Parker
(Admitted *pro hac vice*)
Georgia Bar No. 562425
Donald H. Crawford II
(Admitted *pro hac vice*)
Georgia Bar No. 141753
Stefanie Jackman
(Admitted *pro hac vice*)
Georgia Bar No. 335652

*Counsel for Medical Data Systems, Inc.*

Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
(Tel.) 404-815-2400
(Fax) 404-815-2424

## CERTIFICATE OF SERVICE

I hereby certify that on this $\underline{14}$ day of December, 2007, I electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Michael D. Brock, Esq.
Cary Wyatt Stout, Esq.
Walter Allen Blakeney, Esq.
David Gerald Poston, Esq.
BROCK & STOUT
PO Drawer 311167
Enterprise, AL 36331-1167

.

_____
OF COUNSEL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **WILLIAM C. CARN, III,** **CHAPTER 7 TRUSTEE,** | |
| **Plaintiff,** | **CASE NO. 1:07-CV-00370-WHA** |
| **v.** | |
| **MEDICAL DATA SYSTEMS, INC.,** | |
| **Defendant.** | |

## NOTICE OF APPEAL

Notice is hereby given that Defendant MEDICAL DATA SYSTEMS, INC.,
hereby appeals to the United States Court of Appeals for the Eleventh Circuit, pursuant to
28 U.S.C. § 1291, from the Order entered by this Court on December 4, 2007 overruling
Defendant's Objections to the Proposed Report and Recommendation of the Bankruptcy
Court.

Respectfully submitted this _14_ day of December, 2007.

James C. Huckaby, Jr.
J. Kirkman Garrett

*Local Counsel for*
*Medical Data Systems, Inc.*

CHRISTIAN & SMALL LLP
505 North 20th Street
Suite 1800
Birmingham, AL 35203
Tel. (205) 795-6588
Fax (205) 328-7234

John G. Parker
(Admitted *pro hac vice*)
Georgia Bar No. 562425
Donald H. Crawford II
(Admitted *pro hac vice*)
Georgia Bar No. 141753
Stefanie Jackman
(Admitted *pro hac vice*)
Georgia Bar No. 335652

*Counsel for Medical Data Systems, Inc.*

Paul, Hastings, Janofsky & Walker, LLP
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
(Tel.) 404-815-2400
(Fax) 404-815-2424

## CERTIFICATE OF SERVICE

I hereby certify that on this _14_ day of December, 2007, I electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Michael D. Brock, Esq.
Cary Wyatt Stout, Esq.
Walter Allen Blakeney, Esq.
David Gerald Poston, Esq.
BROCK & STOUT
PO Drawer 311167
Enterprise, AL 36331-1167

OF COUNSEL

Exhibit 12

Debra P. Hackett
Clerk, U.S. District Court
15 LEE ST STE 206
MONTGOMERY  AL  36104-4055


_____ December 21, 2007 _____

**Appeal Number: 07-15882-A**
Case Style: William C. Carn, III v. Medical Data Systems, Inc.
District Court Number:  07-00370 CV-A-S

TO:   James C. Huckaby, Jr.

CC:   Debra P. Hackett

CC:   J. Kirkman Garrett

CC:   John G. Parker

CC:   Stefanie Helen Jackman

CC:   Russel A. McGill

CC:   David G. Poston

CC:   Gary Wyatt Stout

CC:   Administrative File

# United States Court of Appeals

Eleventh Circuit

56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Thomas K. Kahn
Clerk

For rules and forms visit
www.ca11.uscourts.gov

December 21, 2007

James C. Huckaby, Jr.
Christian & Small LLP
505 20TH ST N STE 1800
BIRMINGHAM AL 35203-4633

**Appeal Number: 07-15882-A**
Case Style: William C. Carn, III v. Medical Data Systems, Inc.
District Court Number: 07-00370 CV-A-S

**THE COURT HAS IMPLEMENTED A PROGRAM IN THIS DISTRICT REQUIRING PARTIES IN THIS APPEAL TO FILE EXPANDED RECORD EXCERPTS. PLEASE READ THE ENCLOSED INSTRUCTIONS FOR PREPARING EXPANDED RECORD EXCERPTS. THE ADDITIONAL REQUIREMENTS OF THE PROGRAM ARE MANDATORY AND NOT OPTIONAL.**

**THIS CIVIL APPEAL IS GOVERNED BY <u>MORE STRINGENT</u> PROCEDURES FOR REQUESTING EXTENSIONS OF TIME TO FILE BRIEFS AND RECORD EXCERPTS. RULES PROVIDE FOR <u>DISMISSAL WITHOUT FURTHER NOTICE</u> WHEN A BRIEF OR RECORD EXCERPTS IS NOT FILED OR CORRECTED WITHIN THE TIME PERMITTED. PLEASE SEE THE CIRCUIT RULES AT <u>WWW.CA11.USCOURTS.GOV.</u>**

The referenced case was docketed in this court on December 20, 2007. Please use the appellate docket number noted above when making inquiries. An appeal may be dismissed for failure to comply with the Federal Rules of Appellate Procedure and the rules of this court. Motions for extensions of time to file a brief are frowned upon by the court.

Pursuant to 11th Cir. R. 12-1, the record in this appeal was deemed completed and filed on the date the appeal was docketed in this court. Eleventh Circuit Rule 31-1 requires that APPELLANT'S BRIEF AND RECORD EXCERPTS BE SERVED AND FILED WITHIN FORTY (40) DAYS FROM THE DATE THE APPEAL WAS DOCKETED IN THIS COURT. This is the only notice you will receive concerning the due date for filing briefs and record excerpts. (In cross-appeals pursuant to Fed.R.App.P. 28(h), the party who first files a notice of appeal is the appellant unless the parties otherwise agree.) <u>See</u> Fed.R.App.P. 28, 30, 31 and 32, and the corresponding circuit rules, for further information on preparing briefs and record excerpts.

In addition to providing the required number of paper copies of briefs, all parties (except pro se parties) are required, additionally, to provide briefs in electronic format as described in 11th Cir. R. 31-5 and the enclosed instructions. Electronic briefs must be in Adobe Acrobat® PDF file format. The electronic brief must be completely contained in one PDF file, i.e., cover page through and including the certificate of service. The address wrapper accompanying this letter contains counsel's individual identification number (EDF ID) for electronic brief uploading. When uploading a brief for the first time, you will be prompted to register and create a password known only to you for all future uploads.

We have not yet received the Certificate of Interested Persons and Corporate Disclosure Statement (CIP) required by FRAP 26.1 and the accompanying circuit rules. The rules provide that the

certificate must be filed by every appellant [and cross-appellant] with this court within 10 days
after the appeal is docketed in this court, or along with the filing in this court by any party of
any motion, petition, or pleading, whichever occurs first. The rules further provide that on
the same day a paper certificate is served, the party filing it must also complete the court's
web-based certificate at the "Electronic Filing" link of the court's website, www.ca11.uscourts.gov,
by electronically providing the information required for that form. Only the ticker symbols for
publicly traded corporations that are listed on the paper CIP must be entered in the web-based
system. If your CIP does not include any publicly traded corporations, you are required to go to
the website and simply click the button indicating that you have no publicly traded corporations
to report. Pro se parties are not required or authorized to complete the web-based certificate.

You are hereby notified that the clerk is not authorized to submit to the court any brief (except
for the reply brief of an appellant or cross-appellant), petition, answer, motion or response that
does not contain the certificate, but may receive and retain the papers pending supplementation of
the papers with the required certificate. You are also hereby notified that failure to submit the
required certificate will result in your document(s) being returned unfiled which may ultimately
result in dismissal of your appeal.

Attorneys who wish to participate in this appeal must be properly admitted either to the bar of
this court or for this particular proceeding pursuant to 11th Cir. R. 46-1, et seq. An attorney not yet
properly admitted must file an appropriate application for admission within fourteen (14) days
from this date. In addition, all attorneys who wish to participate in this appeal must complete
and return an appearance form within fourteen (14) days from this date. Application forms and
appearance forms are available on the Internet at www.ca11.uscourts.gov. The clerk may not
accept motions or other filings from an attorney until that attorney files an appearance form.
See 11th Cir. R. 46-5.

11th Cir. R. 33-1(a)(1) requires appellant to file "with the clerk of the court of appeals, with
service on all other parties, an original and one copy of a completed Civil Appeal Statement
within 10 days after filing the notice of appeal in the district court." Civil Appeal Statement
forms are available on the Internet at www.ca11.uscourts.gov and as provided by 11th Cir. R.
33-1(a)(4).

MEDIATION. If a Civil Appeal Statement is required to be filed, your appeal and all
related matters will be considered for mediation by the Kinnard Mediation Center. The
mediation services are free and the mediation process is confidential. You may
confidentially request mediation by calling the Kinnard Mediation Center at 404-335-6260
(Atlanta) or 813-301-5530 (Tampa) or 305-714-1900 (Miami). See 11th Cir. R. 33-1.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Deborah Owens (404) 335-6180

DKT-7-CIV (10-2007)

## Baty, Sarah

**From:** efile_notice@almd.uscourts.gov
**Sent:** Friday, December 21, 2007 11:25 AM
**To:** almd_mailout@almd.uscourts.gov
**Subject:** Activity in Case 1:07-cv-00369-WHA Carn v. Medical Data Systems, Inc. USCA Case Number

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court

### Alabama Middle District

## Notice of Electronic Filing

The following transaction was entered on 12/21/2007 at 10:25 AM CST and filed on 12/21/2007
**Case Name:**      Carn v. Medical Data Systems, Inc.
**Case Number:**      1:07-cv-369
**Filer:**
**WARNING: CASE CLOSED on 12/04/2007**
**Document Number:** 36

**Docket Text:**
USCA Case Number 07-15883-BB for [25] Notice of Appeal filed by Medical Data Systems, Inc. (dmn)

**1:07-cv-369 Notice has been electronically mailed to:**

Walter Allen Blakeney     walter@circlecitylaw.com, christal@circlecitylaw.com, david@circlecitylaw.com

Michael Derek Brock     brockstout@enter.twcbc.com

John Kirkman Garrett     jkgarrett@csattorneys.com

James Cicero Huckaby , Jr     jch@csattorneys.com, jle@csattorneys.com

Stefanie Helen Jackman     stefaniejackman@paulhastings.com, juliarodney@paulhastings.com

Russel A. McGill     rumcgi@sbswlegal.com

John Garrett Parker     johnparker@paulhastings.com, candaceboudreau@paulhastings.com, sarahbaty@paulhastings.com

David Gerald Poston     david@circlecitylaw.com, christal@circlecitylaw.com,

12/21/2007

walter@circlecitylaw.com

Gary Wyatt Stout    brockstout@enter.twcbc.com, lesley@circlecitylaw.com

**1:07-cv-369 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=12/21/2007] [FileNumber=851296-0
] [07a60dcaa73ec0857cbdf0ff51b61dec987f753534b2d68af09fda2e238b6a2d0bb
9f7d2c14ae6a3e9fd4ddaba69538326f19897100081c434ce5f7f462feee5]]

Debra P. Hackett
Clerk, U.S. District Court
15 LEE ST STE 206
MONTGOMERY  AL  36104-4055

_____ December 21, 2007 _____

**Appeal Number: 07-15883-BB**
Case Style: William C. Carn, III v. Medical Data Systems
District Court Number:  07-00369 CV-A-S

TO:    James C. Huckaby, Jr.

CC:   Debra P. Hackett

CC:   J. Kirkman Garrett

CC:   John G. Parker

CC:   Stefanie Helen Jackman

CC:   Russel A. McGill

CC:   David G. Poston

CC:   Gary Wyatt Stout

CC:   Michael D. Brock

CC:   Administrative File

# United States Court of Appeals

Eleventh Circuit

56 Forsyth Street, N.W.

Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

December 21, 2007

James C. Huckaby, Jr.
Christian & Small LLP
505 20TH ST N STE 1800
BIRMINGHAM AL 35203-4633

**Appeal Number: 07-15883-BB**
Case Style: William C. Carn, III v. Medical Data Systems
District Court Number: 07-00369 CV-A-S

**THIS CIVIL APPEAL IS GOVERNED BY <u>MORE STRINGENT</u> PROCEDURES FOR REQUESTING EXTENSIONS OF TIME TO FILE BRIEFS AND RECORD EXCERPTS. RULES PROVIDE FOR <u>DISMISSAL WITHOUT FURTHER NOTICE</u> WHEN A BRIEF OR RECORD EXCERPTS IS NOT FILED OR CORRECTED WITHIN THE TIME PERMITTED. PLEASE SEE THE CIRCUIT RULES AT <u>WWW.CA11.USCOURTS.GOV</u>.**

The referenced case was docketed in this court on December 20, 2007. Please use the appellate docket number noted above when making inquiries. An appeal may be dismissed for failure to comply with the Federal Rules of Appellate Procedure and the rules of this court. Motions for extensions of time to file a brief are frowned upon by the court.

Pursuant to 11th Cir. R. 12-1, the record in this appeal was deemed completed and filed on the date the appeal was docketed in this court. Eleventh Circuit Rule 31-1 requires that APPELLANT'S BRIEF AND RECORD EXCERPTS BE SERVED AND FILED WITHIN FORTY (40) DAYS FROM THE DATE THE APPEAL WAS DOCKETED IN THIS COURT. This is the only notice you will receive concerning the due date for filing briefs and record excerpts. (In cross-appeals pursuant to Fed.R.App.P. 28(h), the party who first files a notice of appeal is the appellant unless the parties otherwise agree.) <u>See</u> Fed.R.App.P. 28, 30, 31 and 32, and the corresponding circuit rules, for further information on preparing briefs and record excerpts.

In addition to providing the required number of paper copies of briefs, all parties (except pro se parties) are required, additionally, to provide briefs in electronic format as described in 11th Cir. R. 31-5 and the enclosed instructions. Electronic briefs must be in Adobe Acrobat® PDF file format. The electronic brief must be completely contained in one PDF file, i.e., cover page through and including the certificate of service. The address wrapper accompanying this letter contains counsel's individual identification number (EDF ID) for electronic brief uploading. When uploading a brief for the first time, you will be prompted to register and create a password known only by you for all future uploads.

We have not yet received the Certificate of Interested Persons and Corporate Disclosure Statement (CIP) required by FRAP 26.1 and the accompanying circuit rules. The rules provide that the certificate must be filed by every appellant [and cross-appellant] with this court within 10 days after the appeal is docketed in this court, or along with the filing in this court by any party of any motion, petition, or pleading, whichever occurs first. The rules further provide that on the same day a paper certificate is served, the party filing it must also complete the court's web-based certificate at the "Electronic Filing" link of the court's website, www.ca11.uscourts.gov, by electronically providing the information required for that form. <u>Only</u> the ticker symbols for publicly traded corporations that are listed on the paper CIP must be entered in the web-based

system. If your CIP does not include any publicly traded corporations, you are required to go to the website and simply click the button indicating that you have no publicly traded corporations to report. Pro se parties are not required or authorized to complete the web-based certificate.

You are hereby notified that the clerk is not authorized to submit to the court any brief (except for the reply brief of an appellant or cross-appellant), petition, answer, motion or response that does not contain the certificate, but may receive and retain the papers pending supplementation of the papers with the required certificate. You are also hereby notified that failure to submit the required certificate will result in your document(s) being returned unfiled which may ultimately result in dismissal of your appeal.

Attorneys who wish to participate in this appeal must be properly admitted either to the bar of this court or for this particular proceeding pursuant to 11th Cir. R. 46-1, et seq. An attorney not yet properly admitted must file an appropriate application for admission within fourteen (14) days from this date. In addition, all attorneys who wish to participate in this appeal must complete and return an appearance form within fourteen (14) days from this date. Application forms and appearance forms are available on the Internet at www.ca11.uscourts.gov. The clerk may not accept motions or other filings from an attorney until that attorney files an appearance form. See 11th Cir. R. 46-5.

11th Cir. R. 33-1(a)(1) requires appellant to file "with the clerk of the court of appeals, with service on all other parties, an original and one copy of a completed Civil Appeal Statement within 10 days after filing the notice of appeal in the district court." Civil Appeal Statement forms are available on the Internet at www.ca11.uscourts.gov and as provided by 11th Cir. R. 33-1(a)(4).

MEDIATION. If a Civil Appeal Statement is required to be filed, your appeal and all related matters will be considered for mediation by the Kinnard Mediation Center. The mediation services are free and the mediation process is confidential. You may confidentially request mediation by calling the Kinnard Mediation Center at 404-335-6260 (Atlanta) or 813-301-5530 (Tampa) or 305-714-1900 (Miami). See 11th Cir. R. 33-1.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Jan Camp/wl/404-335-6171

DKT-7-CIV (10-2007)

## Baty, Sarah

| | |
|---|---|
| **From:** | efile_notice@almd.uscourts.gov |
| **Sent:** | Thursday, December 20, 2007 5:12 PM |
| **To:** | almd_mailout@almd.uscourts.gov |
| **Subject:** | Activity in Case 1:07-cv-00370-WHA Carn v. Medical Data Systems, Inc. USCA Case Number |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

### U.S. District Court

### Alabama Middle District

## Notice of Electronic Filing

The following transaction was entered on 12/20/2007 at 4:11 PM CST and filed on 12/20/2007
**Case Name:**      Carn v. Medical Data Systems, Inc.
**Case Number:**      1:07-cv-370
**Filer:**
**WARNING: CASE CLOSED on 12/05/2007**
**Document Number:** 34

**Docket Text:**
USCA Case Number 07-15882-A for [23] Notice of Appeal filed by Medical Data Systems, Inc. (dmn)

**1:07-cv-370 Notice has been electronically mailed to:**

Walter Allen Blakeney      walter@circlecitylaw.com, christal@circlecitylaw.com, david@circlecitylaw.com

Michael Derek Brock      brockstout@enter.twcbc.com

John Kirkman Garrett      jkgarrett@csattorneys.com

James Cicero Huckaby , Jr    jch@csattorneys.com, jle@csattorneys.com

Stefanie Helen Jackman     stefaniejackman@paulhastings.com, juliarodney@paulhastings.com

Russel A. McGill     rumcgi@sbswlegal.com

John Garrett Parker     johnparker@paulhastings.com, candaceboudreau@paulhastings.com, sarahbaty@paulhastings.com

David Gerald Poston     david@circlecitylaw.com, christal@circlecitylaw.com,

walter@circlecitylaw.com

Gary Wyatt Stout    brockstout@enter.twcbc.com, lesley@circlecitylaw.com

**1:07-cv-370 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1053018227 [Date=12/20/2007] [FileNumber=850813-0
] [7042751e15f97c388ea27b3c7168f5180f5bd229b511acbfbf84e03ed6aee1cdb9e
ac7aba60b3444b0291cc1ab6349b2a63c51470fc79b9815ff37fbdd95746f]]